459 F.Supp. 1020 (1978)
UNITED STATES of America et al., Plaintiffs,
v.
STATE of WASHINGTON et al., Defendants.
Civ. No. 9213Phase I.
United States District Court, W. D. Washington.
Through June 30, 1978.
*1021 *1022 *1023 *1024 *1025 Stan Pitkin, U. S. Atty., J. Ronald Sim, James C. Waldo, Harry J. McCarthy, Asst. U. S. Attys., Seattle, Wash., George D. Dysart, Sp. Asst. U. S. Atty., Portland, Or., for United States.
Alvin J. Ziontz, Mason D. Morisset, Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., for Quileute, Makah and Lummi Tribes.
Alan C. Stay, Thomas P. Schlosser, John H. Sennhauser, Evergreen Legal Services, Seattle, Wash., for Sauk-Suiattle, Samish, Snohomish, Steilacoom, Stillaguamish, Nooksack, Suquamish, Nisqually, Muckleshoot, Squaxin Island, Skokomish, Lower Elwha, Snoqualmie and Upper Skagit Tribes.
Lewis A. Bell, Bell, Ingram & Rice, Everett, Wash., for Tulalip Tribes.
Michael Taylor, Tahola, Wash., for Quinault Tribe.
John Clinebell, Tacoma, Wash., William H. Rodgers, Jr., Washington, D. C., for Puyallup Tribe.
Harwood Bannister, Bannister, Bruhn & Cunningham, Mt. Vernon, Wash., for Swinomish Tribe.
Slade Gorton, Atty. Gen., James M. Johnson, Sr. Asst. Atty. Gen., Dennis Reynolds, Asst. Atty. Gen., Olympia, Wash., for defendant State of Washington.
COMPILATION OF MAJOR POST-TRIAL SUBSTANTIVE ORDERS (Through June 30, 1978).

*1026
 TABLE OF CONTENTS
ORDER PAGE
Decision, Injunction and Order Re State Court Injunctions Preventing
Enforcement of Certain Department of Fisheries Regulations (9/12/74) 1028
Order for Program to Implement Interim Plan (10/8/74, 11/21/74,
8/6/75 and 4/5/76) 1035
Order Directing Prompt Notice to Fisheries Technical Adviser When
Fishery Problems Arise (11/20/74) 1038
Decision re Quinault Fishery Outside the Case Area (11/22/74) 1038
Decisions Re Status of Additional Tribes. First and Second Supplemental
Findings of Fact (12/31/74; 2/26/75) 1039
First and Second Supplemental Conclusions of Law (12/31/74;
2/26/75) 1041
Preliminary Injunction and Memorandum Decision re Green River
Steelhead Fisheries (1/14 and 1/20/75) 1042
Memorandum Decision and Orders re Nisqually River Fisheries (2/14
and 2/26/75) 1047
Orders re Herring Fisheries and Determination of Usual and Accustomed
Fishing Places of Additional Tribes (3/28 and 4/18/75) 1048
Decision and Decree Re 1975 Fraser River Sockeye and Pink Salmon
Harvest (Fourth Supplemental Findings of Fact and Conclusions of
Law) (7/16/75 modified and supplemented 8/6/75) 1050
Permanent Injunction re 1975 Fraser River Sockeye and Pink Salmon
Harvest (7/16/75 as amended 7/30/75) 1055
Injunction Staying Proceedings re 1975 IPFSC Fisheries in Cause No.
52881 Before Superior Court for Thurston County, State of Washington;
and Denial of Defendants' Motions (8/6/75) 1056
Preliminary Injunction Re Swinomish Indian Tribal Community Chinook
Fishery in West Beach Area (8/8/75 as corrected 8/18/75) 1056
Order re Conditional Fishing Rights of Certain Plaintiff-Intervenor
Tribes (8/14/75) 1057
Order re Tulalip Tribes' Usual and Accustomed Fishing Places
(9/10/75 as amended 10/15 and 12/29/75) 1058
Stipulation re Notice of Regulations (10/15/75) 1060
Decision re Certain On-reservation Fisheries of Puyallup and Nisqually
Tribes (10/21/75) 1060
Orders Establishing Fisheries Advisory Board and Prescribing Procedures
for State Emergency Regulations (10/28/75 as amended and supplemented
12/17/76) 1061
Order for Interim Plan for Management of Herring Fisheries
(2/13/76) 1063
Order re Makah Tribe's Request for Reconsideration of Lower Elwha
Usual and Accustomed Fishing Places (3/10/76) 1066
Order re Tulalip Tribes' Objection to Stillaguamish Fishing Regulations
(3/10/76) 1068

*1027
 TABLE OF CONTENTS
ORDER PAGE
Order on Certain Questions re: Salmon Fisheries Management
(4/13/76) 1069
Memorandum Decision and Order Granting Preliminary Injunction re
Hatchery Propagated Fish (8/13/76) 1072
Order Granting Preliminary Injunction re Hatchery-Propagated Fish
(8/13/76) 1085
Order on Certain Questions re Steelhead Management (9/14/76 as extended
1/10/78) 1085
Order re Compliance with State Permit Requirements for Fisheries
Research or Release of Fish (9/15/76) 1089
Order Re: State "Buy-Back" Program (12/22/76) 1089
Memorandum Decision Denying Disqualification (5/2/77) 1093
Memorandum Order and Preliminary Injunction Re: Inclusion of
Grays Harbor in the Case Area (8/31/77) 1097
Memorandum Order and Preliminary Injunction Re: Allocation of
1977 Salmon Runs and Other Matters (8/31/77 as supplemented
9/28/77) 1097
Preliminary Injunction Staying State Court Injunction and Order
Implementing Preliminary Injunction (8/31/77) 1104
Memorandum Adopting Salmon Management Plan (8/31/77 as amended
10/11/78) 1107
Findings of Fact, Conclusions of Law and Preliminary Injunction Re:
Enforcement of 1977 Fisheries Orders (9/27/77) 1113
Preliminary Injunction Staying Thurston County Superior Court
(10/17/77) 1117
Order Adopting Steelhead Management Plan (1/31/78 as modified
4/21/78 and 10/11/78) 1118
Order Re: 1978 Sac Roe Herring Fishery (4/14/78 as supplemented
5/2/78) 1120
Order, Findings of Fact, Conclusions of Law and Preliminary Injunction
Re: Enforcement of Limitations on Nontreaty Salmon Fisheries
for 1978 and Subsequent Seasons (6/6/78 as amended 6/15/78) 1125

COMPILATION OF MAJOR POST-TRIAL SUBSTANTIVE ORDERS

(Through June 30, 1978)
BOLDT, District Judge.
The initial decision of the court dated February 12, 1974, (hereinafter Final Decision # 1) and related rulings and decree of March 22, 1974, in this case are set forth at 384 F.Supp. 312 (aff'd 520 F.2d 676 (9th Cir. 1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97, rehearing denied 424 U.S. 978, 96 S.Ct. 1487, 47 L.Ed.2d 750 (1976)). Under the court's retention of continuing jurisdiction, subsequent decisions and orders of a substantive nature rendered through June 30, 1978, are set forth or summarized below. All summarizations or editing herein of the provisions as entered, are by the court.[1]
*1028 Subsequent to Final Decision # 1 herein, the following parties were allowed to intervene as additional plaintiffs: Duwamish, Jamestown Band Clallam, Lower Elwha Band Clallam, Nooksack, Port Gamble Band Clallam, Samish, Snohomish, Snoqualmie, Steilacoom, Suquamish, Swinomish, Aboriginal Swinomish and Tulalip Tribes. The Nisqually and Puyallup Tribes which had only been represented by the United States, were allowed to intervene on their own behalf. Applications to intervene as additional defendants by the Northwest Steelheaders' Council of Trout Unlimited, Gary Ellis its president, Purse Seine Vessel Owners Association and Washington State Commercial Passenger Fishing Vessel Association were denied.
By separate order the court appointed United States Magistrate Robert E. Cooper as Master and Dr. Richard R. Whitney[2] as fisheries science and management advisor to assist the court. A Fisheries Advisory Board was established as set forth, infra.

DECISION, INJUNCTION AND ORDER RE STATE COURT INJUNCTIONS PREVENTING ENFORCEMENT OF CERTAIN DEPARTMENT OF FISHERIES REGULATIONS

(September 12, 1974)
Paragraph 5 of the Interim Plan and Stay Order entered by this court on March 22, 1974 (384 F.Supp. at 420), obligates defendants State of Washington, Washington Department of Game and its Director and Washington Department of Fisheries and its Director, (hereinafter "defendants") to make significant reductions in the non-Indian fishery as deemed necessary to achieve the objectives of the court's definition of Indian treaty fishing rights. In carrying out this order the court anticipated that defendants would promulgate and enforce regulations reducing the non-Indian fishery. Defendants have promulgated certain regulations establishing reductions in the non-Indian fishery but have been unable to enforce them by reason of certain directives and orders of the Thurston County Superior Court in Washington State Commercial Passenger Fishing Vessel Association v. Tollefson, No. 50380, Washington Kelpers Association v. Tollefson, No. 50552 and Puget Sound Gillnetters Association v. Tollefson, No. 50757.
No additional or alternative regulations have been proposed by defendants. Therefore, it now appears that in order to effectuate the prior orders of this court and to preserve this court's jurisdiction over the subject matter, further orders of this court are necessary to clarify the scope of the court's jurisdiction and of the duties imposed upon defendants under Final Decision # 1.
The principal questions presented by plaintiffs' request are whether this court is empowered to protect its earlier rulings from incursions such as have taken place in the three state court proceedings referred to above and, if such jurisdiction exists, whether this court in its discretion should exercise said authority, and if so, in what form. This court fully adopts the legal arguments recited in Exhibit "A" attached to this order[3] as though fully set forth herein and refers particularly to the following *1029 *1030 *1031 cases cited therein: Atlantic Coast Line; Thomason; Shelton; Donelon; Leiter Minerals; Alonzo v. U. S.; U. S. v. Wood. Based upon the legal arguments and decisions referred to immediately above, this court is not only satisfied that it has jurisdiction to enjoin the state court proceedings referred to, within the express exceptions to the anti-injunction statute, 28 U.S.C. § 2283, but also believes it has an urgent duty to take such action to the extent shown necessary in order to effectuate its judgment and protect the federal treaty rights declared therein.
*1032 It is clear beyond reasonable question that the three state court injunctions referred to above have to some extent prevented defendants from complying with this court's order to make "significant reductions" in the non-Indian fishery in order to make available to treaty-right fishermen a sufficient portion of the harvestable resource to guarantee an opportunity for them to harvest 50% of said resource. Interference with the exercise of Indian treaty fishing rights indisputably is within the jurisdiction of this federal court, and state court proceedings instituted by nonparties to this lawsuit cannot be allowed to frustrate either final determinations based on exhaustive research and evidence or the jurisdiction of this federal court.
Data submitted by the United States Fish and Wildlife Service, which includes Department of Fisheries statistics, indicate that through August 1974, with the exception of the Nisqually River chum harvest in January which, for management purposes would be considered part of the 1973 run, Indian fishermen in the case area in 1974 have caught less salmon of each species than they caught in 1973, both in terms of total numbers of fish caught and in terms of the percentages of Indian harvest as contrasted with total non-Indian commercial salmon, or 3.5% of the total as compared with 3,404,710 salmon harvested by non-Indian commercial interests; through August of 1974, Indians have harvested 89,402 salmon or 2.4% of the total as compared with 3,628,513 salmon harvested by non-Indian commercial fishermen; when the sport catch through August of 1974 of 837,099 salmon is included, the Indian share of the total harvest is 2.0%.
These figures illustrate in the most startling manner the gross inequities between Indian and non-Indian harvest, and the complete failure and inability of defendants to comply with this court's orders to make significant reductions in non-Indian fishing and to afford to Indians an opportunity to catch approximately 50% of the harvestable resource at their usual and accustomed grounds and stations. Because by their nature substantial fish resources will be lost for 1974 to plaintiff tribes if not harvested during the currently ongoing seasons, the immediate threat of substantial economic harm and serious hardship to many treaty-right fishermen convinces this court that prompt action is required to protect federal treaty rights that this court has found are constitutionally guaranteed as the law of the land and to assure the viability of this court's Final Decision # 1, unless and until it be modified or reversed.
In all court litigation in which the United States has an interest, including cases involving the interpretation and application of treaties duly enacted as required by federal law and the national Constitution, the Attorney General of the United States, acting through the Justice Department and United States Attorneys, is the official authorized to speak and act for the people of the Nation in such matters. In this instance, the United States Attorney, presumptively in the national interest, has requested that this court enjoin enforcement of the injunctions issued in all three of the above-referred to state court proceedings. Plaintiff tribes, as descendants of signatories to treaties with the United States, have joined in that request.
Rather than consider the state court proceedings in toto, upon the record now presented this court finds it necessary to consider the injunctions separately and therefore will discuss each of them in the order of issuance. It must be recognized, however, that each of the three state court proceedings was instituted by litigants none of whom was a party to this federal court action. Additionally, none of those state court proceedings joined the United States or the plaintiff tribes, the real parties in interest who could be, if not irreparably, at a minimum grievously, injured by state court injunctions preventing enforcement of the Department of Fisheries regulations promulgated for the express purpose of making more fish available to treaty-right fishermen. Finally, at none of the state court hearings were witnesses interrogated nor was any of the hearings a full scale evidentiary hearing; only affidavits of the *1033 litigants were presented, not subject to cross-examination, and the state court judges could only act upon the materials presented to them.
Beyond question, the state court judges who issued the restraining orders involved herein performed their judicial functions in accordance with established law and practice in the state courts, and in an able and responsible manner beyond criticism in any particular whatever. However, it is clear from the cited authorities that the circumstances above recited can and should be considered by this court together with the full record before it, significant portions of which were not available to the state courts, in determining what action, if any, to take with regard to these state court proceedings.
(1) In Commercial Passenger Fishing Vessel Assoc. v. Tollefson, supra, plaintiffs herein obtained a temporary injunction preventing enforcement of a Department of Fisheries regulation reducing the personal use salmon angling daily bag limit in Washington coastal waters and the Strait of Juan de Fuca from three salmon to two salmon. Upon the evidence before it, this court finds that plaintiffs herein have not sustained their burden of showing that enforcement of that regulation reducing the daily salmon sport bag limit would achieve the purpose of making a significant number of additional fish available for harvest by treaty-right fishermen. For these reasons, this court finds no reason to interfere with the state court temporary injunction currently in effect in Cause No. 50370.
(2) In Washington Kelpers Association v. Tollefson, supra, plaintiffs therein succeeded in temporarily enjoining enforcement of a Department of Fisheries regulation which effectively closed commercial trolling for salmon within the three-mile limit under state jurisdiction. Evidence in the record before this court discloses that the total harvest by the Kelpers Association within the three-mile limit is not substantial and that the runs of fish involved would not significantly enhance the harvest opportunity of treaty-right fishermen because they pass through other non-Indian commercial fisheries before reaching tribal fishing grounds. This court finds that plaintiffs herein have not met their burden of showing that enforcement of the regulation in question, proposing to close commercial trolling for salmon within the three-mile limit, would achieve the purpose of making a significant number of additional fish available for harvest by treaty-right fishermen. For these reasons, this court finds no reason to interfere with the state court temporary injunction currently in effect in Cause No. 50552.
(3) In Gill Netters Association v. Tollefson, supra, plaintiffs therein obtained a temporary injunction enjoining enforcement of a Department of Fisheries regulation proposing reductions in fishing time for gillnetters and purse seiners in the Puget Sound marine fishery. Unlike the evidence concerning the prior temporary injunctions, the record in this case is replete with factual data which establishes beyond reasonable question that very significant portions of the harvestable fish not taken by the non-Indian fishermen referred to would reach the usual and accustomed off-reservation fishing grounds of plaintiff tribes in substantial numbers. Plaintiffs herein have overwhelmingly met their burden of proof to show that enforcement of this proposed Department of Fisheries regulation calling for reduced fishing time for gillnetters and purse seiners in Puget Sound would achieve at least partial compliance with this court's directives to make additional fish available for harvest by treaty-right fishermen, and that prohibition by the state court of enforcement of that regulation presents an immediate threat of substantial economic harm and serious hardship to plaintiff tribes.
Upon the facts found as above stated and after most serious and meticulous consideration of written memoranda and oral arguments by all parties and written submissions by parties to the state court actions, this court finds and holds that injunctive relief in the form set forth below must issue to enjoin enforcement of the state court injunction in Cause No. 50757, as follows:

*1034 Injunctions

(1) For the reasons hereinabove stated, unless and until this court orders otherwise, it is now hereby ORDERED AS FOLLOWS:
That the Superior Court of the State of Washington, County of Thurston, is hereby prohibited and enjoined from in any manner or to any extent enforcing the temporary injunction issued by said court on August 30, 1974, in Puget Sound Gillnetters Association v. Tollefson, No. 50757, and from issuing any other order in said cause which in effect will prevent the Department of Fisheries from fully enforcing the regulations in question adopted pursuant to Administrative Order No. 1143.
This injunction shall in no manner whatever preclude said court from expeditiously proceeding with preparation and trial of the issues presented in said cause.
(2) IT IS FURTHER ORDERED:
That defendants State of Washington, Thor Tollefson, Carl Crouse, Departments of Fisheries and Game of the State of Washington, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, shall not obey, carry out, enforce or otherwise treat as having any lawful force or effect the order of the Thurston County Superior Court for the State of Washington referred to in paragraph (1) above.

Implementing Orders
For reasons not clear to this court, the Department of Fisheries takes the anomalous position of opposing entry of the injunction issued above, while asserting the correctness and appropriateness of the regulations enjoined in the state court proceedings. This court's injunction confirms the propriety of the Department of Fisheries regulations adopted pursuant to Administrative Order No. 1143. Moreover, this court has not and will not direct, limit or in any manner whatever interfere with full exercise of the prerogatives, duties and discretion vested by state law in the Directors of the Departments of Game and Fisheries, excepting to the extent necessary to enforce the judgment and decree entered pursuant to Final Decision # 1 and to restore or preserve the Indian treaty rights specified therein. Nothing in this decision or in the above injunction should be construed or applied to the contrary.
However, due to the circumstances previously recited, and to aid in achieving an equal opportunity to both Indian and non-Indian fishermen to harvest fish in the case area and to compensate treaty-right fishermen for not having been able to harvest the fish resource to the extent determined by Final Decision # 1, this court finds it necessary in aid of its jurisdiction and to protect and effectuate its judgment, to provide as follows:
IT IS HEREBY ORDERED THAT:
(1) The defendants are required to make significant reductions in the non-Indian fishery, as are necessary to achieve the ultimate objectives of the court's Final Decision # 1 without requiring mathematical precision, but in making such reductions shall do so consistent with the concept of permitting the full harvest of fish.
(2) Reductions in the non-Indian fishery, once adopted by the defendants in accordance with the court's prior rulings and this order, shall not thereafter be relaxed or rescinded without prior notice to this court and all parties to this action, unless consent of the affected plaintiff tribes has been obtained prior thereto.
(3) To the extent reduction in the non-Indian fishery adopted in accordance with the court's prior rulings already have been relaxed or rescinded prior to the entry of this order by reason of the temporary injunction of the Thurston County Superior Court in Puget Sound Gillnetters Association v. Tollefson, No. 50757, issued August 30, 1974, defendants shall cease immediately from carrying out directives, orders or policies in accordance with said temporary injunction and shall resume forthwith to implement the regulatory schemes and policies previously adopted to effect reduction in the non-Indian commercial net fishery for salmon on Puget Sound and related waters.
*1035 If defendants are participants in any subsequent legal proceedings which, in their judgment, might possibly result in an order that could impair or otherwise affect adversely their ability to conform to the requirements of this court's Final Decision # 1, or other orders in this case, defendants shall immediately so inform this court and shall serve upon all parties to this action copies of all papers filed in such legal proceedings.

ORDER FOR PROGRAM TO IMPLEMENT INTERIM PLAN
(By order dated October 8, 1974, as amended and supplemented November 21, 1974, and August 6, 1975, this court ordered the following program as an initial program called for by paragraph 20 of the injunction (384 F.Supp. at 417-418) to implement the Interim Plan set forth at 384 F.Supp. at 420. By order of April 5, 1976, this program was extended indefinitely until further order of the court).
This program is subject to modification and further refinement as additional information and further experience become available. The parties will continue to develop such information and experience and will consult frequently with each other on general and specific problems or conditions in an effort to achieve more completely and as rapidly as possible full compliance with the spirit and objectives of the orders of March 22, 1974. Any modifications or refinements agreed to by the affected parties shall become effective upon filing with the court without further action or approval of the court unless such further action is specified therein. Any party may submit requests for other modifications or refinements for approval or other appropriate order by the court.
Tribes having qualified for self-regulation are not bound by the particulars of this program, other than as directed by the terms of Final Decision # 1 and the injunction entered pursuant thereto.

A. Guideline Principles for Regulating Fisheries.

Guideline Principles for Regulating Fisheries pursuant to paragraph 2 of the Interim Plan and Stay Order shall be filed with the court.

B. Exchange of Information Preliminary to Regulation.

Data required to be furnished by the state agencies under paragraphs 17 and 18 of the injunction (384 F.Supp. at 413-419) and paragraph 7 of the Interim Plan and Stay Order (384 F.Supp. 420) and data required to be furnished by the tribes under paragraph 17 of the injunction and paragraph 7 of the Interim Plan and Stay Order shall be furnished at the earliest practical time after such data becomes available, but no later than the following schedule:
1. At least sixty (60) days prior to entry of a run into the first fishery subject to state control run-size predictions, numbers of harvestable fish set pursuant to paragraph 17 of the injunction and information concerning run size, timing and condition requested by the tribes pursuant to paragraph 18 of the injunction and paragraph 7 of the Interim Plan and Stay Order shall be furnished by the state agencies.
Until such time as predictions of steel-head run size are possible, Game shall determine the harvestable portion of the run in the best manner practicable after consulting with the plaintiffs to receive their suggestions. Such predictions relating to harvestable numbers of fish shall be subject to review if the tribes believe there is better information from another source. If the parties cannot agree on the best source the court shall make a determination through the Master in consultation with its Fisheries Technical Advisor. All predictions of harvestable numbers shall be further subject to review during the fishing season as additional information is obtained.
2. At least fifty (50) days prior to the entry of a run into the first fishery subject to state control, the tribes shall furnish information concerning their anticipated fishing activity as requested by the state under paragraph 17 of the injunction.
*1036 3. At least forty-two (42) days before a proposed opening of fishing, the state agencies and tribes shall exchange proposed off-reservation fishing regulations affecting the particular fishery.
4. At least twenty-one (21) days before a proposed opening, regulations shall be adopted and filed pursuant to paragraph 1 of the Interim Plan and Stay Order; provided that emergency regulations are enforceable upon filing them with the court and service upon the other parties affected of a copy of such regulations and a statement of the facts and circumstances of the emergency on which the regulations are based. Any party may respond and seek immediate review. Requests for emergency consideration by the court will be given priority and determined rapidly.

C. Limitation on Harvest.

Whenever such closure or curtailment will (1) increase the opportunity of the other fishery (i. e., non-Indian or Indian, respectively) to take more of the harvestable portion of such run, and (2) not result in overescapement for such run, the Department of Fisheries will close or curtail the non-Indian fisheries on any run of salmon when the non-Indian catches reach or are expected to reach 50% of the harvestable portion of that run. That department may likewise close or curtail Indian off-reservation commercial fisheries on said run whenever those fisheries have taken 50% of the harvestable portion of said run. The Department of Game may close or curtail the Indian off-reservation steelhead commercial fisheries or the non-Indian sport fisheries, respectively, on any river system steelhead run whenever such fisheries have taken 50% of the harvestable portion of said run. For purposes of this paragraph the harvestable portion of the run shall be the number determined by the Department of Fisheries for salmon or the Department of Game for steelhead and supplied in accordance with paragraph B.1. above.

D. Identification of Indian-Caught Steelhead.

The defendants may apply and enforce the provisions of WAC 232-12-210, 232-12-211, 232-12-212 and 232-12-360, as amended or adopted October 2, 1974, to treaty Indians outside of Indian reservations and allotments, and to steelhead caught in the exercise of treaty-secured fishing rights by members of the Intervenor-tribes herein, subject to the following exceptions or limitations:
1. The requirements of WAC 232-12-210 that acceptance or possession of steelhead taken by another person must be accompanied by a written statement as therein described shall not apply to acceptance or possession for noncommercial purposes by a treaty Indian or member of the immediate family (parent, spouse or child) of a treaty Indian of steelhead lawfully caught by a treaty Indian.
2. WAC 232-12-211 shall not be applied so as to prohibit acceptance or possession for noncommercial purposes by the members of the immediate family of a treaty Indian of steelhead lawfully caught by a treaty Indian.
3. The provisions of WAC 232-12-212 shall not be applicable to any tribally-owned enterprise or to any Indian who sells solely to a tribally-owned enterprise provided that said tribal enterprise has previously notified the Department of Game in writing of its name and the addresses of its receiving, processing and storage facilities and has agreed to furnish to that Department the data described in WAC 232-12-212(2), on forms to be provided by the state.

E. Catch Data.[4]
1. Commercial catch reports shall be made by nonstate-licensed Indian fish buyers on forms (fish tickets) provided by the state agencies, except for the Quinault Indian catch which may be on tribally issued fish tickets. Indian fish buyers will submit *1037 a copy of such fish tickets daily to the U.S. Fish and Wildlife Service which shall communicate to the applicable state agency by a copy of the fish ticket or otherwise data concerning the total catch by species, area of catch and tribe before the close of business of the day on which such reports are received. Copies of fish tickets reporting Indian catch purchased by state-licensed fish buyers shall be made available to the U. S. Fish and Wildlife Service by the state agencies within one day of the date that such reports are received.
2. For each run of fish the state agencies shall provide the U. S. Fish and Wildlife Service or the tribes summaries of the non-Indian commercial catch no less than weekly and sport catch biweekly.

F. Determination of Tribal Treaty Status and Fishing Areas.

1. The defendants shall not, with respect to any Indian tribe or group which has not specifically been determined by this court to be entitled on an interim or permanent basis to be recognized as a treaty tribe, treat any off-reservation taking of fish from stocks of the case area by such tribe or group as treaty fishing in making any allocation of fish to treaty Indians or in restricting the fishing of tribes recognized by this court as treaty tribes pursuant to the decree and orders in this case, without first obtaining the concurrence of the tribes involved.
2. In order to be entitled to exercise its off-reservation treaty fishing rights, any tribe allowed to intervene in this case to assert its claim of treaty fishing rights shall, prior to any attempt to exercise such rights, present prima facie evidence and arguments supporting its claim to treaty status and tribal organizations upon which the court may make a preliminary determination as to whether such tribe is to be dealt with as a treaty tribe entitled to fish at specified locations pursuant to the Interim Plan and Stay Order pending final determination of said tribe's status after a full hearing; provided, however, that nothing in this paragraph shall preclude members of such tribes from fishing off-reservation in conformity with state regulations applicable to anadromous fish, to the same extent as nontreaty-right fishermen. Any party disputing a tribe's claim of treaty entitlement or the recognition of specific usual and accustomed places shall cooperate in allowing the matter of final determination of such matters to be made promptly and as rapidly as the court calendar and the interests of justice permit.

G. Nonanadromous Fish and Shellfish.

1. In order to be entitled to exercise off-reservation treaty fishing rights to nonanadromous fish and shellfish, any tribe party to this case shall, prior to any attempt to exercise such rights, present prima facie evidence and arguments supporting its claim to treaty entitlements to such nonanadromous fish and shellfish upon which the court may make a preliminary determination as to the tribe's entitlement to such species, pending final determination of tribal treaty-right entitlement to nonanadromous fish and shellfish; provided however, that nothing in this paragraph shall preclude members of such tribes from fishing off-reservation in conformity with state regulations applicable to nonanadromous fish and shellfish, to the same extent as nontreaty-right fishermen. Following such preliminary determination, off-reservation fishing areas shall be opened only to the extent that tribes which are determined to have such entitlement adopt and file with the court and defendants tribal regulations for the nonanadromous fishing activities of their members specifying the areas to be opened to such fishing. Any party disputing a tribe's claim of treaty entitlement or the recognition of specific usual and accustomed places shall cooperate in allowing the matter of final determination of such matters to be made promptly and as rapidly as the court calendar and the interests of justice permit.
*1038 2. The biologists for the defendants and biologists for the tribe shall meet to formulate general principles to be utilized as guidelines to be flexibly applied in the adoption of specific fishing regulations applicable to particular species of nonanadromous fish and shellfish.
3. Any of the parties may invoke the continuing jurisdiction of this court in order to determine:
a. The procedure and/or method for adopting management principles with respect to any particular species of nonanadromous fish or shellfish;
b. The species taken at treaty times, where (usual and accustomed grounds), and by what tribes (who are entitled to exercise treaty entitlement);
c. Questions of allocation between plaintiff tribes and non-Indian fishermen of the harvestable portion of the specific species on nonanadromous fish or shellfish;
d. A timetable for the taking of evidence regarding any particular nonanadromous species or shellfish; and
e. Such other matters as the court may deem appropriate.

ORDER DIRECTING PROMPT NOTICE TO FISHERIES TECHNICAL ADVISOR WHEN FISHERY PROBLEMS ARISE

(November 20, 1974)
There appears to be some lack of prompt and meaningful communication on problem matters between the counsel for the parties. Whether due to oversight, inadvertence or otherwise the result hampers and sometimes precludes bona fide efforts to promptly reach solutions acceptable to all concerned. As the Fisheries Science and Management Expert appointed by the court, Dr. Richard R. Whitney is now well known to all counsel and most parties in the case and in all matters within his competence he should be able to improve the timeliness and extent of genuine discussion on most fishing problems that may arise. Therefore, the court has requested and Dr. Whitney has agreed that he will act for the court in bringing about, by informal or informal means, earlier and better discussion between interested parties and counsel on fishery problems soon after they arise.
Accordingly, whenever a fishery problem arises that might lead to emergency closure or opening, or to the filing of a motion or petition either with the court or the Master before any action is taken with respect to such matters the interested party or parties, acting through their counsel, are hereby directed to report the matter informally to Dr. Whitney as soon as the matter comes to their attention. A failure to do so will preclude hearing of the matter by either the Master or the court, unless a clear showing is made of exceptional circumstances preventing Dr. Whitney from promptly discussing the problem with interested parties and their counsel, or if the emergency is so urgent as to require immediate action.

DECISION RE QUINAULT FISHERY OUTSIDE THE CASE AREA[5]

(November 22, 1974)
1. Grays Harbor and its watershed, including the Humptulips River, are outside the case area of this litigation. (See Final Decision # 1, p. 1 and C.L. # 7; 384 F.Supp. at 328 and 400).
2. The Quinault Tribe has usual and accustomed fishing places in Grays Harbor and its watershed, including the Humptulips River. (See F.F. # 121, 384 F.Supp. at 374-375).
3. The decision, decree and orders of this court heretofore entered do not prohibit members of the Quinault Tribe from exercising treaty fishing rights at usual and accustomed grounds and stations outside the case area.

*1039 DECISIONS RE STATUS OF ADDITIONAL TRIBES

First and Second Supplemental Findings of Fact

(December 31, 1974; February 26, 1975)
254.[6] The intervenor Swinomish Indian Tribal Community is the present-day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to certain tribes and bands and groups of Indians which were parties to the Treaty of Point Elliott, 12 Stat. 927. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Swinomish Indian Reservation in Skagit County, Washington. The reservation was established pursuant to said treaty by Executive Order of January 9, 1873. The Swinomish Indian Tribal Community is organized pursuant to section 16 of the Indian Reorganization Act of June 18, 1934, 48 Stat. 987, 25 U.S.C. § 476. Its membership is determined in accordance with its Constitution and Bylaws approved by the Acting Secretary of the Interior on January 27, 1936. It does not have a current federally approved tribal membership roll but it has a current membership of approximately 313 persons.
255. The intervenor Tulalip Tribes of Washington is the present-day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to certain tribes, bands or groups of Indians which were parties to the Treaty of Point Elliott. This tribe is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Tulalip Indian Reservation in Snohomish County, Washington. The Tulalip Reservation was established, pursuant to said treaty, by Executive Order of December 23, 1873. The tribe is organized pursuant to section 16 of the Indian Reorganization Act of June 18, 1934, 48 Stat. 987, 25 U.S.C. § 476. Its membership is determined in accordance with its Constitution and Bylaws approved by the Acting Secretary of the Interior on January 24, 1936. It has a base roll as of January 1, 1935, approved by a representative of the Secretary of the Interior on February 1, 1965, which has been maintained and kept current by the tribe since that date. The tribe presently has approximately 1077 enrolled members.
256. The intervenor Port Gamble Band of Clallam Indians is the present-day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to certain tribes, bands or groups of Indians which were parties to the Treaty of Point No Point, 12 Stat. 933. This tribe is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Port Gamble Indian Reservation in Kitsap County, Washington, under its official name Port Gamble Indian Community. It is organized pursuant to section 16 of the Indian Reorganization Act of June 18, 1934, 48 Stat. 986, 25 U.S.C. § 476. Land upon which the reservation is located was purchased by the United States in the 1930's under authority of said Indian Reorganization Act and was proclaimed as an Indian Reservation pursuant to section 7 of that act, 25 U.S.C. § 467, by the Secretary of the Interior on June 16, 1938. Membership of the tribe is determined in accordance with its Constitution and Bylaws approved by an Assistant Secretary of the Interior on September 7, 1939. The intervenor Port Gamble Indian Community has a current federally-approved membership roll, approved August 22, 1974, and supplemental rolls approved September 3, 1974, and October 15, 1974, and presently has approximately 388 members.
257. The intervenor Lower Elwha Band of Clallam Indians is the present-day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to certain tribes, bands or groups of Indians which were parties to the Treaty of Point No *1040 Point. This tribe is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Lower Elwha Indian Reservation in Clallam County, Washington under its official name Lower Elwha Tribal Community. The tribe is organized pursuant to section 16 of the Indian Reorganization Act of June 18, 1934, 48 Stat. 987, 25 U.S.C. § 476. Land for the reservation was purchased by the United States in the 1930's under authority of said Indian Reorganization Act, and proclaimed as an Indian reservation pursuant to section 7 of said Act by the Secretary of the Interior on January 19, 1968. The tribe's membership is determined in accordance with its Constitution and Bylaws approved by an Assistant Secretary of the Interior on April 29, 1968. Its present membership roll was approved by a representative of the Secretary of the Interior on July 9, 1973. The tribe presently has approximately 311 enrolled members.
258. By Act of March 3, 1925, 43 Stat. 1102, Congress authorized $400,000 to be paid per capita to Clallam Indians upon an individual's relinquishment of "all claims of any nature against the United States under any treaty, agreement, or Act of Congress" and his acceptance of such payment "in full satisfaction of any and all claims whatsoever against the United States." Substantial numbers of Clallam Indians executed such written releases on behalf of themselves, their assigns, heirs and representatives and received such payments. Such claims settlement was made after the Clallam Indians had filed claims against the United States for nonfulfillment of promises said to have been made in connection with the Treaty of Point No Point, 12 Stat. 933  principally an alleged promise to establish a reservation for the Clallams in their home country. The written claim did not include denial of fishing rights by the United States.
259. The United States Department of the Interior has not construed or interpreted the said Act of March 3, 1925, or the releases executed pursuant thereto as repealing, modifying or restricting in any way the fishing rights of the Clallam Indians secured by the Treaty of Point No Point.
260. The intervenor Suquamish Indian Tribe was a party to the Treaty of Point Elliott. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Port Madison Indian Reservation in Kitsap County, Washington. The reservation was provided for the Suquamish Indians in Article II of the treaty and was enlarged by Secretary of the Interior Order of October 21, 1864. The Suquamish Tribe is organized under section 16 of the Indian Reorganization Act of June 18, 1934, 48 Stat. 987, 25 U.S.C. § 476. Its membership is determined in accordance with its Constitution and Bylaws approved by the Under Secretary of the Interior on July 2, 1965. It does not have a current federally approved membership roll, but it has a membership of 275 estimated as of July 1, 1972.
261. In negotiating the Treaty of Point Elliott, Governor Stevens designated four head chiefs and a larger number of subchiefs to represent and to give assent to and sign the treaty on behalf of all the Indians with whom he was treating. It was the treaty commission's intent to include the Nooksack Indians in the Point Elliott Treaty Council. Each of the four head chiefs was intended to represent the Indians of one of the major drainages of the area ceded by the Indians.
262. On January 16, 1855, six days before the Treaty of Point Elliott was signed, George Gibbs, a member and secretary of the treaty commission, recorded that a census of Indians at the treaty camp that date included 256 Nooksack. There was no evidence submitted that the Nooksack withdrew from the Council or refused to participate in the treaty.
263. No signator of the Treaty of Point Elliott is specifically identified thereon as having been a Nooksack Indian.
264. A Lummi Indian named Chow-its-hoot was designated as one of the four head chiefs and signed the treaty for "The Lummi and other tribes." On the basis of the evidence offered the court finds that the reference to "other tribes" includes the Nooksack Tribe.
*1041 265. The statements of each of the three U.S. treaty commissioners whose post-treaty views on the question are recorded disclose that after the treaty was concluded and prior to its ratification each of them asserted that the Nooksack Indians were included in the Treaty of Point Elliott and this assertion was directly made by Governor Stevens in his official reports to his superiors in Washington, D. C.
266. The Nooksack Indians of 1855 were included in the Treaty of Point Elliott and the United States considered them bound to the treaty by Chow-its-hoot's signature on the treaty, and the provisions of Article V of the treaty were applicable to them.
267. The intervenor Nooksack Indian Tribe of Washington is the present day tribal entity which, with respect to the matters that are subject of this litigation, is a political successor in interest to the Nooksack Indians of 1855. 12 Stat. 927. It is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Nooksack Reservation in Whatcom County, Washington. The reservation was established pursuant to section 7 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 986, 25 U.S.C. § 467) by proclamation of the Acting Secretary of the Interior dated March 22, 1973. The Nooksack Indian Tribe of Washington is organized pursuant to section 16 of said Indian Reorganization Act, 48 Stat. 987, 25 U.S.C. § 476. Its membership is determined in accordance with its Constitution and Bylaws approved by a representative of the Secretary of the Interior on September 24, 1973. It does not have a current federally-approved membership roll. Its present membership is about 371 persons.
Based on the foregoing findings of fact, the court makes the following:

First and Second Supplemental Conclusions of Law
49. The intervenors Swinomish Indian Tribal Community, Tulalip Tribes of Washington, Port Gamble Band of Clallam Indians, Lower Elwha Band of Clallam Indians and Suquamish Indian Tribe each hold a right under one or more of the treaties cited in paragraph 1 of the findings of fact of Final Decision # 1 to fish at usual and accustomed places outside of reservation boundaries.
50. Neither the Act of March 3, 1925, 43 Stat. 1102, nor the acceptance of any payment by individual Indians pursuant thereto constituted any repeal, relinquishment, modification or diminishment of fishing rights secured to the Clallam Indians by Article IV of the Treaty of Point No Point, 12 Stat. 933.
51. The Intervenor Nooksack Indian Tribe of Washington holds a right under the Treaty of Point Elliott to fish at usual and accustomed places outside of reservation boundaries.
52. Neither the Act of February 12, 1925, 43 Stat. 886, 887, nor the acceptance of any payment by individual Indians pursuant thereto, nor the decision of the Court of Claims in Dwamish, et al. v. United States, 79 Ct.Cl. 530 (1934), nor the decision of the Indian Claims Commission in Nooksack Tribe v. United States, 3 Ind.Cl.Comm. 479 (1955), constituted any repeal, relinquishment, modification or diminishment of fishing rights secured to the Nooksack Indian Tribe by Article V of the Treaty of Point Elliott, 12 Stat. 927.
At the conclusion of oral argument February 13, 1975, on the state's Objections to the Master's Report, the court indicated that it would briefly state in writing the reasons for overruling of the state's objections. The primary thrust of the state's position is that the decisions in Dwamish et al. v. United States, supra, and Nooksack Tribe of Indians v. United States, supra, are binding precedents denying treaty status to the Nooksack Tribe and collaterally estopping the Nooksack Tribe from asserting treaty fishing rights in the above-entitled cause.
A landmark case concerning the doctrine of collateral estoppel is Bernhard v. Bank of America Nat'l. Trust & Sav. Ass'n., 19 Cal.2d 807, 813, 122 P.2d 892, 895 (1942), in *1042 which Justice Traynor, in abandoning the requirement of mutuality of parties, set forth three questions to be considered in application of the doctrine:
(1) Was the issue decided in the prior adjudication identical with the one presented in the action in question?
(2) Was there a final judgment on the merits?
(3) Was the party against whom the plea is asserted a party or in privity with a party in the prior adjudication?
In dicta, the Washington State Supreme Court has recognized the trend toward elimination of the requirement of mutuality of parties in Henderson v. Bardahl Int'l. Corp., 72 Wash.2d 109, 115, 431 P.2d 961, 967-8 (1967), which added a fourth question with respect to collateral estoppel which must also be answered in the affirmative:
(4) Will the application of the doctrine not work an injustice on the party against whom the doctrine is to be applied?
Proceedings before the Court of Claims in Dwamish, and the Indian Claims Commission in Nooksack, dealt with compensation claims for tribal lands taken by the United States, and in no way dealt with asserted Indian treaty fishing rights. Certain historical and anthropological evidence presented for consideration of the Master in this case, which evidence was not rebutted by the defendant State of Washington, was not available to the Indian Claims Commission or to the Court of Claims in the earlier proceedings cited.
For these reasons, there is serious doubt whether the first criterion set forth above, that of identity of issues, is satisfied with respect to the current proceeding. Furthermore, with respect to the fourth criterion listed above, the court is satisfied that in these circumstances application of the doctrine of collateral estoppel may indeed work an injustice on the party against whom the doctrine is to be applied. Because the findings of the Master are not clearly erroneous, and are based upon substantial evidence clearly sufficient to establish a prima facie showing of treaty entitlement in the Nooksack Tribe, the court has approved the findings and conclusions proposed by the Master as set forth above and as supplemented by Conclusion of Law No. 52 above.
The absence of a determination that a specific fishing area is a usual and accustomed fishing place of a particular tribe shall not preclude the tribe or its members from exercising treaty fishing rights at such location if opened under a tribal regulation filed pursuant to paragraph 1 of the Interim Plan, subject to the state's authority to contest the location consistent with the prior judgment and orders of this court.

PRELIMINARY INJUNCTION AND MEMORANDUM DECISION RE GREEN RIVER STEELHEAD FISHERIES

(January 14 and 20, 1975)
The United States and the Muckleshoot Tribe filed motions for a preliminary injunction against the State of Washington, its Directors of Fisheries and Game and other officers and agents to prohibit them from basing their determination of numbers of "harvestable fish" for the purpose of complying with this court's decree and orders in this case on anything other than the total estimated run of free-swimming fish, including those resulting from wild runs as well as those resulting from hatchery or artificially propagated runs without first seeking and obtaining from this court a determination of their right to do so in accordance with the prior orders of this court. They asked for an injunction against enforcement of a purported "closure" of certain steelhead fisheries issued by the Game Department's attorney and against any interference with steelhead fishing by the Muckleshoot Tribe pursuant to its own tribal regulations.
The Muckleshoot Tribe also sought an order requiring the Department of Game to return to the tribe or its members any nets or other equipment or fish taken from them pursuant to such purported "closure."
*1043 The court, following a hearing and after considering the application and supporting affidavits of the plaintiffs and the written and oral presentations of the parties, issued the following preliminary injunction:
The court hereby finds that:
1. Defendant Department of Game, its Director and officers, employees and agents, have attempted to interfere with, prevent and impede the fishing activities of the Muckleshoot Indian Tribe and its members at their usual and accustomed fishing places, and have seized and damaged property of said members, all in violation of the decree and orders of this court previously entered in this case.
2. Said defendant has not adopted or filed with this court any emergency or other regulation prohibiting or restricting such fishing by members of the Muckleshoot Tribe or any statement or finding of conservation need for such restriction.
3. Said defendant has announced and notified plaintiff tribes and this court of its intention to restrict Indian treaty-right harvest of fish by all plaintiff tribes fishing in accordance with the decision and orders of this court in this case, by excluding from the numbers of fish from which such harvest can be taken all artificially propagated steelhead, without first seeking or obtaining either the concurrence of the affected tribes of the approval of this court for such exclusion as required by the prior orders of this court.
4. Unless the defendant is enjoined from continuing to impose and enforce such restrictions in violation of the provisions of the prior orders or this court, the plaintiff tribes and their members will suffer irreparable injury.
Now, Therefore,
IT IS HEREBY ORDERED that, except as necessary to comply with the judgment or orders of the state courts with reference to fishing by or under the authority of the Puyallup Tribe and its members that may be issued in the case of Department of Game v. Puyallup Tribe, Inc., No. 158069, Superior Court of the State of Washington in and for Pierce County, the defendant Department of Game, its Director and officers, agents, and those acting under its direction or control, are hereby restrained and enjoined from basing the determination of numbers of "harvestable fish" for the purposes of complying with the decree and orders of this court in this case on anything other than the total estimated runs of free-swimming fish, including those resulting from wild spawning and rearing and those resulting from hatchery or other artificial propagation or transplanting programs, without first seeking and obtaining from this court a determination of the right to do so in accordance with the prior orders of this court.
Said defendant and persons are further enjoined from enforcing the purported closure of the Green River commercial steelhead fishery as set out in a notice filed with this court dated December 31, 1974, signed by Assistant Attorney General James M. Johnson. Said defendant may close an Indian fishery pursuant to paragraph C of the Order for Program to Implement an Interim Plan only by the promulgation of an appropriate department regulation pursuant to previous orders of this court.
The Department of Game, its officers, agents and those acting under its direction or control, are hereby further ordered to return and make any restitution for loss or damage to any nets or other equipment or fish taken from Muckleshoot Indians subsequent to December 31, 1974, pursuant to said "closure" notice or any other closure that was not filed with this court in accordance with the prior orders of this court.
This injunction shall remain in effect until further order of this court made in connection with any request for determination filed pursuant to the prior orders of this court with respect to the exclusion or separate consideration of artificially propagated fish in determining the harvestable portion of fish to which treaty-right fishermen are entitled under the decree and orders of this court.

*1044 Memorandum Decision

This memorandum decision further explains the court's reasons for issuing the foregoing preliminary injunction of January 14, 1975. The state's action in this matter is based upon applying the Pierce County Superior Court Memorandum Decision in Department of Game v. Puyallup Tribe, Inc., No. 158069, dated December 23, 1974 (hereinafter Puyallup III) to litigants in this case. That decision is not yet final even in the superior court. However, even if it has become final as far as the superior court is concerned, that order is still subject to appeal to the state appellate courts. The adverse parties will undoubtedly appeal it.
To reiterate what this court has said previously (see Final Decision # 1, 384 F.Supp. at 344-345), this court has jurisdiction of the limited issue involved but has abstained from exercising it until the courts of this state, up to and including the final decision on appellate review by the Supreme Court or the highest court that acts on it, have had an opportunity to pass on it. Until then this court wants to allow the state judges to review the state trial court's decision. When the final decision that may be rendered in the state courts at the highest level is of record, this court will review it to see whether or not at that point it should exercise such jurisdiction as it has of the matter. But the state trial court decision in Puyallup III is not in effect as far as this case, United States v. Washington, is concerned, nor may the parties in this case act on the theory that it in any way supersedes the decision and judgment in this case until such time as the matter is finally determined in the state courts and this court has had an opportunity to consider whether to then exercise whatever jurisdiction it may have.
This court has heretofore abstained solely because the Puyallup case was one which was a state court case from its inception and was remanded by the Supreme Court of the United States back to the supreme court of the state, which court remanded it to the Pierce County Superior Court to hear and to determine the allocation of wild and propagated steelhead. That case is applicable only to the Puyallup Tribe and the Puyallup River and the places where the Puyallups fish and does not directly pertain to anything but steelhead.
The matter now before this court on this motion concerns fishing in an entirely different stream by different fishermen, and the Puyallup III decision does not have any effect whatever upon, or permit violation of, the rulings this court has made on this subject.
The present controversy involves the Department of Game's premature attempt to exclude all hatchery-propagated steelhead from the harvestable shares available to all treaty-right fishermen. Although this court has deferred trial of environmental issues in this case to a later time, and has abstained from ruling on the precise issue before the state court in Puyallup III, the prior decision, judgment, decree and other orders entered by this court have never recognized a distinction between natural and artificially propagated anadromous fish resources in determining the scope of treaty fishing rights. The following language from pages 2 and 3 of the declaratory judgment and decree, entered February 12, 1974, is pertinent:
"In addition and specifically for the purposes of interpreting all provisions of this decree, the following definitions shall be controlling:
"1. Anadromous fish: Any fish which spawns or is artificially reproduced in freshwater, reaches mature size while rearing in saltwater and returns to freshwater to reproduce, and which spends any portion of its life cycle in waters within the Western District of Washington.
"2. Adequate production escapement: In an approximate number of anadromous fish, that level of escapement from each fishery which will produce viable offspring in numbers to fully utilize all natural spawning grounds and propagation facilities reasonable and necessary for conservation of the resource, as defined in the Decision of the court.

*1045 "3. Harvestable stock: The approximate number of anadromous fish which is surplus beyond adequate production escapement and Indian needs as defined in the Decision; that is, the number remaining when the adequate production escapement and Indian needs are subtracted from the run size." (Emphasis added) 384 F.Supp. at 405).
Following issuance of the Pierce County Superior Court's memorandum decision, which held that Indians of the Puyallup Tribe fishing at their usual and accustomed places in the Puyallup River system (including saltwater approaches thereto) did not possess a treaty right to harvest hatchery-propagated steelhead, the Game Department notified this court and counsel by letter dated December 24, 1974, that it intended to revise the numbers of steelhead harvestable by treaty Indians to exclude hatchery fish. This action was not in compliance with the following provisions of this court's order of October 8, 1974, approving a Program for Implementing the Interim Plan:
"1. At least sixty (60) days prior to entry of a run into the first fishery subject to state control run-size predictions, numbers of harvestable fish set pursuant to paragraph # 17 of the injunction and information concerning run size, timing and condition requested by the tribes pursuant to paragraph 18 of the injunction and paragraph 7 of the Interim Plan and Stay Order shall be furnished by the state agencies.
"Until such time as predictions of steelhead run size are possible, Game shall determine the harvestable portion of the run in the best manner practicable after consulting with the plaintiffs to receive their suggestions. Such predictions relating to harvestable numbers of fish shall be subject to review if the tribes believe there is better information from another source. If the parties cannot agree on the best source the court shall make a determination through the Master in consultation with its Fisheries Technical Advisor. All predictions of harvestable numbers shall be further subject to review during the fishing season as additional information is obtained. " (Emphasis added) (p. 1035 supra of this document).
Counsel for the Game Department thereafter filed with this court on January 2, 1975, a notice dated December 31, 1974, entitled "Closure of Green River Treaty Indian Commercial Steelhead Fishery" which purported to order a closure of Muckleshoot tribal commercial net fisheries for steelhead on the Green River. This action did not comply with paragraph 19 of the court's injunction entered March 22, 1974, which states as follows:
"19. In order to accommodate unforeseen circumstances as readily as possible, consistent with conservation necessity, defendants may utilize procedures for making emergency regulations affecting taking of fish under their jurisdiction and control; provided that they shall adhere in every respect to the requirements of the Washington State Administrative Procedures Act and the regulations under it, and that the approval of such emergency regulations by this court where otherwise required by Final Decision # 1 and this injunction or the consent of all affected tribes has been obtained; provided, however, that emergency regulations are enforceable by the state upon filing with the tribes affected (or their counsel of record, if any) a copy of such regulations and a statement of facts and circumstances of the emergency on which the regulation is based. Any such tribe may respond and seek immediate court review. Requests for emergency consideration by this court will be given priority and determined speedily." (Emphasis added) (384 F.Supp. at 417).
This court has found and held and hereby reaffirms that the actions of the Game Department did not comply with the prior decree and orders of this court because Game: (1) failed to consult with plaintiffs prior to recomputation of the treaty-right harvestable portion of the steelhead runs for rivers other than the Puyallup; (2) failed to enact emergency regulations consistent *1046 with the requirements of the Washington State Administrative Procedures Act; and (3) failed to file with the court and serve upon the affected tribes or their counsel copies of a properly enacted regulation and a statement concerning the alleged emergency upon which it was based. These actions and inactions of the Game Department, and the purported enforcement efforts taken by Game Department agents in removing Muckleshoot fishing nets from the Duwamish River, represent conduct not legally justified, and presented a substantial danger of immediate and irreparable injury to the Muckleshoot plaintiffs, requiring issuance of the preliminary injunction dated January 14, 1975.
It should be emphasized that these unauthorized activities by the Game Department, its Director, officers and agents, occurred despite the fact that procedures exist for proper and prompt presentation of such controversies to this court. For example, paragraph 25 of the injunction of March 22, 1974 (384 F.Supp. at 419), establishes the following procedure pursuant to this court's continuing jurisdiction:
"25. The parties or any of them may invoke the continuing jurisdiction of this court in order to determine:
"a. whether or not the actions, intended or effected by any party (including the party seeking a determination) are in conformity with Final Decision # 1 or this injunction;
". . .
"d. disputes concerning the subject matter of this case which the parties have been unable to resolve among themselves;
". . .
"In order to invoke such jurisdiction, the party shall file with the clerk of this court and serve upon all other parties (through their counsel of record, if any) a `Request for Determination' setting forth the factual nature of the request and any legal authorities and argument which may assist the court, along with a statement that unsuccessful efforts have been made by the parties to resolve the matter, whether a hearing is required, and any factors which bear on the urgency of the request. Any party shall have an opportunity to respond to, join in, or supplement the request within seven days of its service or such other time as may be directed by the court. The court may then decide the matter, hold a hearing, or refer the request to the special master to hear evidence and legal argument, as soon as practicable.
Counsel for the Game Department and counsel for amicus curiae Northwest Steelheaders have urged that this court give full faith and credit and apply collateral estoppel to the state court decision in Puyallup III, and thereby hold that all plaintiff tribes in the case area possess no treaty rights to harvest hatchery fish. Neither the law nor the factual setting presented justifies such a result. Initially, it must be recognized that the state court decision in Puyallup III is a "Memorandum Decision," that findings of fact, conclusions of law and a decree have not yet been entered and that, therefore, the state court's determination is neither a final decision nor judgment at this time. In that case, even a final judgment by the Pierce County Superior Court must be limited to consideration of the Puyallup Indian fisheries on the Puyallup River system vis-a-vis the state hatchery program for steelhead released into that river system. In addition, none of the plaintiffs in this case, other than the Puyallup Tribe, is a party to or in privity with a party to, the state court case. Also, it is possible that the issue before the state court and the issues to be brought before this court concerning the possible relationship between environmental factors and artificial propagation may not be identical. For these reasons, this court foresees serious questions as to whether the full faith and credit and collateral estoppel doctrines, even if properly applicable, would in any way affect the jurisdiction of this court, except as to the Puyallup Tribe and the Game Department solely with respect to hatchery-propagated steelhead in the Puyallup River System. See Bernhard v. Bank of America Nat'l. Trust & Sav. Ass'n., 19 Cal.2d 807, 122 P.2d 892 (1942); Henderson v. Bardahl *1047 Int'l. Corp., 72 Wash.2d 109, 431 P.2d 961 (1967).
However, this court expresses no views as to the merits of the state court decision at this time, having expressly abstained and reserved ruling on the matters before that court, but recognizes that interpretation of federal treaty provisions is a federal question which can only be finally determined by the federal courts. Nevertheless, the preliminary injunction issued January 14, 1975, expressly excludes from its coverage any action taken by the Department of Game, its Director, officers and agents "necessary to comply with the judgment or orders of the state courts with reference to fishing by or under the authority of the Puyallup Tribe and its members that may be issued in [Puyallup III]."
By agreement of counsel, the motions of plaintiffs to include the State of Washington and Department of Fisheries within the coverage of that injunction shall remain under advisement by the court until such time as the motion may be noted for hearing.

MEMORANDUM DECISION AND ORDERS RE NISQUALLY RIVER FISHERIES

(February 14 and 26, 1975)
This memorandum decision details the bases for the court's denial of a preliminary injunction against certain on-reservation fishing by the Nisqually Indian Tribe and provides guidance to all parties in future comparable situations. The court FINDS AND ORDERS AS FOLLOWS:
1. This court will not, in the exercise of its continuing jurisdiction in this case, entertain any application for interference with on-reservation treaty-right Indian fishing, excepting only
(a) when it is clearly established that a critical emergency exists which threatens to reduce or destroy a given run of fish, or
(b) when necessary to assure adherence to the opportunity for fair sharing of harvestable fish by both treaty and nontreaty fishermen.
2. The decision of this court, among other things, established the concept of "equal sharing" of the opportunity to harvest the fish resources which was intended to be a guiding principle for Indians and non-Indians alike. Just as the defendant state agencies are in general required to limit nontreaty-right fishermen to a catch of 50% of the harvestable portion of fish runs, exclusive of on-reservation catch, the plaintiff tribes in their off-reservation fisheries are required to limit the catch of their members to 50% of the off-reservation harvestable portion of the runs and to allow for the opportunity of nontreaty-right fishermen to harvest the remainder, except in unusual circumstances spelled out in the Interim Plan. The on-reservation catch does not need to be shared with non-Indians but does need to be subtracted from the harvestable number.
In the particular instance presented on the Nisqually River (for the 1974-75 winter steelhead run) the Nisqually fishermen chose to conduct a substantial fishery off-reservation, apparently without giving sufficient consideration to the effect this would have on the necessity to allow sport fishermen the opportunity to catch a number of steelhead approximately equal to the Indian off-reservation catch. Although establishment of guidelines to be applied in such a situation is desirable, the court and counsel have not had sufficient opportunity to consider all possibilities. In some instances a reservation may occupy a sufficient area on a stream that the runs of fish appropriately might be so identified with the tribe that they might be entitled to 100% of the harvestable number. On the other hand, the Nisqually Reservation is upstream in a situation where it clearly seems proper that runs of migratory fish should be shared with non-treaty citizens. The problem is to determine an appropriate formula.
The court has concluded that determination of the on-reservation and off-reservation shares of the catch should be based on historical data to the extent available. *1048 For this proceeding the court has had to determine the estimated historical catch on-reservation by an indirect method.
The court is of the opinion that for the 1974-75 winter steelhead run the best estimate of catch assignable to on-reservation fishing can be derived by utilizing the present estimate of 6,630 as the total harvestable number of steelhead and subtracting the best assignable estimate of the shares to be taken off-reservation by sport fishermen and Indians. The court finds that the best estimate assignable to all off-reservation fishing is the average number of steelhead taken by sport fishermen prior to the 1969-73 period, or 3,700 fish. Thus, the off-reservation Indian share of the 1974-75 runs is 1,850 steelhead and the sport fishing share is also 1,850 steelhead. Subtracting the 3,700 fish to be taken off-reservation from the total harvestable number leaves 2,930 fish to be taken by Nisqually fishermen on-reservation and for subsistence and ceremonial purposes. The total Indian share would therefore be 4,780 steelhead. In the future, as run size estimates may develop and revisions may be made in the harvestable number, the court would assign approximately 44% of the harvestable number of steelhead to the on-reservation catch. The remainder of the harvestable number will be shared equally with sport fishermen. The court will expect these 44% actually to be taken on-reservation in future years, with minor latitude as required for practical purposes.
In future years, the court expects the Nisqually tribal fishing regulations to establish a catch ceiling for steelhead caught on-reservation which will not be more than 44%, and a catch ceiling for the off-reservation fishery amounting to not more than 50% of the remainder.

ORDERS RE HERRING FISHERIES AND DETERMINATION OF USUAL AND ACCUSTOMED FISHING PLACES OF ADDITIONAL TRIBES

(March 28, 1975, and April 18, 1975)
The defendants Department of Fisheries and Department of Game have filed a Request for Determination re Nonanadromous Fish and certain tribes have filed Requests for Determination of Right to Engage in Herring and/or Herring Roe Fisheries. The court makes the following determinations:
The subject matter of the original trial in this action was limited to off-reservation treaty Indian fishing rights in the case area and the application of said rights to anadromous fish resources. (See FPTO § 5 and C.L. # 7, 384 F.Supp. at 400).
The court has, however, expressly retained continuing jurisdiction to assure implementation of the court's rulings and to deal with environmental issues and other relevant matters. (See 384 F.Supp. at 347 and C.L. # 48, 384 F.Supp. at 405). Issues relating to fishing outside of the case area, on-reservation fishing, or nonanadromous fishing are clearly within the subject matter jurisdiction of this federal district court (see F.F. # 11 and C.L. # 21, 384 F.Supp. at 352 and 401) so that that litigation with respect to such issues could clearly be brought before this court in separate actions. However, equity favors prevention of a multiplicity of actions, Camp v. Boyd, 229 U.S. 530, 33 S.Ct. 785, 57 L.Ed. 1317 (1913), and in the opinion of this court, proper exercise of its jurisdiction permits, and efficient administration of justice requires, this court to deal with matters related to, but not included within, Final Decision # 1 such as possible treaty-right nonanadromous fishing.
The court, having thoroughly considered all of the pleadings, testimony, evidence, memoranda and oral arguments, HEREBY FINDS, ORDERS AND DECREES AS FOLLOWS:
1. The Intervenor-plaintiff Upper Skagit Tribe's oral motion to withdraw, without prejudice to its subsequent resubmission, its Request for Determination as to its treaty entitlement to fish for herring, to which motion no objection was made, is granted.
2. The Intervenor-plaintiffs Lower Elwha Tribe, Lummi Tribe, Muckleshoot *1049 Tribe, Nisqually Tribe, Nooksack Tribe, Port Gamble Band of Clallam, Puyallup Tribe, Skokomish Tribe, Squaxin Island Tribe, Suquamish Tribe and Swinomish Tribal Community have each made a prima facie showing, on the basis of evidence that was not controverted, of their treaty-secured right to take herring at their respective usual and accustomed fishing places and it is HEREBY DECREED, subject to reconsideration as specified in paragraph 8 hereof that each of said tribes has the right under such of the treaties referred to in Final Decision # 1 in this case as have heretofore been held to apply to said tribe, to take herring at all of its usual and accustomed fishing places to the same extent and subject to the same terms and conditions as specified in Final Decision # 1 with respect to the right of taking anadromous fish and subject further to the provisions of paragraph 7 below.
3. The usual and accustomed fishing places of the Lower Elwha Tribe include all of the streams draining into the Strait of Juan de Fuca from the Hoko River east to the mouth of Hood Canal and the waters of the Strait of Juan de Fuca.
4. The usual and accustomed fishing places of the Nooksack Tribe include the Nooksack River and its tributaries, Bellingham Bay, Chuckanut Bay, Birch Bay, Semiahmoo Bay and Semiahmoo Spit and surrounding marine waters.
5. The usual and accustomed fishing places of the Suquamish Tribe include the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal.
6. The usual and accustomed fishing places of the Swinomish Tribal Community include the Skagit River and its tributaries, the Samish River and its tributaries and the marine areas of northern Puget Sound from the Fraser River south to and including Whidbey, Camano, Fidalgo, Guemes, Samish, Cypress and the San Juan Islands, and including Bellingham Bay and Hale Passage adjacent to Lummi Island.
7. Although Indians from several Puget Sound area tribes, including specifically those which were predecessors in interest to the Swinomish Tribal Community, regularly and customarily used Hale Passage adjacent to Lummi Island for travel and fishing before, during and after treaty times, said Passage was an area over which the Lummi Tribe exercised and was acknowledged by many others to have primary control as regards fishing or other resource gathering and occupancy. Prior to the hearing in this case the Lummi, Nooksack and Suquamish Tribes without relinquishing any claims to fishing locations, agreed for the present time to resolve any differences on this matter among themselves and not to request a court determination as to their relationship with each other in this area. As to the Swinomish Tribal Community, the court finds that its treaty-right fishing in said Hale Passage is subject to the permission of the Lummi Tribe.
8. The findings and determinations made in paragraphs 2 through 7 above are made on the basis of a prima facie showing as heretofore provided and each is subject to reconsideration on the basis of a full evidentiary hearing if requested by any party by written request filed on or before May 19, 1975. If no such reconsideration is requested within said time as to any such finding or determination, the latter shall become final and reviewable as provided by 28 U.S.C. §§ 1291 and 2201 without further order of this court.[7]
9. The treaty tribes found by this court to be entitled to participate in the herring sac-roe fishery in northern Puget Sound waters on the one hand, and the nontreaty fishermen entitled to participate in said fishery pursuant to state law on the other hand, are each entitled to take 50% of the *1050 off-reservation harvestable amount of herring.
[The March 29 and April 18, 1975, orders also contained provisions applicable to the conduct the 1975 herring fisheries. These are omitted here in view of the subsequent approval of an interim plan for management of future herring fisheries. P. 1063 infra].

DECISION AND DECREE RE 1975 FRASER RIVER SOCKEYE AND PINK SALMON HARVEST (FOURTH SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW)[8]

(Order of July 16, 1975, as modified and supplemented August 6, 1975)[9]

Definitions
As used in findings Nos. 271 through 284 and Conclusions of Law Nos. 55 through 66, infra, the terms 
"Convention" means the Convention for the Protection, Preservation and Extension of the Sockeye Salmon Fisheries of the Fraser River System, entered into by the United States and Canada and signed at Washington on the 26th day of May, 1930 (50 Stat. 1355; TS 918), as amended by the Pink Salmon Protocol signed at Ottawa on the 28th day of December 1956 (8 UST 1057; TIAS 3867) (Ex. USA-79; USA-80).
"Commission" means the International Pacific Salmon Fisheries Commission (IPSFC) established pursuant to the Convention.
"Convention Waters" means those waters described in sections 1, 2 and 3 of Article I of the Convention of May 26, 1930.
"U.S. Convention Waters" means those Convention Waters located in, or under the fisheries regulatory control, of the United States.
"Period of Commission control" means, with respect to any portion of U.S. Convention Waters, the 1975 period that such portion is under the regulatory control of the Commission. As of the date of this Order said period is from June 26, 1975, to September 20, 1975, inclusive, for U.S. Convention Waters between the Bonilla-Tatoosh line and the Angeles Point-William Head line and from June 26, 1975, to September 27, 1975, for certain of those waters east of the latter line plus the period September 28, 1975, to October 11, 1975, inclusive, for an area near Point Roberts as described in the Commission's recommended regulations. (Ex. USA-77)

Findings of Fact
271. The Commission has adopted recommendations and the United States Government has approved those recommendations for restrictions on the commercial taking of sockeye and pink salmon in certain Convention Waters, including those comprising Washington Department of Fisheries Puget Sound Salmon Fishing Areas 1, 2, western portion of 3, and western portion of 8, as defined in WAC 220-47-201, WAC 220-47-202, WAC 220-47-203 and WAC 220-47-209 (Director of Fisheries Order No. 1210, June 26, 1975) during the 1975 period of Commission control. (Ex. JX-2a, Fig. 18, p. 254; Ex. USA-77). The Washington Director of Fisheries, after a public hearing, adopted regulations implementing the Commission's recommendations. (Ex. USA-78) Neither the Commission's recommended regulations nor the Director of Fisheries' regulations make any specific reference to or distinctive provisions for fishing by treaty Indians at their usual and accustomed fishing places.
272. In transmitting the Commission's 1975 recommendations to the Washington Director of Fisheries for implementation the United States Department of State, on behalf of the U.S. Government, advised the Director as follows:
"In light of the decision in U. S. v. Washington, regulation in conformity with Indian Treaty rights, as set forth in that *1051 decision, is now required. It is understood, in view of this decision, that the State will regulate in a manner consistent with Indian Treaty rights."
"In this regard, the United States has reached an understanding with the Government of Canada which we believe will ensure sufficient flexibility in the Commission to accommodate domestic implementation of that decision. Specifically, should action to implement the decision, through means such as restrictions of fishing on certain U.S. fishing days to Indian fishermen, create a situation in which effort by the Indians as insufficient to permit the U.S. fishery to reach the catch goals set by the Commission, then the Commission could take action to remedy this imbalance by providing extra time to assure that the targets are reached. Thus, regulation by the State of Washington in conformity with the Boldt decision can be undertaken in a manner consistent with the overall obligations of the U.S. under the Convention." (Ex. USA-77)
273. The Commission takes the position that while it is aware that changes in units of gear and in fishing effort have occurred in different segments of the industry and that these changes sometimes affect individual catches, the Commission fulfills its responsibilities to assure proper spawning escapement and to divide the allowable catch in Convention Waters by considering the catches that are made, and not by setting the number of days of fishing in the abstract. The number of days allowed for fishing need not be, and often is not, the same for each country. The Commission has no jurisdiction over the numbers or types of gear that may be operated in Convention Waters. Jurisdiction over these matters rests with the respective national or state or provincial governments as matters of domestic law. (Ex. USA-89)
274. The best available estimates of the number of treaty Indian gear that are likely to be used in U.S. Convention Waters during the 1975 period of Commission control, as compiled by the Northwest Indian Fisheries Commission from treaty tribes having treaty-right usual and accustomed fishing places within those waters, are 65 large gillnet boats, 39 gillnet skiffs and 4 purse seine vessels. (Ex. USA-84)
275. In 1974 the number of units of United States gear landing sockeye during the period of Commission Control was 272 purse seine, 1140 gillnets and 54 reef nets. (Ex. USA-85)
276. The 1974 Fraser River sockeye run totalled 8.5 million fish and the Convention Waters catch was 5 million fish, of which U.S. fishermen caught 2,476,073 (Ex. USA-86) and Canadian fishermen caught 2,500,019. The Indian portion of the United States catch was 34,277 (Ex. USA-86). Pink salmon runs occur only in odd-numbered years. (Ex. USA-86)
277. The Commission presently forecasts a 1975 Convention Waters run of 5.5 million Fraser River sockeye.
278. A regulation by the State of Washington or its Director of Fisheries limiting fishing in U.S. Convention Waters to treaty Indians for at least one day per calendar week of the days on which fishing in such waters is authorized by the Commission during 1975 would not adversely affect the conservation of any species or run of fish under normal fishing patterns, deny non-Indians an opportunity to take up to 50% of the harvestable fish available at the Indian treaty usual and accustomed fishing places, or adversely affect any obligation of the United States under the Convention with Canada. Such a regulation is appropriate "to approach more nearly an equal allocation of the opportunity to harvest fish at usual and accustomed grounds and stations" as required by Final Decision # 1 in this case, 384 F.Supp. at 344.
279. The Commission controls the Convention Water harvest of sockeye and pink salmon by adopting recommended regulations several months in advance of the season which are submitted for approval by the respective national governments and thereafter, as a matter of practice, for Washington waters, for adoption by the Washington Department of Fisheries. *1052 Thereafter the Commission staff closely monitors the actual runs and catches throughout the season and the Commission meets, or confers sometimes by telephone, frequently throughout the season to adopt such changes to the preseason regulations as necessary. These become effective without the necessity for further approval by the national governments and, for Washington waters are customarily placed in effect through their promulgation by the Director of Fisheries as emergency regulations. In 1973 the Commission met over thirty times during the 113-day period of Commission control.
280. The Canadian Government has indicated that it will not consider it contrary to United States' obligations under the Convention if the State of Washington or its Director of Fisheries authorizes, during period of Commission control in 1975, a fishery in U.S. Convention Waters that is less extensive than the fishery authorized by the Commission, so long as such action has not been shown either to prevent the Commission from assuring a proper escapement to the spawning grounds of Fraser River sockeye and pink salmon, or to preclude an equal division of the harvestable catch as between Canada and the United States or to unduly burden the Government of Canada in fulfilling its obligations or realizing the benefits due its citizens under the Convention.
281. On or about July 10, 1975, the Director, Washington Department of Fisheries, contacted the United States Department of State, outlining four alternative proposals for action by the State of Washington, with respect to its fisheries under the jurisdiction of the Commission. The Director therein requested guidance as to whether any or all of these alternatives would be consistent with the obligations of the United States under the Convention. The State Department, by William L. Sullivan, Jr., after consultation with the Canadian Government, responded to the Director by cable on July 11, 1975, to the effect that the first alternative (extra days for treaty Indian fishermen) would be objectionable to the State Department; that the second alternative (restricting non-Indian fishing more than the Commission's regulations would otherwise require), would be acceptable thereto; that the third alternative (allowing all treaty Indians to fish with any gear whenever the Commission allowed fishing by any United States fisherman), was not objectionable in principle, although some technical changes in the Commission's regulations might be necessary; and that the State Department had no legal objection to the fourth alternative (closing down the United States' non-Indian fishery) although it might seem to violate the spirit of the Convention. (Ex. USA-90) Further, the State Department sent a subsequent telegram to the Director, State of Washington Department of Fisheries, stating that, at the present time, the State Department is opposed to the third alternative given existing Commission regulations, but not indicating that the State Department's lack of objection in principle thereto had been changed.
282. In light of the need to provide for Indian treaty fishing rights, and with regard to the management scheme of the Commission, of all of the alternatives presented to the court and practically available to this court at this time for meeting that need, the one which would cause the least disruption to the Commission's management scheme and to the non-Indian fishery and which would not violate the responsibilities of the United States under the Convention would be one allowing treaty Indians to fish with any gear whenever the Commission's regulations would allow fishing by any United States fishermen in Convention Waters.
283. It has not been clearly established that a violation of the responsibilities of the United States under the Convention would occur if the fishery management authorities of the treaty Indian tribes were to allow treaty Indian fishermen to fish with any gear whenever the Commission's regulations would allow fishing by any United States fishermen.
*1053 284. On July 11, 1975, representatives of the governments of the United States and Canada met in Bellingham, Washington to attempt to reach some agreement which would allow implementation of this court's injunction of July 16, 1975. However, the Canadian government would not agree to proposals put forward by the United States. Subsequent thereto, the United States temporarily withdrew its approval under the Convention of those parts of the Commission's regulations which seek to allocate the open fishing periods among various types of gear.

Conclusions of Law
55.[10] The Sockeye Convention of May 26, 1930, between the United States and Canada, as amended by the Pink Salmon Protocol of December 28, 1956, does not require the State of Washington to open its fisheries in U.S. Convention Waters, or any portion thereof, to all Washington fishermen or any specific group or category of Washington fishermen during all or any portion of the times when the Commission-prescribed regulations authorize fishing in such waters. A Washington regulation prohibiting fishing by persons who are not treaty Indians during certain portions of the fishing time allowed by the Commission or in portions of the U.S. Convention Waters within which fishing is not prohibited by the Commission would not necessarily be in conflict with the Convention or the United States' obligation under the Convention.
56. The Convention does not confer any rights on Washington non-Indian fishermen to a greater share of fish taken in Washington waters than they would have under the earlier treaties of the United States with the Indians.
57. The State of Washington and its Director of Fisheries may, consistent with the United States' obligations under the Convention and the 1975 regulatory recommendations of the Commission approved by the United States, allow fishing only to treaty Indians during certain times or in certain areas authorized to be open to fishing by such approved regulatory recommendations so long as such action has not been shown either to prevent the Commission from assuring a proper escapement to the spawning grounds of Fraser River sockeye and pink salmon, or to preclude an equal division of the harvestable catch as between Canada and the United States or to unduly burden the government of Canada in fulfilling its obligations or realizing the benefits due its citizens under the Convention.
58. The management authorities of the various Indian treaty fishing tribes or the State of Washington may allow treaty Indian fishermen to fish in Convention Waters with any gear whenever the Commission's regulations would allow fishing by any United States fishermen.
59. The Director of Fisheries may allocate the fishing times authorized by the Commission for Washington waters that are under Commission control so as to fulfill as nearly as possible the twin objectives prescribed by the orders of this court of February 12, 1974, and March 22, 1974, of providing Indian treaty fishermen an opportunity to take up to 50% of the U.S. share of the harvestable fish and of permitting a full U.S. harvest of said harvestable quota.
60. The temporary withdrawal by the United States of its approval under the Convention of those parts of the Commission regulations which seek to allocate the open fishing periods among various types of gear is a valid exercise of its rights and responsibilities under the Convention.
61. The Commission may prohibit all fishing within Convention Waters but Commission regulations do not preclude the state from allocating the time allowed United States fishermen among various user groups.
62. The Commission regulations, as approved by the United States, allow fishing time without regard to gear limitations.
*1054 63. The Stevens treaties between the United States and the various Indian tribes, as interpreted by this court and the Ninth Circuit Court of Appeals, preempted state control of fishing within Washington territorial waters in Puget Sound, including fishing for Fraser River sockeye and pink salmon, and made it the supreme law of the land that the Indians must be allowed the opportunity to take up to 50% of the fish that may be harvested legally in Washington territorial waters.
64. Through federal preemption of state regulation of Indian fishing at treaty fishing grounds, this court has jurisdiction to suspend, modify or substitute state regulations.
65. The Washington Director of Fisheries has authority under state law to adopt regulations of the Commission and, under order of this court, to allocate the United States' share of Fraser River sockeye and pink salmon among user groups.
66. The adoption of regulations as required by order of this court of July 16, 1975, modified July 30, 1975, is a valid exercise of the authority delegated to the Director by the state legislature as limited by this court.

Decree and Injunction
In accordance with Findings Nos. 271-284 and Conclusions of Law Nos. 55-66, it is HEREBY ORDERED, ADJUDGED AND DECREED as follows:
1. It is necessary for proper enforcement of state and tribal regulations that may be promulgated to carry out the orders of this court that the number and identity of boats and gear used in the treaty Indian fishery be known to state, tribal and federal enforcement authorities. Accordingly, no boat or fishing gear shall be used in the exercise of Indian treaty rights with respect to any fishery or in any area over which the International Pacific Salmon Fisheries Commission is exercising control until such boat or gear has been specifically registered with, and use in such fishery or area authorized by, the tribal authorities of the user's tribe and notice of such registration and authorization has been given by the tribal authorities to the Washington Department of Fisheries and the Regional Director of the National Marine Fisheries Service. Such offices shall also be immediately notified of the cancellation or suspension of any such registration or authorization. The registration and notice shall contain at least the following information: name and address of the owner and operator; type and name, if any, of the vessel; tribal identification number; type of gear to be used; and area or areas for which registered. No boat or unattended gear shall be used in the exercise of Indian treaty rights with respect to any fishery or in any area over which the Commission is exercising control unless there is affixed to it an identification tag, the style and type of which and the location at which affixed shall have been agreed to previously by the Director, Washington Department of Fisheries. Use of any vessel or gear in violation of this paragraph may be subject to the provisions of state law or regulation applicable to nontreaty fishermen.
2. The defendants State of Washington, Washington Department of Fisheries, and Donald W. Moos, its Director, are HEREBY ENJOINED from allowing any fishing, authorized by the 1975 regulations of the International Pacific Salmon Fisheries Commission by persons not entitled to exercise Indian treaty rights pursuant to the decrees of this court, until the Department of Fisheries adopts and files with this court regulations within the limitations required by the regulations of said Commission as they may from time to time be modified, and which conform with this court's orders that defendants must, to the extent consistent with permitting the full permissible total harvest, afford treaty Indians an opportunity to take an equal share of the total number of harvestable fish which, absent the fishing activities of other citizens, would be available for harvest at their usual and accustomed fishing grounds within Washington waters, or must, otherwise equitably adjust the treaty Indians' share of other species or in other areas to compensate *1055 them for disproportionate numbers of fish taken by other Washington citizens under regulations issued by said Commission.
3. Said defendants are directed to file with this court and serve on the following participating tribes  to wit, the Makah Tribe, Lower Elwha Band Clallam Tribe, Port Gamble Band Clallam Tribe, Suquamish Tribe, Lummi Tribe, Nooksack Tribe, the Swinomish Indian Tribal Community and Tulalip Tribes  the United States and the United States Commissioners of the International Pacific Salmon Fisheries Commission, copies of such regulations by July 1, 1975 (sic) and to thereafter similarly file and serve within 24 hours after adoption any changes or supplementary regulations that may be adopted as a result of any modification to the Commission's regulations.
4. The treaty Indians' opportunity to take fish up to the share specified in Final Decision # 1 and the related orders of this court shall be taken into consideration in making any equitable adjustments or with respect to other fisheries subject to state regulatory control.
5. Regulatory restrictions prescribed by the Commission limit somewhat the latitude of means that will be available to the state and the tribes for achieving the allocation of fish in accordance with the Stevens treaties. This makes it particularly necessary that the tribes and the state regulatory agency retain and promptly exercise, when appropriate, the authority and capability to enact on an emergency basis, and place into immediate effect, subject to limitations prescribed by this court, additional openings or closures or other modifications to their respective regulations that in conjunction with the permissible regulations of the other parties and the applicable provisions of the Commission requirements will reasonably assure protection, proper harvest, and the allocation of, or compensatory adjustments from, the fishery resource within the state's total regulatory authority required by this and prior orders of this court in this case. Accordingly, this court retains continuing daily jurisdiction over the implementation of this order and decree. Any party hereto or any other person aggrieved by any action or failure to act on the part of another party pursuant to this decree shall bring the matter to this court for an appropriate order to implement the requirements of this decree. Consideration of such matters will be given on a highly expedited basis by the court, particularly if it develops that the Commission or the Canadian Government raises serious objection hereto, or if the effective implementation of the Commission's management responsibilities is hindered hereby. The Master is hereby authorized and directed, subject to the provisions of Rule 53, Federal Rules of Civil Procedure, to act upon any request for relief at any time that the undersigned judge is unavailable to give timely consideration to the request.
6. The court retains the authority to modify or terminate the provisions of these findings, conclusion and decree, and the order signed July 16, 1975, implementing such, either on its own initiative or on motion of any party, whenever it appears to the court that such change is necessary or appropriate to conform to the holding of Final Decision # 1 or comply with the obligations of the United States under the International Sockeye Convention and Pink Salmon Protocol.

PERMANENT INJUNCTION RE 1975 FRASER RIVER SOCKEYE AND PINK SALMON HARVEST[11]

(Order of July 16, 1975, as modified July 30, 1975)[12]
The plaintiff tribes are willing to subject themselves to a regulation of the State of Washington as a temporary matter which *1056 provides that they may fish with any gear authorized by the state in all International Pacific Salmon Fisheries Commission Convention Waters when such waters are open to fishing by any United States fishermen. In the absence of any effective alternative solution having been submitted by the State of Washington Department of Fisheries to remedy the inequitable state of affairs presently facing the Indian treaty fishermen and on the basis of the above findings of fact, conclusions of law and decree of July 16, 1975,
IT IS HEREBY ORDERED, AND ADJUDGED that the Director of the Washington Department of Fisheries shall promulgate appropriate regulations effective immediately to insure that Indian treaty fishermen may fish with any gear authorized by the State of Washington in all IPSFC Convention Waters when such waters are open to fishing by any United States fishermen.

INJUNCTION STAYING PROCEEDINGS RE 1975 IPSFC FISHERIES IN CAUSE NO. 52881 BEFORE THE SUPERIOR COURT FOR THURSTON COUNTY, STATE OF WASHINGTON; AND DENIAL OF DEFENDANTS' MOTIONS

(August 6, 1975)[13]
The court having considered all evidence, briefs and oral argument of the parties hereby ORDERS as follows:
1. The court finds and concludes that it is necessary, in aid of this court's jurisdiction, and to protect and effectuate the judgment of this court securing rights guaranteed plaintiff Indian tribes by federal treaties, to stay and enjoin further proceedings in the Superior Court of the State of Washington for Thurston County in Purse Seine Vessel Owners Assoc., et al., v. Donald W. Moos, et al., (Cause No. 52881).
2. The injunction issued in said cause by the aforementioned superior court, dated July 23, 1975, and amended on August 1, 1975, is hereby stayed.
3. The aforementioned superior court is hereby enjoined, pursuant to 28 U.S.C. § 2283, from enforcing the injunction referred to in paragraph 2 above; and further proceedings in Cause No. 52881 are hereby stayed pending further order of this court.
4. This court hereby reaffirms its Findings of Fact, Conclusions of Law and Order of July 16, 1975, as amended on July 30 and August 6, 1975, and directs the State of Washington, its Department of Fisheries and the Director thereof, to repromulgate the regulations rescinded on August 1, 1975, by the Director of Fisheries by orders No. 1238 and No. 1239.
5. The motions of the defendant State of Washington for a further stay of this court's order and for certification of this court's order for expedited appeal are hereby denied.

PRELIMINARY INJUNCTION RE SWINOMISH INDIAN TRIBAL COMMUNITY CHINOOK FISHERY IN WEST BEACH AREA[14]

(August 8, 1975, as corrected August 18, 1975)
On motion of the Swinomish Indian Tribal Community and after hearings the court FINDS, HOLDS AND ORDERS as follows:
The Swinomish Indian Tribal Community desires to continue its treaty-right commercial fishery for chinook salmon at its adjudicated usual and accustomed fishing grounds off of Whidbey Island's West Beach using fishing gear that will minimize any harvest of sockeye or pink salmon. The West Beach fishing area is within "Convention Waters" over which the International Pacific Salmon Fisheries Commission has jurisdiction over the taking of sockeye and pink salmon under treaties with Canada. See pp. 1048-1055, supra. The State of Washington has cited a member of the Swinomish Indian Tribal Community for fishing *1057 for chinook salmon in this area during a time that the area was closed to fishing for sockeye or pink salmon by regulations recommended by the IPSFC and accepted by the United States. Fishing with a net having a stretch mesh size of 8¼" or greater results in only an incidental catch of sockeye or pink salmon which is so small in number as not to interfere with the management of the sockeye and pink salmon resource.
The treaty between the United States and Canada relates to the regulation of fishing for sockeye and pink salmon. The Swinomish Indian Tribal Community should be allowed to fish for chinook under regulations which safeguard the sockeye and pink salmon escapement.
IT IS ORDERED AND ADJUDGED that the State of Washington is hereby enjoined from prohibiting the fishing for chinook salmon by Swinomish Indian Tribal Community fishermen in the West Beach area defined as that area lying easterly of a line from Deception Island to Lawson Reef to Partridge Point and westerly of Whidbey Island provided that such fishing shall be done by the use of nets with a minimum eight and one-quarter inch stretch mesh, using a ten-pound weight on a wet net, unless said fishing results in more than an incidental catch of sockeye or pink salmon, or closure is necessary for conservation of the chinook salmon, and
IT IS FURTHER ORDERED that Mr. Ronald Costello, fish biologist for the Swinomish Indian Tribal Community, constantly monitor the fishery and if the catch of sockeye or pink salmon exceeds 5% of the catch to require closure of the fishery or report to the court, and
IT IS FURTHER ORDERED that the permanent injunction application be heard at 9:30 a. m., October 20, 1975.

ORDER RE CONDITIONAL FISHING RIGHTS OF CERTAIN PLAINTIFF-INTERVENOR TRIBES

(August 14, 1975)
This matter having come on regularly for hearing on the motion of the Samish, Snohomish and Steilacoom Tribes, and the court having found that it would be in the best interests of all parties to enter an order granting those tribes, along with the Snoqualmie Tribe who joined in the above motion, a temporary treaty fishing right to be exercised only after the compliance with special terms and conditions which are set out below. The court further finds that the Duwamish Tribe has forfeited its right to such conditional fishery. Therefore,
IT IS HEREBY ORDERED THAT:
The Samish, Snohomish, Steilacoom and Snoqualmie Tribes may exercise the following special fishing rights:
1. The right to fish under state regulations at times and places open to all citizens without the requirement of purchasing a state fishing license or being subject to the Washington State limited entry law, RCW 75.28.450-485; and
2. The right to fish at the invitation and under the regulations of any Indian tribe already having established treaty fishing rights in this case.
It is further ORDERED that prior to exercising those fishing rights established above, the Samish, Snohomish, Steilacoom and Snoqualmie Tribes shall comply with the following special conditions:
a. Compile, certify and file a complete list of those tribal members who are eligible to exercise the temporary treaty fishing right and who will be exercising the fishing rights established above.
b. Provide for each member whose name appears on the above-described list an identification card which will contain a picture of the card holder, along with the name of the card holder's tribe, tribal identification number and certificate of the tribal chairman establishing that the card holder may exercise treaty fishing rights.
It is further provided that prior to exercising treaty fishing rights at the invitation of any tribe which has already established its treaty fishing rights the Samish, Snohomish, Steilacoom and Snoqualmie Tribes shall
*1058 a. File with the court and serve on all parties: a written statement setting out the terms and conditions under which any of the above-named tribes will be fishing under the regulations and control of an inviting tribe, and
b. File and serve on all parties a declaration from the tribe that while fishing under the regulations of an inviting tribe each tribal member shall submit to the full regulatory power and authority of the inviting tribe including the power of the inviting tribe to enforce all tribal regulations on a member of one of the above-named tribes who is fishing under the inviting tribe's regulations.
No fishing shall commence under the conditions set out above until the required documents and/or agreements have been filed with the court and served on all parties. In addition, this order shall become effective only upon certification by counsel to the Department of Fisheries that each person of the respective tribe possesses a tribal identification card and upon the service on the Department of Fisheries of copies of the respective identification cards.
Except as may be otherwise provided by subsequent order of this court, the provisions of this order shall cease to apply to each of the aforesaid tribes and its members at such times as the court enters an order with respect to determination of the treaty status of said tribe.

ORDER RE TULALIP TRIBES' USUAL AND ACCUSTOMED FISHING PLACES

(September 10, 1975, as amended October 15, & December 29, 1975)
Pursuant to paragraph 25 of the injunction of March 22, 1974 (384 F.Supp. at 419), the Tulalip Tribes of Washington filed a Request for Determination of their Usual and Accustomed Fishing Places.
The Tulalips request a determination of their usual and accustomed fishing places both as to marine and fresh waters and anadromous and nonanadromous fish. The following areas are claimed as usual and accustomed fishing grounds and stations:
(1) All marine waters of the State of Washington lying within the lands and waters ceded to the United States of America by Article I of the Treaty of Point Elliott.
(2) All fresh waters of the Stillaguamish and Snohomish River systems together with all tributaries thereof including but not limited to all fresh water lakes connected thereto and the Snoqualmie and Skykomish River systems.
(3) All marine waters of Puget Sound and of the Strait of Juan de Fuca lying within the territorial limits of the State of Washington and outside of those waters ceded to the United States of America by Article I of the Treaty of Point Elliott.
Additionally, the Tulalip Tribes seek a finding that certain of the claimed usual and accustomed fishing areas are their exclusive fishing locations such that other tribes may be excluded or regulated.
The Stillaguamish Tribe objects to the Tulalip claims contending the latter have no usual and accustomed fishing grounds and stations on the Stillaguamish River or the northern portion of Port Susan. The Stillaguamish argue that under the current method of determining the usual and accustomed fishing places of a tribe entitled to treaty rights, no fishing places of the Stillaguamish should accrue to the Tulalips because of the small number of Indians of Stillaguamish descent presently enrolled as Tulalips. It is further argued that Stillaguamish Indians never settled on the Snohomish Reserve or the Tulalip Reservation in significant numbers for any substantial period of time. A grant of Stillaguamish fishing areas to the Tulalips, it is argued, cannot be sustained upon the minimal interaction between the two groups.
The Snohomish Tribe also objects to the Tulalip claims of exclusive fishing areas. It is argued that the Snohomish and Tulalips claim certain usual and accustomed fishing places, in common. Therefore a finding of exclusivity would either foreclose Snohomish claims or subject their fishing to Tulalip regulation.
*1059 In determining usual and accustomed fishing places the court cannot follow stringent proof standards because to do so would likely preclude a finding of any such fishing areas. Little documentation of Indian fishing locations in and around 1855 exists today. The anthropological reports of Dr. Barbara Lane, which this court finds highly credible, have been very helpful in determining by direct evidence or reasonable inferences the probable location and extent of usual and accustomed treaty fishing areas.
An additional method of locating tribal fishing locations subsequent to entering into treaties was established in these proceedings, upon the credible testimony of tribal elders who speak from personal experience or data acquired from other sources. In the present case the testimony of Mrs. Harriett Shelton Dover regarding marine fishery areas of a tribal component of the Tulalip Tribes was substantially confirmed by the testimony of Dr. Barbara Lane. Where there is conflicting evidence or the testimony of tribal elders is the sole evidence of usual and accustomed fishing grounds and stations, counsel should make extra efforts to assure the court that such testimony is of sufficient accuracy to support findings of usual and accustomed fishing places or areas. A few examples of the court's concerns are the source(s) of the witnesses' information, the knowledgeability of the witnesses with respect to fishing places, means and methods, the identity of the user group(s) and the frequency of fishing activities. There are other similar considerations and the foregoing list is not exhaustive. The court does not mean to suggest that the testimony of any tribal member was knowingly exaggerated or erroneous; indeed, each of the witnesses was highly credible to the extent of his or her knowledge. The court's concern and objective is to act upon the most accurate and authoritative data concerning usual and accustomed fishing places that can be developed by thorough investigation and research.
Because the court was provided with copies of findings of fact supporting decisions of the Indian Claims Commission, a caveat concerning that source of information is appropriate. The primary purpose of those proceedings was for the establishment of aboriginal territories in order to base claims for compensation pursuant to 25 U.S.C. § 70a. That inquiry was not directed to determining fishing places but to prove land use and occupancy. In the present case, the findings of the Claims Commission of the Indian coastal and river villages, from which fishing activities may be presumed, coincide with the findings of Dr. Lane and the testimony of Mrs. Dover. Future utilization of Indian Claims Commission decisions and findings for the purpose of establishing usual and accustomed fishing places shall be given consideration consistent with the above stated limitations.
After fully considering the memoranda and argument of counsel as well as the testimony of Dr. Lane, Mrs. Dover and Mr. Williams, the court finds and holds as follows:

A. MARINE FISHERY
The Tulalip Tribes claim extensive marine areas as usual and accustomed fishing places. Notwithstanding the court's prior acknowledgement of the difficulty of proof, the Tulalips have the burden of producing evidence to support their broad claims. In view of their burden, the evidence adduced in this matter, and subject to the conditions enumerated hereafter, the following described areas are found to be usual and accustomed marine fishing areas of the Tulalip Tribes of Washington: Beginning at Admiralty Head on Whidbey Island and proceeding south, those waters described as Admiralty Bay and Admiralty Inlet, then southeasterly to include the remainder of Admiralty Inlet including Mutiny and Useless Bay, then northeasterly to include Possession Sound and Port Gardner Bay, then northwesterly to include the waters of Port Susan up to a line drawn true west of Kyak Point and Holmes Harbor and Saratoga Passage up to a line drawn true west of Camano on Camano Island.

*1060 B. FRESH WATERS
The court is satisfied that the Indians who settled on the Snohomish Reserve and the Tulalip Reservation, and whose descendants comprise the numerical majority of the present Tulalip Tribes, were members of tribes known today as Snoqualmie, Snohomish and Skykomish. The following usual and accustomed fresh water fishing places of the foregoing tribes are for present purposes the usual and accustomed fishing places of the Tulalip Tribes, subject to the conditions below: the Snohomish River system including tributaries and fresh water lakes and the Snoqualmie and Skykomish River systems.

C. CONDITIONS
These findings of the Tulalip Tribes' usual and accustomed fishing places are provisional until further order of the court. The court will entertain future argument and receive further evidence, from any affected party, going to possible expansion or limitation of these provisional findings and whether the findings should be made permanent. Ruling on the Tulalip Tribes' claims of exclusive fishing areas is reserved pending receipt of further evidence and argument. These provisional findings shall have no application whatsoever upon claimed usual and accustomed fishing places by the Duwamish, Samish, Snohomish, Snoqualmie and Steilacoom tribes.

STIPULATION RE NOTICE OF REGULATIONS

(October 15, 1975)
The Puyallup Tribe has requested a determination of the requirements for adequate notice prior to state enforcement of state regulations against treaty Indian fishermen. In resolution thereof the court hereby approves a stipulation of the Department of Fisheries, the Department of Game and certain plaintiffs in which it is agreed that notice of emergency regulations promulgated by said departments may be served on the tribes by first-class mail addressed to the most recent tribal address filed with the Department of Fisheries or Game, as the case may be, or by personal service on the tribal chairman or other designated tribal representative; provided, that no enforcement action shall be undertaken against a tribal fisherman until (a) 24 hours after such regulation has been filed with the court and delivered to the home or office of the designated tribal representative either in person or by reasonably anticipated mail or other receipt during normal office hours, or (b) the fisherman has been given personal notice of the regulation and an opportunity to desist from further noncompliance after such notice.

DECISION RE CERTAIN ON-RESERVATION FISHERIES OF PUYALLUP AND NISQUALLY TRIBES

(October 21, 1975)[15]
The following finding of fact is made in this action:
No. 285. The on-reservation fisheries of the Puyallup and Nisqually Tribes for pink and chinook salmon involve runs which are subject to the decrees of this court in this case because they are the subject of treaty provisions securing to these and other Indian tribes the right of taking fish at off-reservation locations in common with others. These fish are subject to Indian and non-Indian fisheries both before and after they pass through the reservations. Thus, on-reservation and off-reservation fisheries on these runs are interrelated and the preservation of such runs can be affected by the extent of both on- and off-reservation fishing on them.
The following conclusions of Law are made in this action:
No. 67. The State of Washington has no jurisdiction to restrict or regulate fishing by Puyallup or Nisqually Indians within the exterior boundaries of their reservations.
No. 68. This court has jurisdiction over the Puyallup and Nisqually Tribes and *1061 jurisdiction in this case to order them to curtail or terminate their fisheries within the exterior boundaries of their reservations on runs of fish affected by this court's decrees when necessary for the effectuation of the decrees or the preservation of the runs.
The finding of fact and conclusions of law set forth in the previous paragraphs are hereby certified as final determinations for the purposes of appeal pursuant to 28 U.S.C. § 1291.

ORDERS ESTABLISHING FISHERIES ADVISORY BOARD AND PRESCRIBING PROCEDURES FOR STATE EMERGENCY REGULATIONS

(October 28, 1975, as amended and supplemented December 17, 1976)
In order to promote the goals established in Final Decision # 1  increased communication between the parties (384 F.Supp. at 329-330) and consultation before tribal or state regulations affecting treaty fishing are adopted (384 F.Supp. at 341, 420)  and to establish a more orderly procedure for making day-to-day management decisions, thereby reducing the need for adversary proceedings,
IT IS HEREBY ORDERED THAT

1. Establishment and Composition of Fisheries Advisory Board.

1.1 There is established a Fisheries Advisory Board composed of two members selected as follows:
(a) One member selected by the State of Washington and the defendant agencies.
(b) One member selected by the Treaty Indian tribes.
1.2 There shall be in addition a nonvoting chairman whose function shall be to convene meetings, act as moderator, and perform such other duties as are provided herein, or agreed to by the parties, or directed by the court. Dr. Richard Whitney, the court's technical advisor, shall serve as chairman.
1.3 The state and the tribes are responsible for selecting their representatives and shall promptly inform the chairman of any changes or substitutes appointed by either the state or the tribes. The representatives shall serve as the members of the Fisheries Advisory Board until the chairman is notified by either the Northwest Indian Fisheries Commission or the state of the selection of new or alternative representatives.

2. Jurisdiction and Authority of the Board.

2.1 Submission to Board. The Board shall consider only those matters relating to the fishery resource that are submitted to it by the court or any party. The Board shall advise the court on technical aspects of the case and make recommendations on questions of management and regulation of the resource.
2.2 Committee Reports. The Board members, upon agreement, shall have the authority to appoint temporary committees to study particular matters submitted to the Board for which more information is needed. A committee shall have only those powers delegated to it by the Board members and shall report back to the Board by a date certain. Committee reports are not binding on any party or Board member and need not be filed with the court but shall be given to any party upon request. The Board may adopt such other and further procedures as are acceptable to the parties.
2.3 Right to Judicial Determination of Matters. Nothing in this order shall affect the right of any party to judicial determination of any matter within the court's continuing jurisdiction, as specified in previous orders of the court, provided that if the matter is within the Board's jurisdiction, it has first been submitted to the Board for consideration and an aggrieved party seeks review of the Board's determination or the Board has been unable to reach agreement. If the matter for determination is of such an emergency nature that delay would threaten serious harm to the resource, then submission to the Board shall not be required prior to submission to the court.

*1062 3. Board Procedures.

3.1 The Board shall convene at the request of a member or any party or the court. The chairman shall give to all parties, amici, the Northwest Indian Fish Commission and the members of the Board such notice of a Board meeting as is practicable, taking into account the urgency of the matters to be considered. Provided, however, that any party directly affected by the matters to be considered shall be given actual notice within such time as is reasonable in the then existing circumstances. Any party may object to the jurisdiction of the Board to hear any matter referred to it. In such a case the Board shall take no action until the court has determined that the Board has jurisdiction to hear the matter.
3.2 The chairman shall preside over meetings of the Board. The chairman shall briefly state the matter to be considered and then call upon the Board member or party referring the matter to the Board to make a presentation concerning it. In any proceeding, an affected party may be represented by the person of the party's choice. Any party may call witnesses to give testimony in the nature of evidence before the Board. No person shall have a right to give testimony before the Board unless called as a witness by an affected party, a Board member or the chairman. Board members may participate in questioning witnesses and the representative of the parties. Proceedings shall not be under oath but any portion thereof may be recorded at the request of any party. The chairman may make whatever rulings deemed reasonably necessary in terms of limiting the number of participants and the length of time allowed to each participant. Meetings shall be open to attendance by any person or group.
To aid in an orderly procedure, any party requesting a meeting of the Board shall attempt to advise the chairman as soon as possible as to the nature of the party's presentation, including the number of participants, time needed, etc.
3.3 The Board chairman or member designated by a majority of the Board shall prepare a written report of the Board's proceedings after each meeting which shall be filed with the court and served on all parties and amici. The report shall be limited to a summary of what transpired at a Board meeting, and shall include whenever applicable an exact statement of any agreements reached by the participants.
3.4 The court's technical advisor shall, upon the request of the court, or any party, report to the court and all parties, his analysis of the matters discussed in the Board meeting and recommendations, if any. Whenever practicable said analysis and recommendations shall be provided to all parties and the court in writing prior to a hearing.
3.5 The Board shall establish such other and further procedures for its deliberations as it deems advisable and shall include a description of such procedures in its reports to the court and parties.

4. Procedures for Promulgation and Enforcement of State Conservation Regulations.[16]
4.1 The state shall retain the responsibility for conservation closures.
4.2 This section 4 is intended to further define paragraph 19 of the injunction of March 22, 1974 (384 F.Supp. at 417), which requires: "a statement of facts and circumstances of the emergency on which the regulation is based."
4.3 No state conservation regulation which would close or limit an off-reservation treaty fishery which is open pursuant to tribal regulation shall be enforceable unless adopted pursuant to the requirements of this section 4; provided, the state may apply directly to the court for enforcement of an emergency conservation regulation that is adopted without following the procedures specified herein. Any state emergency conservation regulation which complies with the procedures of this section, or is specifically approved by the court, may be enforced by the state.
*1063 4.4 As soon as the state has reason to believe that it may become necessary to enact and enforce an emergency conservation regulation affecting off-reservation treaty fishing, it shall give notice either directly or through the chairman of the Fisheries Advisory Board to all affected tribes of the potential emergency specifying the data upon which the state bases its opinion that an emergency regulation may be necessary. The state shall continue to provide up-dated data to all affected tribes and to the chairman of the Fisheries Advisory Board.
4.4.1 Each tribe that desires to be governed by the notice procedures and requirements contained in paragraphs 4.5 and 4.6 shall contribute to a central 24-hour telephone service to receive notice by the state of any proposed emergency conservation closure.
4.5 At least forty-eight (48) hours prior to the effective date of any state emergency conservation regulation which would affect off-reservation treaty fishing, the state shall:
4.5.1 Request that the Fisheries Advisory Board convene to study the need for such regulation.
4.5.2 Serve on all affected tribes copies of any emergency regulation along with a statement of the basis of the alleged emergency and supporting data that would justify the proposed emergency conservation regulation.
4.6 The Fisheries Advisory Board shall convene, if desired by any party, at least twenty-four (24) hours prior to the effective date of the proposed state emergency conservation regulation and shall consider the propriety of the proposed regulation(s).
4.6.1 The state shall present to the Board all data supporting the state's proposed regulation with an explanation of the relevancy of such data.
4.6.2 Any affected party may present additional data or explanation thereof intended to rebut or support the state's presentation.
4.6.3 Whenever possible the Board shall convene so as to facilitate oral presentation of all relevant data.
4.7 Reports of any Board recommendation shall be prepared consistent with paragraph 3.3 of these procedures.
4.8 Any affected party may seek immediate court review. Request for emergency consideration by the court will be give priority.
This order does not apply to self-regulating tribes except where made applicable to them by Final Decision # 1, and previous orders of this court; provided, that by agreement between any self-regulating tribe and a state defendant, the procedures set out in this order may be invoked to provide a hearing before the Board on any issue within the scope of this order.
6. These rules and guidelines shall apply until further order of the court or until modified by agreement of all parties. If after a substantial period of time, barring any emergency, this order proves unsatisfactory, any party may apply to the court for modification of the order.

ORDER FOR INTERIM PLAN FOR MANAGEMENT OF HERRING FISHERIES

(February 13, 1976)[17]
IT IS HEREBY ORDERED that the following Interim Plan for Management of Herring Fisheries as agreed to by the parties shall be followed.

I. General Provisions for Management of All Herring Fisheries.

A. Guideline Principles for Herring Fisheries Management.

The March 12, 1975, joint statement of "Principles of Management for Herring" prepared by biologists for the principal parties hereto shall apply to this Interim Plan.

B. Treaty Status and Fishing Areas.

The provisions of Part F of the order of October 8, 1974, (supra, at 1037) relative to *1064 determination of treaty status and fishing areas shall apply to the administration of this Interim Plan.

C. Modification of Plan.

This plan is subject to modification and further refinement as additional information and further experience become available. The parties will continue to develop such information and experience and will consult frequently with each other on general and specific problems or conditions in an effort to achieve as completely and rapidly as possible full compliance with the spirit and objectives of the orders of March 22, 1974. Any modifications or refinements agreed to by the affected parties shall become effective upon filing with the court without further action or approval of the court unless such further action is specified therein. Any party may submit requests for other modifications or refinements for approval or other appropriate order by the court.
Tribes having qualified for self-regulation are not bound by the particulars of this Plan, other than as directed by the terms of Final Decision # 1 and the injunction entered pursuant thereto.

II. Sac-Roe Herring Fisheries

A. Collection and Exchange of Information for the Sac-Roe Fishery.

Data of the type required to be exchanged by the parties under paragraphs 17 and 18 of the injunction of March 22, 1974 (384 F.Supp. at 417), and paragraph 7 of the Interim Plan and Stay Order of that date (384 F.Supp. at 420) shall be furnished at the earliest practical times after such data become available, but no later than the following schedule:
1. The Department of Fisheries shall furnish the participating tribes information regarding the estimated total biomass of spawners and timing and condition of the run at least one week prior to the anticipated commencement of a sac-roe herring fishery.
2. Prior to the opening of a sac-roe herring fishery, the Department of Fisheries shall determine, in consultation with tribal and federal biologists, and inform the tribes of the appropriate amount of the total sac-roe herring that may be harvested, taking into account the amount of fish to be left for spawning and the amount to be left as forage for other fishes.
3. The portions of the total harvestable amount that shall be deemed on-reservation and off-reservation catches shall be established prior to the opening of the season. The parties shall thereafter regulate the fisheries under their respective controls so as to attempt to achieve such agreed division of harvest.
4. Prior to opening of any sac-roe herring fishery, the participating tribes and Department of Fisheries shall exchange information on the number and types of gear units to be used in the fishery, and the areas in which the sac-roe fishery may be authorized.
5. At least weekly during the sac-roe herring fishing season, the Department of Fisheries, in consultation with the tribal and federal biologists, shall review, and if appropriate shall revise, the estimates of total biomass and harvestable amount.
6. The state, tribes and Federal Government may, jointly or separately, conduct test fisheries to determine independently the stage of maturity of the sac-roe herring available, both before and after the scheduled commencement of the commercial fishery. The undertaking of such test fisheries shall not require the consent of the other parties if conducted under the authorization of the Fisheries Advisory Board.
7. The Department of Fisheries, the plaintiff tribes participating in any sac-roe herring fisheries, and the United States Fish and Wildlife Service shall exchange data daily as to the amount of catch for the preceding day and as to any other factors that will affect the need to make any adjustment in the then existing regulations governing either the treaty Indian or nontreaty sac-roe herring fishery.

*1065 B. Regulation of the Treaty and Non-treaty Sac-Roe Herring Fisheries.

1. The treaty tribes entitled pursuant to decisions of this court to participate in any off-reservation sac-roe herring fishery on the one hand and the nontreaty fishermen entitled to participate pursuant to state law on the other hand are each entitled to the opportunity to take up to 50 percent of the off-reservation harvestable amount of such herring. Close coordination of the regulation of the treaty and nontreaty herring fisheries, particularly those for which the fixing of catch limits is required, is necessary to assure the conservation, full permissible utilization, and lawful allocation of the herring resource as prescribed by this court. Accordingly, it is necessary that the tribes and the Washington Director of Fisheries each retain, and promptly exercise when appropriate, the authority and capability to enact on an emergency basis, and place into immediate effect, subject to limitations prescribed by this court, additional openings or closures or other modifications to their respective regulations that in conjunction with the permissible regulations of the other parties will reasonably assure such protection, harvest, and allocation.
2. At least forty-two (42) days before a proposed opening of a sac-roe fishery, representatives of the Department of Fisheries and all affected tribes shall meet together to discuss and attempt to reach agreement on proposals for fishing regulations, except for such provisions as catch limitations or open and closed periods that cannot reasonably be determined until a later date. The participating tribes shall adopt and file joint fishing regulations at least five (5) days before a proposed opening; regulations shall be filed pursuant to paragraphs 1 and 3 of the Interim Plan and Stay Order (384 F.Supp. at 420); provided that emergency regulations are enforceable upon filing with the court and service upon the affected parties of a copy of such regulations and a statement of the facts and circumstances of the emergency on which the regulation is based. Any party may respond and seek immediate review. Requests for emergency consideration by the court will be given priority and determined rapidly.
3. Whenever such closure or curtailment will increase the opportunity of the Indian treaty fishery to take more of the harvestable portion of such run, the Department of Fisheries shall close or curtail the nontreaty sac-roe fisheries on any run of herring when the nontreaty catches reach or are expected to reach 50 percent of the previously determined total off-reservation harvestable quantity from that run. If the tribes fail to do so the Department may likewise close or curtail Indian off-reservation treaty commercial fisheries on said run whenever those fisheries have taken 50 percent of the previously determined total off-reservation harvestable quantity from said run.
4. It is necessary for proper enforcement of state and tribal regulations that may be promulgated to carry out this order that identification of treaty fishermen and the number and identity of boats and gear used in both the treaty Indian sac-roe herring fisheries and nontreaty sac-roe herring fisheries be known to state and tribal enforcement authorities. Accordingly, the provisions of prior orders of this court concerning identification of treaty fishermen and of gear used in the treaty fisheries shall apply to all treaty-right herring fisheries. In addition, no boat or fishing gear shall be used in the exercise of Indian treaty rights with respect to any herring fishery until such boat or gear has been specifically registered with and its use in such fishery or area authorized by the tribal authorities of the user's tribe and notice of such registration and authorization has been given by the tribal authorities to the Department of Fisheries. The Department shall also immediately be notified of the cancellation or suspension of any such registration or authorization. The registration and notice shall contain at least the following information: name and address of the owner and operator; type and name, if any, of the vessel; tribal identification number; type of gear to be used; and area or areas for which registered. No fishing boat or unattended *1066 fishing gear or buyer boat shall be used in the exercise of Indian treaty rights with respect to any herring fishery unless there is affixed to it an identification tag, the style and type of which and the location at which affixed shall have been agreed to previously by the Director, Washington Department of Fisheries, and the Northwest Indian Fisheries Commission. Use of any vessel or gear in violation of this paragraph may be subject to the provisions of state law or regulation applicable to nontreaty fishermen. The Department of Fisheries shall require nontreaty boats and gear  including buyer boats  used in the sac-roe herring fisheries to be similarly identified.
5. The parties are encouraged to continue their direct dealings for maintaining and improving the cooperative enforcement of the applicable regulations for the herring fisheries.
6. This court retains continuing daily jurisdiction over the implementation of this order. Any party hereto or any other person aggrieved by any action or failure to act on the part of another party pursuant to this order shall bring the matter to this court for an appropriate order to implement the requirements of this order. Consideration of such matters will be given on a highly expedited basis by the court. The Master is hereby authorized and directed, subject to the provisions of Rule 53, Federal Rules of Civil Procedure, to act upon any request for relief at any time that the undersigned judge is unavailable to give timely consideration to the request.

III. Herring Fisheries Other than Sac-Roe.
1. Because of some early expressions of interest in fisheries for herring other than for sac-roe, the following provisions are adopted as preliminary guidelines. It is expected that provisions will be added as experience is gaining with the fishery.
2. In any new fishery or significantly increased fishery, the parties shall keep each other informed as to catches and proposed efforts by fishermen participating in nonsac-roe herring fisheries. The parties will promptly notify each other in writing of any significant increase or anticipated increase over present levels of catches in those fisheries or of any other indication of the desirability of prescribing catch limitations, and upon request in writing of the other shall discuss such desirability. Information concerning anticipated activity in those fisheries shall be furnished by each party to the other a least twenty (20) days prior to any appreciable increase in the present level or geographic area of such activity or as otherwise requested by the Department pursuant to paragraph 17 of the injunction Order of March 22, 1974 (384 F.Supp. at 417).

ORDER RE MAKAH TRIBE'S REQUEST FOR RECONSIDERATION OF LOWER ELWHA USUAL AND ACCUSTOMED FISHING PLACES

(March 10, 1976)
The essence of this dispute is the fact that the court in its rulings has recognized usual and accustomed fishing areas for use by both the Makah Tribe and the Lower Elwha Band. The Makah objections to the Lower Elwha regulations are a result of the tribes promulgating fishing regulations for common areas which are not identical.
The adjudicated usual and accustomed fishing places of the Makah Tribe are specified in Finding of Fact # 65 (384 F.Supp. at 364).
The adjudicated usual and accustomed fishing places of the Lower Elwha Band of the Clallam Indian Tribe are contained in paragraph 3 of the Order and Decree re Herring Fisheries entered April 18, 1975[18] (p. 1049 supra). Those findings are hereby confirmed subject to the conditions specified in this order.
*1067 The Lower Elwha Band also claims additional marine and river areas as usual and accustomed fishing places[19] but the court declines to rule or consider such claims at this time.
The common fishing areas of the Makah Tribe and the Lower Elwha Band are as follows:
The marine waters of the Strait of Juan de Fuca east to Port Crescent (near Port Angeles) and the rivers and streams along the Strait of Juan de Fuca from the Hoko River east to the Lyre River, including the Pysht River and Twin River.
There is no dispute with respect to Makah and Lower Elwha fishing in common marine areas. The dispute concerns which of the tribes has fishing rights on the common rivers (Hoko, Pysht, Twin and Lyre) which are primary to the rights of the other tribe, to the extent that one tribe may control or preclude fishing by the other on those rivers.
The Lower Elwha Band contends that joint fishing between the tribes should take place on the Hoko River and that all rivers east of the Hoko were historically within Clallam-controlled lands and, therefore, any Makah fishing rights on those rivers should be subject to the permission of the Lower Elwha Band.
The Makah Tribe contends that its "modus operandi" at treaty times[20] precludes this court from making the Makah Tribe's right to fish the Hoko and rivers east thereof subject to the control and regulation of the Lower Elwha Band.
The testimony and reports of Dr. Barbara Lane have been found on numerous occasions to be highly credible and well researched and justify reliance thereon by the court. Her testimony in this matter establishes that some form of a joint fishery existed on the Hoko River between the two tribes, that east of the Hoko River was Clallam territory over which the Clallams exercised some control and that any Makah fishing on rivers within the Clallam territory was due to kinship, individual in nature and based upon intermarriage, or a grant of permission. The concept of territorial control with instances of permissive use, as asserted herein, is "the generally accepted view of people concerned with ethnography of this area" and is a conclusion supported by the evidence. (Tr. Aug. 6, 1975, pp. 151-171.)
Upon a full and careful examination and consideration of the briefs, exhibits and transcripts of the testimony taken on July 30 and August 6, 1975, the court concludes: (1) that the Makah Tribe and the Lower Elwha Band should exercise a joint fishery, wherein neither tribe shall exercise control or regulation over the other, on the Hoko River but that Makah fishing on rivers or streams east of the Hoko to Port Crescent shall be subject to the control and regulation, as defined above, by the Lower Elwha Band of the Clallam Indian Tribe; (2) the Lower Elwha fishing on the Sekiu River shall be subject to the control and regulation by the Makah Indian Tribe; (3) a joint fishery as defined above shall exist with respect to Makah and Lower Elwha fishing in the marine waters of the Strait of Juan de Fuca.
If any disputes arise with regard to the joint fishery, the matter shall be referred to the Northwest Indian Fisheries Commission for hearing, upon notice and oral presentation by the parties; the decision of the commission and written findings of fact and conclusions of law, if requested by the parties, may be reviewed by the court, or Special Master, and will be rejected or modified only when the decision and findings *1068 and conclusions, if any, are clearly erroneous.
The court is convinced that the best interests of both tribes will best be served by reasonable and equitable consideration of each tribe by the other.[21]

ORDER RE TULALIP TRIBES' OBJECTION TO STILLAGUAMISH FISHING REGULATIONS

(March 10, 1976)
The Tulalip Tribes object to the 1975 and 1976 Stillaguamish Indian fishing regulations for the following reasons:
1. That Finding of Fact # 146 (384 F.Supp. at 379) and Final Decision # I limit the Stillaguamish Tribe to a subsistence fishery.
2. That the foregoing finding of fact plus Final Decision # I prohibit Stillaguamish tribal fishing in the marine waters of the northern portion of Port Susan.
3. That the membership roll and organizational structure of the Stillaguamish Tribe have not been approved by the Secretary of the Interior.
4. That there has been no determination by the United States that the Stillaguamish Tribe is the present day successor in interest to treaty fishing rights.
5. That 1975 chinook catch quotas are excessive and that summer run steelhead quotas are nonexistent.
The court finds the construction given Finding of Fact # 146 by the Tulalip Tribes to be without merit. That finding merely sets forth the historical extent to which the Stillaguamish exercised their treaty fishing right. Nothing contained therein limits or precludes present-day commercial fishing activity by the Stillaguamish tribal members duly authorized.
The contention that the Stillaguamish Tribe may not fish the northern portion of Port Susan because no usual and accustomed fishing places existed there historically or have been recognized by this court presents a more difficult question. Finding of Fact # 146 sets forth the usual and accustomed fishing places of the Stillaguamish Tribe as follows:
"* * * the Stillaguamish River and its north and south forks, which river system constituted the usual and accustomed fishing places of the tribe." 384 F.Supp. at 379.
Paragraph 25 of the court's injunction in Final Decision # I (384 F.Supp. at 419) establishes the mechanism whereby further usual and accustomed fishing grounds may be established and recognized by the court. The Stillaguamish Tribe has not sought to expand its fishing places to include the northern portion of Port Susan by following the procedures set forth in that paragraph. It is only as a result of the Tulalip objections that the court has been made fully aware that the Stillaguamish Tribe has, apparently unilaterally, expanded its fishing places beyond those areas recognized and determined in Final Decision # I. For all of the foregoing reasons the court sustains the objections of the Tulalip Tribes to the Stillaguamish fishing regulations insofar as they authorize tribal fishing activities at grounds and stations beyond those determined and recognized in Final Decision # I. The Stillaguamish Tribe may at any future time apply to this court for hearing, or reference to the Master, regarding expanded usual and accustomed fishing places so long as such application is in accordance with paragraph 25 of the court's injunction.
Further, the court has been made aware that other treaty tribes have sought to expand *1069 their usual and accustomed fishing places not in accordance with the procedures of paragraph 25 but by filing fishing regulations merely including such additional places. Such conduct evidences a disregard for the court's rulings and procedural guidelines meticulously set forth in Final Decision # I. Those tribes or counsel expanding fishing places in a manner inconsistent with Final Decision # I are admonished to follow its provisions or risk the imposition of sanctions.
The fact that the Stillaguamish tribal organization and membership roll have not been approved by the Secretary of the Interior has no effect upon the exercise of treaty fishing rights as found by this court and affirmed by the Ninth Circuit Court of Appeals. (520 F.2d 676 (9th Cir. 1975).) Counsel for the Tulalip Tribes cite Conclusion of Law # 15 (384 F.Supp. at 401) for the proposition that nonapproval of the Stillaguamish rolls and organization within one year of Final Decision # I abrogates the treaty fishing rights in the Stillaguamish Tribe. Such a position is untenable in view of the Court of Appeals' opinion wherein that court affirmed the treaty status of the Stillaguamish Tribe and confirmed the fact that the tribe is composed of descendants of treaty signatories and has maintained a tribal organization. (520 F.2d at 692-693.)
The contention that there has been no determination that the Stillaguamish Tribe is the present-day successor in interest to treaty fishing rights negotiated in 1854-55 is unfounded in view of Finding of Fact # 144 (384 F.Supp. at 388) and the court of appeals' affirmance.
In sum, the Tulalip Tribes' objections are sustained only to the extent that the Stillaguamish tribal regulations purporting to open tribal fisheries at grounds and stations other than those determined and recognized in Final Decision # I are unauthorized and therefore stricken from the 1975 and future regulations. This decision shall remain in effect unless and until the court provides otherwise.

ORDER ON CERTAIN QUESTIONS RE: SALMON FISHERIES MANAGEMENT

(April 13, 1976)
The court's Fisheries Technical Advisor has propounded certain questions which he believes require resolution by the parties or the court in connection with the further implementation of this court's prior orders and he has actively sought consultations with and recommendations concerning these questions from all of the parties. He has held consultations with such representatives as sought to participate and has considered all views submitted by any party hereto. Thereafter, the court held hearings at which the Fisheries Technical Advisor's report and recommendations together with all written memoranda and oral argument of the parties were considered. The court having considered all of the foregoing and recognizing the need for an interim tentative determination of the issues presented to apply to the development of a management program for the coming year hereby ORDERS AND DECREES as follows:
In the preparation and implementation of a salmon fisheries management program for the case area for the year 1976 to continue the progressive implementation of the orders and decrees of this court in this case, the principles and guidelines set out below as answers to the questions shall apply.[22] These answers are intended to implement the prior orders of this court and nothing herein is to be applied so as to change any provisions of Final Decision # I or other prior rulings or orders of the court as affirmed by the court of appeals. The court hereby reaffirms its intention, as previously expressed, that these principles and guidelines are to be applied so as to advance progressively toward the full and early realization of the opportunity for treaty fishermen to take their treaty-secured entitlement as set forth in Final Decision # I. The parties having not yet fully considered *1070 the application of these principles and guidelines to the steelhead fisheries, they shall presently be applicable only to the salmon fisheries management.[23] The questions and responses are as follows:
1. Are fish of Canadian origin to be counted in the same set of books as those of United States origin? and
4. Are shares to be calculated on a stream-by-stream basis, or a regional basis, or for the case area?
Response: The shares which treaty and nontreaty fishermen are to be accorded the opportunity to harvest shall be calculated on a river-system by river-system basis wherever practical. This shall be based upon the system of origin and shall apply regardless of where the fishery occurs. Further clarification is presented in the responses below. In some cases, for more effective management or because data for stock separation do not exist, the sharing must be on a regional basis.
Shares will be calculated on a regional basis for South Puget Sound and Hood Canal, and on a river-system by river-system basis for the remainder of Puget Sound and the Washington coast (including the following combinations: Nooksack-Samish, Stillaguamish-Snohomish).
Canadian stocks passing through usual and accustomed fishing areas will be considered as a separate "river system" as will each other major salmon stock originating outside the case area.
All parties shall manage the salmon runs so as to insure that salmon in sufficient numbers return to each region or each river system or each combination as described above to allow treaty fishermen a fair opportunity to harvest their shares.
Nothing contained herein shall limit the court's authority to make equitable adjustments to the full extent provided for in Final Decision # I and the injunction of March 22, 1974.
2. Are shares to be calculated separately for chum salmon stocks that differ in the timing of their runs?
Response: No  not for stocks within the same region or river system or combination described above  but they shall be managed separately.
3. What is an appropriate on-reservation share?
Response: This will be negotiated on a reservation-by-reservation basis between the state and each respective treaty tribe. Each tribe may initially inform the state what the tribe believes will be its fair and reasonable on-reservation catch and how the amount was calculated. If the state does not agree with the amount of or the method of arriving at the estimate of the amount, the state may request supporting data from the tribe to be used in carrying forward the negotiations. The tribal estimate shall govern unless it is shown to be significantly inaccurate.
5. Are fish caught by foreign fishermen within United States contiguous waters to be counted in the non-Indian share?
Response: No. For the present such fish shall not be counted in the non-Indian or treaty-Indian share.
6. Do fish caught outside of state territorial waters (i. e., outside of three miles) count in the shares?
Response: Such fish originating in the case area which are harvested by
(a) Washington fishermen outside of the territorial limits of the State of Washington, and
(b) other United States fishermen and landed in the State of Washington
shall be included in the total number from which shares will be determined. The court reserves its exercise of equitable discretion to determine the number of fish harvested by the above classes of fishermen that will be included in the allocation until presented with evidence upon which to base the extent of such discretion. See also answers to questions 7 and 8.
7. Are juvenile fish caught in the sport fishery to be considered equally with mature *1071 fish taken by commercial and Indian fisheries?
8. Are fish in the offshore troll fishery to be considered equally with mature fish taken on their way to the streams?
Response: For purposes of determining the appropriate off-reservation allocation, all runs will initially be computed as those harvestable numbers of salmon that would return to treaty fishing areas in the absence of nontreaty fishing as clarified under No. 6. The reservation, ceremonial and subsistence catch adjustment (see question 3) will then be subtracted before equal catch shares are computed. Each projected run size will be a net result of accounting for natural mortalities, additional Canadian interceptions, and direct fishery-related wastage, such as hooking mortality and net "drop-out" which are not reflected in actual landings. The first two factors would take place in the absence of nontreaty fishing and reduce projected run sizes, while the third factor has an opposite effect.
These factors shall be used in recomputing the actual harvest in a sport fishery, a fishery on juveniles, or a troll fishery, whether the harvest is made by a treaty fisherman or a nontreaty fisherman.
9. How do we determine whether one party or the other is unable to harvest its 50%?
Response: There is little doubt that nontreaty fisheries can harvest greater than their 50% of any case area salmon stock, and the issue has been over the fishing power of treaty fisheries.
Treaty tribes should submit to the state, along with their proposed regulations, documentation of their expected fishing power for upcoming fisheries. The documentation should include descriptions of fishing gear, estimates of the number of units of each type of gear, the times and places the gear will be fished, and a statement of the tribe's anticipated harvest level or intent to take its full share.
If the state disagrees with the tribe's estimate of fishing power, the state must show that the tribal effort will not be sufficient with a critical evaluation based on some factual information. The evaluation must be based on projected estimates of increased effort and/or estimates of effectiveness of any new techniques planned by the tribe.
If in the future it is a nontreaty fishery that has questionable fishing power, the responsibilities outlined above will be reversed.
10. (a) If the state negotiates with Indians to take surplus fish at the hatcheries, will the fish be counted as part of the 50%?
Response: All agreements should be negotiated on a tribe-by-tribe basis. Hatchery surplus fish used for ceremonial, subsistence or charitable purposes shall not count in the Indian share. The number of fish taken at the hatcheries for commercial use shall be subject to a reduction on an equitable basis to reflect the reduced value of those fish. The nature and extent of such reduction shall be negotiated by each tribe.
(b) Will fish sold on bid to non-Indians or donated to institutions for the needy count in the non-Indian share?
Response: No. The surplus fish are taken by the state government and used for charitable purposes and the funds derived from the disposal of the fish are used for state governmental purposes. Thus the fish shall not count in the non-Indian share.
11. What is the definition of a test fishery?
Response: A test fishery is a fishery allowed on a limited basis for the purpose of acquiring technical or management information including run strength, timing, composition, gear selectivity, exploitation rate, and enhancement possibilities. Any fish taken in test fisheries are not to be sold for personal profit.
Procedural guidelines governing test fisheries shall be established in the jurisdictional guidelines which will be a part of the joint management plan.
12. Is there a time schedule within which the court is willing to allow the Department *1072 of Fisheries to operate in moving toward providing the full 50% harvest opportunity for Indians?
Response: The Washington Department of Fisheries indicates that it can fully provide treaty Indian fishing opportunities in 1976 and subsequent years for all usual and accustomed areas of tribes in the case area for coho, chum, sockeye, and pink salmon stocks. Full fishing opportunities can be provided for coastal, northern Puget Sound, and Canadian chinook salmon stocks but precise catch sharing for inner Puget Sound chinook runs may not be attained immediately. This latter situation is complicated by offset harvest by treaty and nontreaty fishermen, expanded artificial production that has not been stabilized, and an emergent treaty fishery on blackmouth. Restrictions of the nontreaty recreational fishery beginning in 1976 will, however, hasten the process of equitable catch division.

MEMORANDUM DECISION AND ORDER GRANTING PRELIMINARY INJUNCTION RE HATCHERY PROPAGATED FISH

(August 13, 1976)[24]
The court has thoroughly considered all of the issues, contentions and the proposed findings of fact and conclusions of law submitted by the parties and amicus curiae Northwest Steelheaders, pertaining to the so-called "hatchery issues." The court is satisfied that the issues raised in this proceeding can only be properly and finally determined in an open court trial on the merits in Phase II of this litigation.[25] To the extent the issues presented in this proceeding can now be determined by testimony and exhibits, as distinguished from less reliable information such as affidavits and argumentative assertions not supported by either evidence or legal decisions, the court has made and entered herewith the below-stated findings of fact and conclusions of law, all subject to reconsideration in the trial of Phase II.
All proposed findings of fact and conclusions of law on this issue not included in those stated below are, in the opinion of this court, either irrelevant, immaterial, unsupported by authority or contrary to the findings or conclusions of this court either in fact or law, or both. Any party may assert and offer evidence in the trial of Phase II on any issues or contentions it deems relevant to the "hatchery issues." The findings and conclusions of the court on all other issues of fact or law held to be relevant are stated in the following findings of fact and conclusions of law.

Findings of Fact
1. This case was brought by the United States on its own behalf and on behalf of seven Indian tribes on September 18, 1970, pursuant to 28 U.S.C. § 1345 (FPTO, § 1(a)). Subsequently, those seven tribes and twenty others were granted intervention on their own behalf and through their own counsel under 28 U.S.C. §§ 1331, 1343 and/or 1362, to assert their claims with respect to fishing rights secured by federal treaties (FPTO, § 1(b) and several subsequent orders). After extended pretrial discovery and disposition of certain motions, a final pretrial order was entered August 24, 1973. Certain environmental issues were segregated for subsequent hearing (Phase II) and determination (FPTO, § 12-3, 384 F.Supp. at 328). Following an extensive trial and post-trial briefing and argument, this court rendered a decision, judgment and decree, and an injunction on the issues not segregated or deferred (384 F.Supp. 312) (1974). These have been affirmed by the court of appeals and are now final and binding (520 F.2d 684 (9th Cir. 1975), cert. denied 419 U.S. 1032, 95 S.Ct. 513, 42 L.Ed.2d 307 (1976), rehearing denied 424 U.S. 978, 96 S.Ct. 1487, 47 L.Ed.2d 750 (1976)). This court retained a continuing jurisdiction (384 F.Supp. at 408).
*1073 2. One of the agreed issues of law in this case from its beginning was the scope and extent of the treaty-secured rights of the plaintiff tribes to take fish at their usual and accustomed places off their reservations (FPTO, § 4-6). This includes the extent to which the right applies to artificially propagated fish (384 F.Supp. at 344-345; FPTO § 6-3). However, in Final Decision # I this court stated as follows:
"It is suggested in Puyallup-II [414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973)] that a distinction between native and propagated steelhead should be made in computing the allocation of fish to off reservation treaty right and to nontreaty right fishing. This appears to present many difficulties and problems which must be considered and determined with all deliberate speed, by agreement or by judicial decision. Discharge of that responsibility appears to be within the jurisdiction of this court by issues all parties have submitted to this court in the Final Pretrial Order in this case. However, under the Puyallup-II mandate to the State Supreme Court it appears appropriate to this court that the state courts hear and determine the matter referred to, at least in the first instance."[26] 384 F.Supp. at 344-345.
3. Included in this court's paramount jurisdiction in this case is the federal question of the extent to which the applicable federal treaties secured rights to take artificially propagated or transplanted fish as well as the question of the nature and extent of the state's obligation to take necessary action, including restricting the fishing by persons subject to its jurisdiction or its control, to assure that treaty Indians are accorded the opportunity to take the share of fish which this court has decreed, or may subsequently decree, they are entitled to under the federal treaties. However, this court finds that it is appropriate for the purpose of this preliminary injunction to continue for the present to defer exercise of its jurisdiction with respect to the issue of inclusion of Puyallup River system hatchery steelhead in the off-reservation treaty share. (See Puyallup II, 414 U.S. 44 at 48, 94 S.Ct. 330, 38 L.Ed.2d 254.)
4. This court has found in Final Decision # I that:
(a) The Department of Fisheries has undertaken to augment the volume of fish available to treaty Indians at their off-reservation treaty areas by increasing its planting efforts in streams where Indian fisheries occur, and that hatchery-reared plants of salmon have contributed significantly to Indian catches (F.F. # 210(e) & (f), 384 F.Supp. at 391).
(b) The Game Department has received federal financial assistance in the amount of 50% under the Anadromous Fish Conservation Act, 16 U.S.C. §§ 757a-757f, for construction and operation of its steelhead hatcheries (F.F. # 253, 384 F.Supp. at 399).
(c) The Game Department believes its steelhead planting program can be used in some instances to reestablish decimated runs (F.F. # 240, 384 F.Supp. at 397).
5. This court has previously held as a conclusion of law:
"The protection of the treaty rights of the Plaintiff tribes to take fish at their usual and accustomed places must be an objective of the State's regulatory policy co-equal with the preservation and propagation of fish runs for other users. Before it can restrict the treaty rights of the Plaintiff tribes to take fish at their usual and accustomed places, the State and its regulatory agencies must treat such treaty rights as an obligation and interest to be promoted in the State's regulatory, management, and propagation programs." C.L. # 34, 384 F.Supp. at 403.
6. This court has previously held that salmon runs such as those at the Deschutes River and Minter Creek, which the state asserts are entirely artificially propagated, *1074 as distinguished from wild salmon runs which are artificially augmented, are not excluded from any calculation of the treaty fishermen's off-reservation 50% share as defined in the court's opinion. However, this ruling was made subject to further consideration of the artificial propagation issue during pretrial and trial of the environmental issues. (Answer to Fisheries' Question # 19, 384 F.Supp. at 411.)
7. This court ruled in its pretrial order and in Final Decision # I that it had jurisdiction over the question of Indian treaty entitlement to hatchery fish (FPTO §§ 3-612, 4-6, 6-3, 7-96 and 7-109; 384 F.Supp. at 344-345).
8. This court, in its decree, defined anadromous fish for the purposes of interpreting all provisions of its decree as including hatchery fish: "any fish which spawns or is artificially produced in freshwater * *." Further, this court defined adequate production escapement as "an approximate number of anadromous fish * * * which will produce viable offspring in numbers to fully utilize all natural spawning ground and propagation facilities * *." Finally, this court defined the harvestable stock as "the approximate number of anadromous fish which is surplus beyond adequate production escapement * * *." (384 F.Supp. at 405.)
9. One of the contentions of the Department of Game set forth in the Final Pretrial Order of August 24, 1973, was that its "management of the steelhead resource involves protection of the natural reproduction of the steelhead species and development and operation of an artificial propagation program" (FPTO § 7-90). It further contended that "the hatchery program, with resultant programs, has substantially contributed to the harvest of steelhead in the State waters" (FPTO § 7-96), and that "Indian tribes in Western Washington have shared in the enjoyment of increased runs of steelhead due to Game Department hatchery propagation programs." (FPTO § 7-109.)
10. The Director of the Game Department testified in this case that the Department's hatchery program:
"is financed in several ways. It is financed by the license money for fishing, by the steelhead punchcard; it is financed by a Dingel-Johnston (sic) Program which is an excise tax at the wholesale level on sports fishing gear that is collected by the Federal Government and a portion goes to the states on a formula basis. In addition, our hatchery programs are financed through mitigation from various federal, city and county as well as private industries that are paying for losses that occurred to steelhead due to such things as hydroelectric projects. These are not enhancement programs but are mitigation programs that are provided in order that the Game Department may sustain the steelhead runs in the various rivers where substantial habitat losses have occurred through power dam construction. * * *" (Ex. G-14, pp. 14-15.)
11. In post-trial submissions and oral argument in this case subsequent to the United States Supreme Court's decision in Puyallup II, both the Fisheries and Game defendants herein urged this court to exclude, in whole or in part, artificially propagated fish from the Indians' treaty entitlement. Fisheries limited its request to the exclusion of "runs which are entirely artificial, planted by State propagation efforts, as distinguished from natural runs of fish which have been artificially augmented * * *." (Fisheries' Proposed Decree, p. 3, § 8; Fisheries' Post-Trial Brief, p. 16; Game's Proposed Conclusions of Law, p. 2, No. 5; Game's Position & Recommendations: Post-Puyallup II, p. 13; Tr. 4469-4472; Fisheries' Motion for Reconsideration, Qn. 19, p. 4.) Plaintiffs argued against both such limitations (United States' Response to Post-Trial Submissions of Fisheries, p. 17; Tr. 4551-4552, 4558-4559, 4588-4592). This court declined to adopt any such limitation without a full presentation of evidence (384 F.Supp. at 344-345, 411).
12. On January 14, 1975, after the Washington Department of Game had unilaterally attempted to extend the Pierce *1075 County Superior Court's holding in Puyallup III that Puyallup Indians had no treaty entitlement to artifically propagated Puyallup River steelhead to other rivers in the case area and to other tribes who are parties to this case, this court entered a preliminary injunction enjoining the Department of Game from "basing the determination of numbers of `harvestable fish' for the purposes of complying with the decree and orders of this court in this case on anything other than the total estimated runs of free-swimming fish, including those resulting from * * * hatchery or other artificial propagation or transplanting programs, without first seeking and obtaining from this court a determination of the right to do so in accordance with the prior orders of this court," except as necessary to comply with "the judgment or orders of the state courts with reference to fishing by or under the authority of the Puyallup Tribe and its members that may be issued in [Puyallup III] * * *." (p. 1043 supra). That injunction is still in effect.
13. This court stated in its memorandum of January 20, 1975, that "the prior decision, judgment, decree and other orders entered by this court have never recognized a distinction between natural and artificially propagated anadromous fish resources in determining the scope of the treaty fishing rights." (p. 1044 supra).
14. Notwithstanding the above explicit ruling of this court in this case the Department of Fisheries caused to be published in the July 18, 1976, Daily Olympian newspaper a statement that the recent decision of the Washington Supreme Court in Puyallup III "leads us to conclude that artificially produced salmon resulting from `pure enhancement,' such as chinook salmon in the Deschutes system, are exempt from the Boldt decision. This will be the position of the Department of Fisheries unless it is otherwise determined in an appropriate court."
15. On June 23, 1976, the defendant State of Washington, through its Director of Fisheries, gave public notice of a public hearing to be held July 15, 1976, to be followed by a hearing to adopt regulations on July 16, 1976, in which the Director proposed to base the Indian and non-Indian shares of the harvestable numbers of chinook salmon on an exclusion from the "legal treaty Indian catch" of all artificially produced chinook salmon.
16. On motion of the United States and the plaintiff tribes and after a hearing, this court on July 14, 1976, temporarily restrained the "defendant State of Washington, including its Directors of Fisheries and Game, and all other officers, employees, agents and attorneys of each * * * from basing the determination of numbers of harvestable fish which Treaty Indians shall have the opportunity to take pursuant to this court's previous decisions, on anything other than the total estimated runs of free-swimming fish, including those resulting from hatchery or other artificial propagation or transplanting programs, until this court hears the motion for a preliminary injunction at a hearing that is hereby set to commence at 9:30 a. m. July 19, 1976, at Tacoma, Washington." In issuing that order the court found that the announced action of the defendant State of Washington and its Director of Fisheries "is contrary to the prior decisions and orders of this court as confirmed and restated in this court's Memorandum Decision of January 20, 1975." And that "[s]uch actions will work immediate and irreparable harm on the plaintiff tribes and their members unless this court takes appropriate action to declare and enforce its paramount jurisdiction over the above-described matters against the defendants and those acting under their authority, direction, license or control." (Temporary Restraining Order, July 14, 1976 Findings # s 5, 6). On the basis of the total record to date the court hereby confirms those findings.
17. On July 16, 1976, the defendant Director of Fisheries issued an emergency regulation, Order No. 76-55, providing for the nontreaty commercial harvest of chinook salmon in Bellingham Bay (Areas 7B and 7C) commencing July 18, 1976, Skagit Bay (Area 8) commencing August 9, 1976, *1076 and Carr and Case Inlets on lower Puget Sound (Areas 13A and 13B) commencing August 1, 1976. The order provides that if this court's order of July 14, 1976, is extended or an order is issued by this court including artificially propagated salmon in the treaty Indian share the seasons prescribed for Skagit Bay and Carr and Case Inlets shall not be effective and a reduction of the season prescribed for Bellingham Bay will be required.
18. On or about June 28, 1976, the Department of Game filed a request for determination pursuant to paragraph 25 of the injunction of March 22, 1974 (384 F.Supp. at 419), that "the rights of the treaty tribes in this action do not extend to artificially propagated runs of the summer steelhead." The department requests this court to order the treaty Indian fishery for summer steelhead in the Skagit and Green Rivers to be terminated on the basis "that those runs are almost exclusively the result of artificial enhancement programs conducted by the Department of Game and thus treaty Indians have no entitlement to those fish." (Request for Determination dated June 27, 1976).
19. On or about November 4, 1963, the Washington Departments of Fisheries and Game instituted a civil suit in the Superior Court of the State of Washington in and for Pierce County (designated as Cause No. 158069 therein) against the Puyallup Indian Tribe and certain of its members for the purpose of seeking a declaratory judgment and injunctive relief with respect to the nature and scope of any off-reservation fishing rights or immunities of the tribe and its members derived from the Treaty of Medicine Creek. (10 Stat. 1132).
As used in this order the term "Puyallup I" refers to that proceeding up through the denial of a rehearing of the United States Supreme Court's decision of May 27, 1968 (391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689; 393 U.S. 898, 89 S.Ct. 64, 21 L.Ed.2d 185); the term "Puyallup II" refers to the proceedings from the first remand through the United States Supreme Court decision of November 19, 1973 (414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254); and the term "Puyallup III" refers to the proceedings following the second remand ordered in that latter decision.
20. The defendant tribe was erroneously designated in that proceeding as a corporation "the Puyallup Tribe, Inc." but as the Washington Supreme Court has repeatedly pointed out there is no such entity (70 Wash.2d 245, 422 P.2d 754, 755; 86 Wash.2d 664, 548 P.2d 1058, 1062). The Puyallup Tribe is not incorporated under Section 17 of the Indian Reorganization Act of 1934. (FF # 94, 384 F.Supp. at 370; 25 U.S.C. § 477).[27]
21. None of the plaintiff tribes in this case except the Puyallup Tribe, has ever been a party to Puyallup I, II or III, or been in privity with a party to that case. The United States has never been a party to Puyallup I, II or III although the United States, through the United States Attorney, provided certain legal representation to the Puyallup Tribe in Puyallup II and III as more fully described in the findings below.
22. Throughout all of the proceedings in Puyallup I, from the filing of the case up through and including the decision of the United States Supreme Court, 391 U.S. 392, 88 S.Ct. 1725, 20 L.E2d 689, and the remand to the state court, the Puyallup Tribe was represented solely by private counsel (not its present counsel) and the United States did not supply any legal counsel to represent or assist in representing the tribe or any member thereof (422 P.2d 754). The trial in the state superior court held pursuant to the remand from the United States Supreme Court commenced on September 21, 1970, subsequent to the filing of this case on September 18, 1970. Pretrial proceedings commenced prior to September 18, 1970. At the request of the Puyallup Tribe, which was then without private counsel in Puyallup II, the United States Attorney *1077 represented the Puyallup Tribe pursuant to 25 U.S.C. § 175 and private counsel represented certain members thereof. (80 Wash.2d 561, 497 P.2d 171, 173).
23. The first time that the question of a possible distinction between naturally propagated and artificially propagated fish with respect to the applicability of Indian treaty rights appears to have been discussed by a court, was in the United States Supreme Court's decision of November 19, 1973, in Puyallup II. (414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254). The testimony regarding the extent of hatchery contribution to Puyallup River steelhead runs and the source of funding of the Puyallup River steelhead hatchery program had been discussed by the Washington Supreme Court (497 P.2d at 178) but with no suggestion from that court that Indian treaty rights did not apply. That court concluded only that because of these and other factors "the steelhead fishery in the Puyallup River is not comparable to the salmon fishery."
24. The United States Supreme Court in Puyallup II reversed a state court finding that treaty Indians were totally precluded from harvesting steelhead with nets on the Puyallup River. The Court observed (414 U.S. at 48, 94 S.Ct. at 333):
"At issue presently is the problem of accommodating net fishing by the Puyallups with conservation needs of the river. . . . At oral argument counsel for the Department of Game represented the catch of steelhead that were developed from the hatchery program was in one year 60% of the total run and in another 80%. And he stated that approximately 80% of the cost of that program was financed by the license fees of sports fishermen. Whether that issue will emerge in this ongoing litigation as a basis for allocating the catch between the two groups, we do not know. We mention it only to reserve decision on it."
In that decision the Court remanded the case to the Washington Supreme Court solely for the purpose of allocating steelhead in the Puyallup River.
The language quoted in defendants' Proposed Finding of Fact # 1-20 suggests it is a ruling of the United States Supreme Court. The quoted language was joined in by only three Justices and not by the other six Justices. Accordingly the quotation is merely a commentary by three of the nine Justices of the Court and therefore not authoritative as a majority ruling.
25. The trial in Puyallup III before Judge Brown in the Pierce County Superior Court, as evidenced by a Statement of Facts in that case. (Ex. G-34 herein; hereinafter cited as "St") was devoted largely to questions involving the historic sizes of the natural and hatchery steelhead runs on the Puyallup River, the sources of funding for the Puyallup River steelhead hatchery plants, and whether there are reliable methods for distinguishing between natural and hatchery steelhead.
26. During the Puyallup III trial, testimony and exhibits offered to show extensive federal funding of Western Washington hatchery facilities and steelhead smolts were excluded on objection of the Game Department and sportsmen's groups. (St. 324, 328, XXX-XX-XXX, 736-40, 744, 990-1004; Exs. 74-M, 74-C and 74-K therein).
27. During the Puyallup III trial, testimony and exhibits dealing with matters outside the Puyallup watershed were excluded on objection of the Game Department and sportsmen's groups. (St. 324, 572, 702-03, 990-1004).
28. During the Puyallup III trial, testimony and exhibits dealing with environmental degradation of the Puyallup watershed, offered to show widespread adverse affects on the spawning and rearing of naturally produced steelhead, were excluded on objections of the Game Department and sportsmen's groups. (St. 668-69, 683-94, 720-25).
29. During the Puyallup III trial, testimony and exhibits dealing with competition for survival between natural and hatchery steelhead were excluded on objections of the Game Department and sportsmen's groups. (St. 382-321, Exs. 74-E, 74-F).
*1078 30. The Fisheries Department did not participate as a party in the Puyallup II appeal to the United States Supreme Court (414 U.S. 44, 46, 94 S.Ct. 330, 38 L.Ed.2d 254), or in the Puyallup III litigation. No issues pertaining to treaty fishermen's entitlement to hatchery-reared salmon were raised in the pleadings or proof of that trial. (Exs. G-33, G-34).
31. This court's initial decision in this case that treaty Indians were entitled to an equal opportunity to share in the off-reservation harvest applied without distinction to all off-reservation fisheries at the Indians' usual and accustomed places in the case area. The assumption by the state courts of jurisdiction to allocate the Puyallup River natural steelhead run on a 45%-55% basis (with 45% going to the tribe) conflicts with earlier rulings of this court.
32. In United States v. Washington (this case), the state and its agencies conceded that they lacked power to regulate the on-reservation fishery. This court ruled on October 21, 1975, that the State and its agencies lack power to regulate on-reservation Indian fisheries. (C.L. # 67, at p. 1060 supra).
33. In May of 1974 the United States Court of Appeals for the Ninth Circuit ruled that the Puyallup Reservation continued to exist. United States v. Washington, 496 F.2d 620 (9th Cir.) (per curiam), cert. denied, 419 U.S. 1032, 95 S.Ct. 513, 42 L.Ed.2d 307 (1974). That case was adjudicated on a complaint alleging, among other things, that "the Puyallup Tribe and its authorized representatives have exclusive right to and regulation of, all fishing on or in the Puyallup River within the Puyallup Indian Reservation." In the Puyallup III trial, the Game Department conceded it was bound by the ruling of the Ninth Circuit's ruling (St. 1131-36). In Puyallup III it was also established that 90%-100% of the Puyallup Tribe's steelhead fishery is on-reservation (St. 773). Thus, the effect of the Puyallup III state decision is that the state courts are exercising continuing jurisdiction both on and off reservation to enforce orders affecting both natural and hatchery-reared Puyallup River steelhead.
34. The transcript of the Puyallup III trial indicates conclusively that private counsel for the tribe and Ramona Bennett, Mr. Rodgers and Mr. Sennhauser, respectively, carried the laboring oar of the litigation. Virtually all opening and closing argument, and virtually all examination of witnesses and evidentiary objections were handled by Mr. Rodgers and Mr. Sennhauser. An examination of the 1200 page transcript discloses that questions and comments from the federally employed attorneys are contained on approximately 30 pages of the proceeding. (St. 600-07, 654-58, 1094-1100, 1109-1115, 1131-1136 therein). Both Mr. Giere and Mr. Dysart, the United States representatives, were not present during some entire trial days. Based upon the review of the record in Puyallup III this court finds that control of the defense in that trial rested with and was exercised by private counsel for the defendants therein and not with the United States.
35. It is represented as fact by counsel, and the court therefore further finds, that Mr. Rodgers was paid neither fee nor expenses by the United States Government. He had a contract with the tribe which called for the payment of expenses and the payment of a fee in the amount of $1.00 per year. Mr. Sennhauser, likewise, had private arrangements with his client. The briefs submitted to the Washington State Supreme Court in Puyallup III, while over the signatures of all counsel, were written almost exclusively by Mr. Rodgers as private counsel for the Puyallup Tribe. The specification of errors and issues was formulated by him. The argument before the Washington State Supreme Court was shared by Mr. Rodgers and Mr. Sennhauser. The United States representatives did not participate in that argument.
36. The United States neither brought nor consented to the bringing of Puyallup I, II or III nor did any attorney employed or paid by the United States bring or prosecute those proceedings. The role of the United States Attorney was limited to defending *1079 or assisting in defending the Puyallup Tribe in a suit brought against the tribe without its consent.
37. The following issues were neither raised, litigated nor adjudged in Puyallup I, II or III:
(a) The applicability of an Indian tribe's treaty fishing right to fish artificially propagated or transplanted by the state under a program that was not exclusively or almost entirely funded from earmarked state revenues which were essentially derived from sportsmen.
(b) The applicability of an Indian tribe's treaty fishing right to fish artificially propagated or transplanted by the state under a program undertaken to mitigate or compensate for reduction of natural runs of fish attributed to specific types of state or state-authorized activity, over-fishing or other abusive fishing practices, or other human activity or natural disaster.
(c) The relative rights of tribes inter se or the relative obligations of the state to such tribes where more than one tribe has treaty rights at either the same or successive fishing locations along the migratory path of an anadromous fish run.
(d) The number of fish that any river system, including the Puyallup River system, would produce if left to its own devices.
(e) The extent to which artificial propagation on any river system is in mitigation or in replacement of fish that such system would have produced if the river system had not suffered environmental damage or impairment of fish productive capability or if runs to that river system had not been over-fished or otherwise diminished by acts of man.
(f) The source of funding of artificial steelhead propagation programs for any river system other than the Puyallup or of artificial salmon propagation programs for any area including the Puyallup.
38. This court has held that the right secured by the treaties to the plaintiff tribes is not limited as to species of fish, the origin of fish, the purpose or use, or the time or manner of taking, except to the extent necessary to achieve preservation of the resource and to allow non-Indians an opportunity to fish in common with treaty-right fishermen outside reservation boundaries. (C.L. # 21, 384 F.Supp. at 401) The passage of time and the changed conditions affecting the fisheries resource in the case area cannot erode the right secured by the treaties, which right is subject only to the limitation of preserving the resource so as to provide for the continued future enjoyment of the right. (C.L. # 22, 384 F.Supp. at 401).
39. This court has held that the exercise of a treaty tribe's right to take anadromous fish is limited only by the geographical extent of the usual and accustomed fishing places, the limits of the harvestable stock, the tribe's fair need for fish, and the opportunity for non-Indians to fish in common with treaty Indians outside reservation boundaries. (C.L. # 25, 384 F.Supp. at 402).
40. With respect to steelhead, the Game Department has no data or opinions concerning the level of steelhead runs in the Washington Territory between 1840 and 1860. (FPTO § 3-484 p. 78). The Game Department has conducted an extensive steelhead planting program in some Washington State rivers since 1951. (FPTO § 3-445, p. 66).
41. Salmon and steelhead frequently spawn in the same areas of the various river systems (FPTO § 3-453, p. 68).
42. The Game Department is aware that the planting of pre-smolt-size steelhead may create an adverse competition with natural stocks which would not otherwise occur with smolt-size plants. (FPTO, § 3-444, p. 65).
43. Early explorers' observations confirm that salmon and steelhead at one time used all streams open to them in the Pacific Northwest. They were the mainstay of a large population of Indians inhabiting the area. Due to man's activities, subsequent to the settlement of the area by non-Indians, and to other environmental changes, *1080 sections of streams or entire streams have been removed from salmon and steelhead production. (Ex. JX-2a, § 1.2.0, p. 9).
44. With the invention of the tin can during the mid-1800's, the salmon fishing industry began an intensive exploitation of the species which has caused a decline in the harvest of natural salmon runs in Puget Sound. (Ex. JX-2a, § 1.3, p. 13).
45. The natural fish production habitat in Washington streams has been damaged or destroyed by watershed alteration resulting from extensive logging, irrigation, diversion of water, obstruction and in some cases, destruction of waterways, industrial development, water pollution, and residential development. (Ex. JX-2a, §§ 1.5-1.5.5, pp. 20-27).
46. Hatchery systems and operations have been developed to provide a practical means of renewing stocks of salmon through artificial propagation. (Washington State Fisheries Department Report, FISHERIES, FISH FARMING AND FISHERIES MANAGEMENT, CONSERVATION  PROPAGATION  REGULATION, Washington State Department of Fisheries, 1960, cited in Plaintiffs' Supplemental Memorandum re: Federal Jurisdiction Over Hatchery-Natural Question, pp. 16-17).
47. Artificial propagation of fish is conducted throughout the State of Washington by state and federal agencies and Indian tribes. (Plaintiffs' Supplemental Memorandum, supra, pp. 18, 19 and exhibit attached to Memorandum; Ex. JX-2a, § 2.2.4, p. 53).
48. Salmon hatcheries have existed on the Pacific coast since 1872 (Ex. JX-2a § 2.2.4, p. 53) and in Washington since 1895. (Ex. JX-2a § 2.6.5, p. 79). The hatchery program was undertaken primarily as a means of off-setting the reduction in rearing capacity of Washington streams resulting from man-caused watershed utilization and despoilment and from excessive commercial fishing. (Ex. JX-2a § 2.6.6, p. 78). Today, the Washington Department of Fisheries, Washington Department of Game, the Federal Government, and various Indian tribes each operate and maintain artificial propagation facilities for anadromous fish in the case area. (Ex. JX-2a §§ 2.6.5, 2.8.2, 2.10.3, 2.11.1, pp. 80, 92, 96-97, 98). In addition, the International Pacific Salmon Fisheries Commission operates propagation facilities in Canada to supplement the natural production of salmon runs that comprise major portions of the case-area harvest. (Ex. JX-2a § 2.13, p. 102).
49. Once they are released into open public waters, artificially propagated salmon and steelhead pass out of control of the state or other entity which propagated them. They migrate freely to marine waters as wild fish, intermingled with naturally propagated fish and at or nearing maturity return to freshwater to spawn. (Ex. JX-2a, § 1.1.0, pp. 1-2; §§ 1.8.0-1.8.4, pp. 40-43, Figs. 7, 8 and 9, pp. 241-243).
50. No evidence or contention has been submitted to the court and the court has found no evidence or indication that, except as noted below, the laws and regulations of the State of Washington and its fisheries management agencies make, or have ever made, any distinction between naturally propagated or artificially propagated fish that are released into and harvested from public waters, with respect to who may harvest fish, the extent of permissible harvest, the means of harvest, or the use to which the harvested fish may be put, and regardless of whether the artificially propagated fish are propagated by the state, the United States, Indian tribes, a sister state, or private parties. The sole exception to this is that, subsequent to December 19, 1974, the Department of Game has, pursuant to the state court decision in Puyallup III, excluded hatchery-produced steelhead from the numbers of Puyallup River system steelhead which the Puyallup Indian Tribe and its members may take other than pursuant to the Department's all-citizen sport fishing regulations. The Department of Game in January 1975, and the Department of Fisheries in July 1976, attempted to extend this exception to other waters and tribes until temporarily enjoined by this court from doing so.
*1081 51. The following questions of fact are critical to a determination on the contention, by the Fisheries and Game Departments, that artificially propagated fish are not within the scope of the Indians' treaty right:
(a) What were the facts and circumstances at the time of the treaty from which the understanding of the parties, and particularly the Indians, can be deduced?
(b) What has happened to the subject matter of the treaty, that is, the native stocks of fish, since the time of the treaty?
(c) Why have hatcheries and other means of artificially propagating fish been created?
(d) What functions do the hatcheries perform?
(e) What has been the effect of hatcheries on native stocks of fish?
(f) Have other species of fish been damaged or destroyed where hatchery-produced steelhead have been introduced into streams and rivers?
(g) Whose money or resources, if the court later determines this relevant, are contributing to the production of artificially propagated fish?
(h) Is it possible to distinguish between hatchery and natural fish for the practical purposes of fisheries management, assuming a legal distinction were to be drawn?
(i) How might other management decisions be affected by a decision that there is a legal difference between hatchery and natural fish (e. g., where an endangered natural run is fished on incidentally in connection with efforts to enhance the catch of hatchery fish)?
52. This court has consistently maintained that a trial of the treaty right to hatchery fish is inherently interwoven with the history of Washington State's developing economy, its effects on the environment, the Washington State management program for fisheries and the cumulative effect of the above on the natural anadromous fish runs. (State's Motion for Reconsideration, Qn. 19, 384 F.Supp. at 411; Memorandum Decision Re: Green River Steelhead Fisheries, January 20, 1975, at p. 1046 supra; comments from the court, May 3, 1976, Tr. 16).
53. There was uncontroverted evidence at the hearing on the request for a preliminary injunction that the Washington State Department of Fisheries has viewed its hatchery program as "renewing and preserving a depleted natural resource."
54. This court served notice on the defendants over 28 months ago and again over 18 months ago that its existing decision and orders (subsequently affirmed by the court of appeals) made no distinction between naturally and artificially propagated fish as regards Indian treaty application; but it expressed its willingness to reconsider this question on the basis of a full development of a record after proper application for such reconsideration. (384 F.Supp. at 411; Memorandum Decision of January 20, 1975, at pp. 1044-1047 supra). In Phase II the contentions of all parties and all evidence supporting such contentions pertaining to the allocation of artificially propagated fish will be fully considered and determined.
55. This court has held that the harvestable number of fish available off reservation to both treaty and nontreaty fishermen is equal to the total run size for any particular run and species less the following:
a. The number of fish required for spawning escapement and any other requirements established to be reasonable and necessary for conservation;
b. The number of fish harvested by treaty fishermen on reservation; and
c. The actual number of fish harvested by treaty fishermen for traditional tribal subsistence and ceremonial purposes. (384 F.Supp. at 343).
Both treaty and nontreaty fishermen are entitled to an opportunity to harvest up to 50% of the harvestable fish as defined above.
56. This court has held that the amount of fish of each species from which the harvestable *1082 portions shall be determined for the purposes of allocation consistent with its opinion include:
1. The total number of fish within the regulatory jurisdiction of the State of Washington which, absent harvest enroute, would be available for harvest at the treaty tribes' usual and accustomed fishing places; * * *. (384 F.Supp. at 344).
Thus, fish which treaty or nontreaty fishermen, respectively, have taken under Washington jurisdiction prior to their returning to the various Puget Sound terminal fishing areas must be taken into account in determining the number of remaining fish which treaty and nontreaty fishermen, respectively, must be accorded an opportunity to take at such terminal areas.
57. The state authorizes significant sport and commercial fisheries on runs of fish destined for usual and accustomed fishing grounds of treaty Indians. Such fish, taken by nontreaty fishermen, are to be counted as part of the nontreaty share.
58. The state has adopted regulations for the 1976 harvest of fall chinook salmon which exclude from the treaty share all hatchery fish.
59. The state forecasts that 87,737 harvestable chinook will return to Bellingham Bay in 1976. By excluding hatchery fish from the harvestable number, the state has allocated the treaty fishermen only 7,918 chinook, or 9% of the total harvestable number destined for Bellingham Bay. On the basis of these figures, if all harvestable fish, both hatchery and wild, destined for Bellingham Bay were included in the allocation between treaty and nontreaty fishermen, each group should have, under this court's prior decision, an opportunity to harvest approximately 43,865 fish.
60. Exhibit F-106 discusses hatchery chinook salmon destined for Skagit Bay. This exhibit indicates that if nontreaty fishermen are allowed to harvest all hatchery-reared chinook salmon the relative shares would be 3,956 for treaty fishermen and 6,099 for nontreaty fishermen. Treaty fishermen would be allowed only 39% of the harvestable number available to all fishermen. If hatchery-reared chinook are included in determining the harvestable number available to the treaty and nontreaty fishermen, the resulting allocation to both treaty and nontreaty fishermen would be 5,233. Under this formula, both user groups would have an equal opportunity to harvest. The exhibit erroneously includes treaty on-reservation and subsistence harvests as relevant to the calculation of off-reservation shares.
61. The state has authorized nontreaty fisheries which have harvested 5,182 chinook salmon destined for the Skagit terminal area prior to their arrival in the Skagit area. Under this court's decision these fish, harvested by nontreaty fishermen, are part of the total nontreaty share (5,233 fish under the state's run-size figures) and serve to reduce the number of chinook remaining to be harvested by nontreaty fishermen in the Skagit terminal area. The choice made by the state to authorize a prior harvest on Skagit Bay chinook does not serve to reduce the number of chinook salmon required to be made available to treaty fishermen. Any adverse impact on the in-Sound commercial nontreaty harvest is due to the state's decision on where to allow the taking of the nontreaty share.
62. The state predicts that there are 750 returning harvestable summer-run steelhead to the Skagit River. Of that 750, only 90 are considered by the state to be wild. If hatchery fish are excluded from the treaty share, treaty fishermen would be permitted to take only 45 steelhead while the nontreaty fishermen could take 705 fish. Such a division would limit treaty fishermen to 6% of the total harvestable steelhead returning to the Skagit River. Based upon the above division the state would preclude treaty fishermen from harvesting in excess of 45 steelhead, and the state has proposed to this court that treaty fishing for steelhead on the Skagit River be terminated.
63. The state is again attempting, without benefit of this court's sanction, to limit the treaty right to wild fish, excluding from *1083 the treaty share all hatchery fish. This court has been required on two occasions to issue injunctions against the state prohibiting such unilateral exclusion of hatchery fish. The most recent incident required this court to issue a temporary restraining order against the Department of Fisheries after the state would not assure the court that it would not adopt its 1976 chinook regulations based on such an exclusion pending a decision by this court. The state has not given the court any assurances that it will comply with Final Decision # 1 and refrain from applying Puyallup III to all tribes in this case pending further resolution of this matter by the court.
64. Among the basic issues to be tried and determined in Phase II are appropriate allocation of all species of artificially propagated fish and any conservation issues that may be asserted by any party.
65. The court finds that this order will not prevent the state from according the nontreaty fishermen the opportunity to catch 50% of the harvestable fish as provided for in this court's previous decisions and orders.
66. The court finds that this order is necessary in aid of its jurisdiction in this case and to protect and effectuate the rulings of this court.
From the foregoing findings of fact the court makes the following:

Conclusions of Law
1. The paramount jurisdiction to litigate federal questions relating to treaty rights resides in the federal courts United States v. Ahtanum Irrigation Dist., 236 F.2d 321 (9th Cir. 1956).
2. This court has maintained continuing jurisdiction to provide a single forum wherein all of the parties to this case may resolve all of the complex questions involved in the issue of treaty application to hatchery fish. The Phase II trial, one trial for the entire case area, will minimize the judicial time required by this or any other court, and minimize the time and expense required of the parties.
3. Any question of excluding fish of hatchery origin that freely swim unrestricted to or through Indian usual and accustomed fishing places from the applicability of the Indian treaty provision that on its face applies to "the right of taking fish" without limitation as to the origin or type of such fish, presents many difficulties and problems that can properly be considered only after an opportunity to assemble and submit adequate relevant evidence, much of which is in the possession of the defendants.
4. In order for the doctrine of collateral estoppel to apply, all of the following conditions must be present: The issue to be concluded must be the same as that involved in the prior action; the issue must have been raised and litigated, and actually adjudged, in the prior action; the issue must have been material and relevant to the disposition of the prior action, and it must be shown that the use of the doctrine would not work injustice on any of the parties involved. Based upon these criteria, collateral estoppel does not apply in this case. Nickert v. Puget Sound Tug & Barge Co., 335 F.Supp. 1162, 1163 (W.D.Wash. 1971); Moore's Fed. Practice, Vol. 1B, pp. 3901, 3907.
5. Application of the principle of collateral estoppel to the plaintiff tribes in this case would work a manifest injustice in the particulars specified in the findings of fact.
6. Neither the United States nor any tribe is barred by collateral estoppel or res judicata from litigating before this court issues of law or fact relating to the environmental degradation of the fish habitat on any river or marine area within the case area. (FPTO § 12-3).
7. Neither the United States nor any tribe is barred by collateral estoppel or res judicata from litigating before this court issues of law or fact relating to the treaty entitlement to hatchery-reared salmon or steelhead. (FPTO § 3-612; 4-6; 6-3; 7-96; 7-109; 384 F.Supp. 344-45, 405, 411; Memorandum Decision Re Green River Steelhead Fisheries, January 20, 1975, at p. 1044 supra).
*1084 8. The Puyallup Tribe is not barred by collateral estoppel or res judicata from litigating before this court issues of law relating to either environmental degradation of the fish habitat, or the treaty entitlement to hatchery-reared salmon and steelhead in the Puyallup River, or the application of Puyallup III to on-reservation fishing. City of Los Angeles v. City of San Fernando, 14 Cal.3d 199, 123 Cal.Rptr. 1, 537 P.2d 1250 (1975); United States v. Washington, 496 F.2d 620 (9th Cir. 1974), cert. denied, 419 U.S. 1032, 95 S.Ct. 513, 42 L.Ed.2d 307 (1974); C.L. # 67 herein, p. 1060 supra.
9. To the extent that the Puyallup Tribe may be collaterally estopped from litigating before this court fact issues actually litigated during the Puyallup III trial (for example, questions concerning the historic sizes of the natural and hatchery steelhead runs on the Puyallup River and the sources of funding for those runs), the issues are best decided as they arise during pending Phase II litigation.
10. The decision of the court in Final Decision # 1 in this case has heretofore established that plaintiff tribes have a fundamental and valuable right to take fish at their usual and accustomed grounds and stations which right arises out of treaties with United States. C.L. # s 19, 20, 21, 22; 384 F.Supp. at 401.
11. The plaintiff tribes' right may not be diminished by state action which allocates to non-Indians more than an equal opportunity to take the resource. C.L. # 25, 384 F.Supp. at 402.
12. This court has ruled in this case that the mere fact that some fish are artificially propagated provides the state with no justification for denying the Indians' share, although the court has reserved the right for all parties to present further evidence on this issue. C.L. # 21, 384 F.Supp. at 911; Memorandum Decision January 20, 1975, pp. 1044-1047 supra; comments of the court May 3, 1976, TR 16.
13. The United States, acting as guardian of the Puyallup Tribe, is not bound by the decision of the Washington Supreme Court in Puyallup III, where the United States was not a party in its own right, did not initiate the litigation or control or direct the case, and was not the laboring oar in presenting the defense of the tribe. Drummond v. United States 324 U.S. 316, 65 S.Ct. 659, 89 L.Ed. 969 (1945); United States v. Candelaria, 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023 (1926); United States v. Bosurgi, 389 F.Supp. 1088 (S.D.N. Y.1975).
14. When the United States Attorney assumes the obligation to defend an individual Indian tribe in civil litigation, and, when acting in such capacity pursuant to 25 U.S.C. § 175, the United States is acting as a guardian for the particular Indian tribe involved. Pyramid Lake Paiute Tribe of Indians v. Morton, 354 F.Supp. 252 (D.D.C.1972).
15. When the United States, acting as trustee or guardian for an individual Indian or tribe, defends a particular tribe or individual and does not act as a party on its own behalf, then the United States is not bound by any finding of fact or conclusion of law rendered therein. To find otherwise would prevent the United States from fully and completely fulfilling its trust obligations. A trustee must be free to act in the interests of the beneficiary and not exercise his duties in any manner other than in the best interests of the beneficiary. Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 (1919); Garrett v. 1st Nat'l Bank, 153 F.2d 289 (5th Cir. 1946); Spilker v. Hankin, 88 U.S.App.D.C. 206, 188 F.2d 35 (1951); Moore's Fed. Practice § 1B at 0.411[3] and [4]; Restatement of Judgments, § 80, 563.
16. The United States is not bound by, or collaterally estopped by virtue of, a decision of a state court to which it has not given its consent. United States v. Candelaria, supra 271 U.S. at 444, 46 S.Ct. 561. The United States, not having commenced the Puyallup I, II or III case nor consented to the prosecution of such case, is not bound or collaterally estopped by the decisions in that case. United States v. Ahtanum, supra at 321.
17. This court, like all federal courts, has a special responsibility "to see that the *1085 terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the [treaty] council, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." Tulee v. Washington, 315 U.S. 681, 684-85, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942).
18. There is a sufficient likelihood of success by the plaintiffs on the merits to support the granting of a preliminary injunction to preserve the status quo until trial of Phase II is concluded in this court.

ORDER GRANTING PRELIMINARY INJUNCTION RE HATCHERY-PROPAGATED FISH

(August 13, 1976)
The court hereby FINDS, HOLDS AND ORDERS that a Preliminary Injunction is granted as follows:
The defendant State of Washington, including its Directors of Fisheries and Game, and all other officers, employees, agents and attorneys of each are restrained and enjoined from basing the determination of numbers of harvestable fish which treaty Indians shall have the opportunity to take pursuant to this court's previous decisions, on anything other than the total estimated runs of free-swimming fish, including those resulting from hatchery or other artificial propagation or transplanting programs. This order applies to the entire case area, each of the tribes, and all of the waters within the case area.
This injunction shall continue in effect until further order of the court after entry of final determination in Phase II.

ORDER ON CERTAIN QUESTIONS RE STEELHEAD MANAGEMENT

(September 14, 1976, as extended January 10, 1978)
The court's Fisheries Technical Advisor and some parties have propounded certain questions concerning steelhead fisheries which are believed to require resolution by the parties or the court in connection with further implementation of this court's prior orders. Consultations between the parties and the Fisheries Technical Advisor have been held. After hearings on the matter, the court hereby ORDERS AND DECREES as follows:
A. In the preparation and implementation of a steelhead fisheries management program for the case area for the year beginning November 1, 1976, and ending October 31, 1977, and to continue the progressive implementation of the orders and decrees of this court, and particularly the order of October 8, 1974, for a program to implement the interim plan (pp. 1035-1038 supra) the principles and guidelines set out below as answers to the questions propounded shall obtain. These answers are intended to implement the prior orders of the court and nothing herein is to be applied so as to change any provisions of Final Decision # 1 or other prior rulings or orders of this court as affirmed by the Ninth Circuit Court of Appeals. The court hereby reaffirms its intention, as previously expressed, that these principles and guidelines are to be applied so as progressively to advance and support the full and early realization of the opportunity for treaty fishermen to take their treaty-secured entitlement as set forth in Final Decision # 1. These questions and responses shall apply only to steelhead and only until October 31, 1977, or until otherwise ordered by this court.[28] Although many of the responses are based upon whole or partial consensus among the parties, all parties retain the right to seek modifications in this order.
B. The questions and responses concerning steelhead management are as follows:
1. How should an equitable adjustment be made if one party (treaty or nontreaty fishermen) is not provided the opportunity *1086 to take 50% of the harvestable numbers? What time period is allowed for making the adjustment?
Response: Equitable adjustment should not occur in steelhead fisheries. The real question is not adjustment but rather proper management to insure that neither party preempts the opportunity of the other.
2. Should sharing be determined on a calendar year, brood-year or other basis? and
3. Is a separate catch allocation to be made among winter- summer- and spring-run steelhead?
Response: Sharing opportunity must be determined on a cycle basis for rational management decisions. For this purpose the winter cycle of steelhead is considered to begin on November 1 and extend through April. The summer cycle then shall be from May 1 through October. There is at this time no practical method of separating the so-called spring-or fall-run steelhead stocks because of overlapping cycles. Sharing for the 1976-77 steelhead run-year will be based on a continuous 12-month catch-reporting system which will begin November 1, 1976 to October 31, 1977. The tribes are entitled to a share of the summer run but are encouraged to add those numbers to the winter harvest and refrain from fishing on the summer run. In no case shall the tribes' share of the summer run exceed 50% of that run.
4. What is the geographical basis for the catch allocation, i. e., case area, treaty area, river system, major tributary, etc.?
Response: Management of the steelhead runs and allocation of opportunity should be on a river-system basis unless unique problems in an area suggest that another basis would be more rational. Allocation other than on a river-system basis must be agreed upon between the state and affected tribe(s) before the fishing season begins. In all cases, treaty tribes must be assured opportunity to catch 50% in their entire area of usual and accustomed places and the tribes as a whole must be assured 50% in the case area except in extraordinary circumstances which clearly show that modification is required.
5. What constitutes "opportunity" for both sport and Indian fishermen? For example, if the Indian fishery takes 50% of the estimated harvestable amount and the sport fishery fails, for one reason or another (lack of interest due to unattractive fish densities, weather or water conditions, social factors, etc.) to take an equal amount, must the Indian fishery be curtailed at some point during the run or in subsequent runs? Likewise, if the sport fishery takes 50% of the estimated harvestable amount and the Indian fishery fails to take an equal amount due to lack of interest or any other reason, must the sport fishery be curtailed during the run?
Response: Opportunity is defined for both groups as the presence of a harvestable surplus of fish to be taken by the fishery for steelhead. If the steelhead are present in the appropriate percentages for either fishery, then opportunity exists. Unless more reliable enumeration or estimation procedures exist, the number of fish present will be determined by the pre-season harvest prediction made in accordance with paragraph B-1 of the Order of October 8, 1974 (p. 1035 supra) after meaningful consultations with the affected tribes and any agreed-upon or court-ordered in-season adjustments. Management of fishing power is required to insure that an equal opportunity exists for the sports fishery.
6. How do we determine whether one party or the other is unable to harvest its 50%?
Response: Determination of whether a tribal net fishery is able to harvest its 50% is readily accomplished through appropriate study. At the present time, determination of the recreational fishery's ability to harvest its share can only be made through extensive and expensive monitoring programs.
7. What is an appropriate on-reservation share?
*1087 Response: This will be negotiated on a reservation-by-reservation basis between the state and each respective treaty tribe. Each tribe may initially inform the state what the tribe believes will be its fair and reasonable on-reservation catch and how the amount was calculated. If the state does not agree with the amount or the method of arriving at the estimate of the amount, the state may request supporting data from the tribe to be used in carrying forward the negotiations. The tribal estimate shall be presumed to be reasonably accurate until determined otherwise.
8. What is the definition of a tribal ceremony as the basis for ceremonial fishing needs?
Response: This must be defined by trial authorities.
9. Shall ceremonial and subsistence needs be specifically identified and these fisheries be restricted in timing and duration?
Response: This has been answered by paragraph 17 of the injunction of March 22, 1974. (384 F.Supp. at 417).
10. Define a test fishery for steelhead.
Response: A test fishery is a fishery allowed on a limited basis for the purpose of acquiring technical or management information including run strengths, timing, composition, gear selectivity and exploitation rates. Any fish caught and retained in a test fishery will be counted in the appropriate allocation.
11. Define a sports fishery.
Response: Fisheries which are managed or engaged in for recreational purposes or personal use, the catch of which cannot lawfully be sold.
12. Should steelhead be harvested only in terminal areas, i. e., where only single stocks are present at a given time?
Response: Steelhead harvest does not need to be limited entirely to locations and/or times at which only one stock occurs. Steelhead harvest may occur in areas containing single or several mixed stocks if the several stocks can be reasonably well identified. Harvest management must conform to the requirements of the individual stocks. A terminal area is an arbitrary geographical designation where the catch is predominantly a single stock. For this purpose, stock is defined as a group of fish of a single species which return to a single river system during a specified continuous time period.
13. Should steelhead stocks from coastal waters be planted in Puget Sound streams?
14. Should all streams within a given river system be stocked with artificially propagated steelhead stocks?
15. Are enhancement fish that were produced from native stocks indigenous to systems within the usual and accustomed places of the tribe and transferred away from an active treaty fishery accountable to the party making the transfer?
Response: The answers to Questions 13-15 require full presentation of facts. The court should not render an advisory opinion on them without full trial and presentation of all issues in Phase II.
16. Should steelhead plants be coordinated with salmon management on individual systems?
Response: The parties agree that they should.
17. What determines the maximum allowable harvest of native wild stocks for repropagation purposes?
Response: See answer to Questions 13-15 above.
18. Shall nonstate-licensed Indian fish buyers (individual or tribal enterprise) be required to provide steelhead catch data on forms (fish tickets) provided by the state, and shall such reporting be on a daily basis as provided for in the "Order for Program to Implement Interim Plan"?
Response: A single, uniform fish receiving ticket (joint tribal and state design) is necessary and must be used to record all "first transactions" (i. e., transfer of steelhead from fisherman to buyer). Copies of these tickets must be provided to regulatory agencies on a daily basis by the fish buyers, either Indian or non-Indian.
*1088 19. How often should steelhead fishermen report their catches in order to implement timely in-season management?
Response: Washington Department of Game should continue to work toward perfecting a more dependable system for sampling the sport fishery to provide precise, timely, hard catch data. This data should optimally be reported on a daily basis. At the present time all professional, licensed guides shall report catches on at least a weekly basis.
20. Is the present method of gathering sport catch data (punch cards) accurate and is it a valid tool for management and allocation?
Response: Analysis of punchcard bias in historical records, along with in-season monitoring of sport fisheries, should make the punchcard a reasonably accurate tool for planning harvest management and allocation prior to the season. The question of timeliness of sport harvest data is of real concern to everyone. It is infeasible to accomplish daily reporting on sport fisheries at this time. For in-season management, a creel census is currently the most effective tool. The Game Department and the tribes are accelerating their efforts along these lines.
21. What is the means of accounting for over-the-bank sales of steelhead?
Response: Previous orders require reporting all sales. To the extent that tribes permit over-the-bank sales, they must require reporting of such sales in their fishing regulations. Non-reporting then becomes an enforcement problem. There are no legal over-the-bank sales of non-Indian caught steelhead. Any violation of this is also an enforcement problem.
22. Should steelhead stock or the right to harvest thereof be traded for salmon, or vice versa? and
23. Are there any specific procedures to be followed in effecting species substitution; i. e., exchanging tribal harvest of steelhead for comparable additional harvest of salmon?
Response: (to Questions 22 and 23) Any exchanges of salmon for steelhead and vise versa must be negotiated between the state and individual tribes on a case by case basis. All affected tribes must agree on the trade. Negotiations must be formal with agreements in writing and approved by the court.
24. Should steelhead management be considered separate from salmon management?
Response: Salmon and steelhead management are interrelated. Separate species management plans are needed but must consider the interrelationship of all species.
25. What are the proper management responsibilities of all parties, both presently and in the future?
Response: The parties have agreed to defer the answer to this question until resolution of the Phase II litigation.
26. Shall the Department of Game, in consultation with tribal technical staffs, propose commercial steelhead guidelines based on run-size, and/or harvest, predictions along with other criteria to which all tribal regulations to harvest steelhead should conform?
Response: Broad steelhead harvest and season guidelines will be proposed by the Department of Game based on preservation of the resource, harvestable number predictions, and equitable sharing of the harvest in conformity with the decision and after consultation with the tribes or their representatives. Indian tribes may then adopt regulations based upon these harvestable number predictions, individual tribal needs and objectives.
27. What mechanism does the court prescribe that will insure that all tribes establishing a fishery on any given steelhead stock promulgate season regulations which will:
a. share equally the tribal harvest within overlapping usual and accustomed fishing grounds, and among tribes having fishing rights on the same stocks; and
b. guarantee the opportunity of the all-citizen sport fishery to take up to 50% of the harvestable numbers?
*1089 Response: This question has been answered by the decision, injunction and subsequent orders of the court including the answers re: steelhead fisheries management herein.

ORDER RE COMPLIANCE WITH STATE PERMIT REQUIREMENTS FOR FISHERIES RESEARCH OR RELEASE OF FISH

(September 15, 1976)
This matter came on for hearing on motion of certain plaintiff tribes for a preliminary injunction to restrain the Washington State Department of Fisheries from enforcing against them its Emergency Order 76-74. That order prohibits any person, group or governmental entity from conducting any scientific study, research, collection or release of food fish or shellfish in state waters without first obtaining a permit from the Department of Fisheries. The court FINDS, HOLDS AND ORDERS as follows:
1. Those tribes which have attained self-regulating status under previous orders and decrees of this court shall not be required to apply for or obtain a state permit in order to engage in any project involving scientific research, collection or release of food fish and activities pertaining thereto. Before activating any such project, such tribes shall continue their previous practice of coordinating their research activities and exchange of information with the state Department of Fisheries.
2. Non self-regulating tribes are required to obtain permits prior to engaging in any scientific research, collection or release of food fish.
3. This decision is based solely on the facts presented at the hearing. Such facts did not disclose any state abuse or significant harm to the various tribal management programs. If and when any party contends a research permit has been unreasonably or unnecessarily limited or denied, the aggrieved party may apply to this court for hearing and determination of the alleged grievance.

ORDER RE: STATE "BUY-BACK" PROGRAM

(December 22, 1976)[29]
This proceeding arises out of a program referred to as "Buy-Back." It is funded by the Federal Government and administered by state authorities pursuant to state law enacted solely for the purpose of auction sale of fishing boats owned and operated by fishermen within the State of Washington, including the case area of this case. Details of the program are set forth in findings of fact and conclusions of law adopted by the court and summarized below. Each of the parties has filed a motion for summary judgment and the motions have been exhaustively briefed and argued. All of the memoranda and documents have been carefully and fully reviewed and considered by the court.
The basic issues involved are: (1) jurisdiction of the court and (2) whether in administering the Buy-Back Program the state failed to properly recognize and apply the rights of treaty Indian tribes. The parties agree that the court has jurisdiction to determine the validity of the Buy-Back Program as it affects treaty Indian fishing rights and the court so finds. Thus, the single basic question remaining for determination by the court is whether or not the Buy-Back Program, as enacted by the state legislature and implemented by state agencies, impairs rights of treaty fishermen which are guaranteed by decisions in this and other cases.
The court is fully satisfied that the manner in which the state set up and has administered the Buy-Back Program, specifically the re-use provisions as they relate to treaty Indians, directly or indirectly impairs the fishing rights of treaty Indians within the case area and therefore violates principles established by prior holdings in this case. Upon that basis the court concludes that the controlling facts and law *1090 require that the summary judgment prayed for by the United States and plaintiff tribes, should be and hereby is granted.

Summary of Findings of Fact
On the basis of a series of detailed findings of fact (numbered 286-325) the court has found that the provision in the state's Buy-Back Program that vessels purchased and resold by the state under the program could not thereafter be used by treaty Indians in their treaty fisheries was an unjustified and unlawful restriction on the Indians' treaty-secured fishing rights. The findings of fact may be summarized as follows:
Washington limits entry into the commercial salmon fishery in order to reduce the amount of gear and the number of fishermen to equate better the commercial fishing effort with the available resource and thereby provide an economic benefit to the persons remaining in the fishery. State action to limit commercial fishing can take several forms, including moritoria on issuance of new licenses, stratification of licenses on the basis of vessel size or duration of license, limitation of seasons, and efforts to reduce the fleet size. In 1974 the state adopted a moratorium on issuance of new commercial salmon fishing licenses. The state's Buy-Back Program was developed in 1975 as another aspect of the state's program to limit commercial fishing power. The program was developed in cooperation with representatives of various segments of the nontreaty commercial fishing interests. No representatives of treaty Indian tribes were included in the groups which were set up to develop or advise on the programs. In enacting the Buy-Back Program the legislature found that there was an overabundance of commercial fishing gear in use in the state. It did not find that there was an overabundance of gear in the Indian treaty fisheries and no evidence has been offered to refute this court's prior findings that treaty Indian capability is presently below treaty entitlement level.
The Department of Fisheries has recognized three distinct categories of salmon fisheries  commercial, recreational and Indian treaty-right fisheries. The different objectives of these distinct fisheries has dictated the application of separate management policies with respect to each of them.
The Buy-Back statute and regulations expressly allow future use of vessels sold under the program in the state's recreational fishery, including use as charter vessels in that fishery. But as construed by state authorities, they prohibit use of such vessels in the treaty Indian fishery.
Those who drew up and enacted the Buy-Back Program were aware of concern over the validity of the prohibition on use of the vessels in the treaty Indian fishery but they felt that such prohibition was necessary to retain the support of the non-Indian commercial fishing interests for the program. As enacted and implemented the program includes a prohibition against subsequent use in any commercial salmon fishery in the state or adjacent offshore waters, including the treaty Indian fishery, of vessels acquired and resold under the program. This prohibition is enforced by requiring all purchasers to sign an agreement which incorporates the restrictions against reuse, provides for injunctive relief and imposes a $200 per day liquidated damages for such use. The Director of Fisheries stated that commercial use of such a vessel by a treaty Indian in the treaty fishery may result in the user's arrest, seizure of the vessel and forfeiture of fish.
The Buy-Back Program is entirely funded by a grant from the Economic Development Administration of the federal government. The restrictions on future use of vessels by treaty Indians was not a term or condition of the grant nor was such restriction considered by the federal officials in approving the grant although they were aware of the state's restriction on subsequent use and assumed it applied to all persons, including treaty Indians. EDA's concern was with the general goal of the program; the details were decided by the state.
Those who drew up the program anticipated that it would result in increasing the market value (price) of fishing vessels not *1091 purchased under the program. However, they did not conduct any studies on the effect of such increase or reduced open market availability of such vessels on the Indians' future efforts to acquire vessels and gear necessary to increase their ability to exercise their treaty right as decreed by this court.
A major short-term effect of the program is to enable vessel owners to obtain a substantially higher price for their vessels from the state than they could obtain on the present private market. Because the present demand for construction of new gillnet fishing boats exceeds the supply, it was not possible to obtain a new boat during the 1976 fishing season.
After purchase by the state the vessels are stripped of their gear and offered for resale through public auction. The resale prices are for the most part considerably less than the price at which they were purchased by the state. This is due in large measure to the restrictions against relicensing and reuse. Where the vessels are purchased by out-of-state buyers for out-of-state commercial fishing use, the high quality ones have brought from 80% to 110% of the state's purchase cost.
When purchasing vessels under the Buy-Back Program the state must also purchase and permanently retire all current Washington commercial fishing licenses and delivery permits issued to the vessel or its owner. The boat may not be relicensed for commercial fishing or delivery and under the state's license moratorium laws the repurchaser from the state cannot obtain a new license.
Commercial use of these vessels by treaty Indians in their treaty fisheries would not defeat the purposes of the Buy-Back Program but would increase the economic opportunity of treaty fishermen. There is no conservation purpose, as previously defined by this court, for imposing a restriction on subsequent use of the vessel in the treaty Indian fishery.
A survey undertaken by the Northwest Indian Fisheries Commission disclosed that at least 87 treaty fishermen from 11 treaty Indian tribes will seek to purchase used fishing boats from the state's Buy-Back auctions if there are no waivers of, or restrictions on, use of the boats for treaty-right fishing and that at least 71 treaty Indian fishermen have sufficient funds to purchase a used commercial fishing boat but will not have sufficient funds to purchase a new boat.
At least two identified treaty Indians have purchased vessels at the first two state auctions for intended commercial use in their treaty fishery.

Conclusions of Law
69. This court has jurisdiction over the question of validity of the Buy-Back Program under its continuing jurisdiction in this case only to the extent of its effect on the Indian treaty fishing rights. United States v. Washington, 520 F.2d 676, 693 (9th Cir. 1975); CL # 48, 384 F.Supp. at 405. Injunction, ¶ 25, 384 F.Supp. at 419.
70. The state-imposed restriction on the reuse of Buy-Back vessels by treaty Indians in the treaty fishery for commercial purposes is unlawful in that it fails to recognize that treaties secure to the Indians rights, privileges and immunities that are distinct from those of other citizens. CL # 19, 384 F.Supp. at 401.
71. By prohibiting commercial use of Buy-Back vessels by treaty Indians in their treaty-right fisheries while allowing use in some nontreaty fisheries pursuing the same fish, such as the sport fishery, the state is unlawfully discriminating against the treaty-reserved right to take fish. Department of Game v. Puyallup Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973).
72. When the state undertakes a fisheries management program of affirmative action, such as Buy-Back, it must not only recognize the distinctive treaty rights of the Indians, but it must treat their interest in this resource as an obligation and interest to be promoted co-equal with the interests of other persons and groups in the resource. CL # 34, 384 F.Supp. at 403.
*1092 73. Special statutory treatment of Indians with treaty fishing rights is not racial discrimination. State statutes and regulations which properly recognize treaty rights as distinctive have the effect of treating Indians not as a discrete racial group but rather as members of a constitutionally recognized category of political entities. Morton v. Mancari, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).
74. The use by this court in Final Decision # 1 (e. g., 384 F.Supp. at 342) of the term "regulations" with respect to limitations on the state's authority to restrict Indian treaty fishing encompasses all forms of state restriction on the treaty fishery whether accomplished by state statute, initiative measure, departmental regulations or instruments or other means.
75. In carrying out a regulatory program, whether designed specifically to affect treaty Indians or not, the state has an obligation to promote and facilitate a more nearly equal enjoyment of the fishing opportunity by treaty Indians than has resulted from prior state practices and restrictions. CL # 32, 384 F.Supp. at 403.
76. The application of RCW Ch. 75.28 and WAC Ch. 220-95 to restrict the use of certain gear by treaty Indians is to that extent unlawful for the reason that, a) they have not been established to be necessary to preserve and maintain the resource; b) they operate to discriminate against the tribes' treaty right to fish; c) they have been adopted and enforced in violation of appropriate standards; d) they have been adopted and enforced in derogation of the meaning and purposes of the treaty provision as established by order of this court. CL # 29 and 31, 384 F.Supp. at 402.
77. State statutes and regulations which purport to apply to "all citizens of the State of Washington" may not be enforced against Indians exercising treaty fishing rights if such enforcement would interfere with those rights, unless the state can demonstrate that enforcement against treaty Indians is necessary for conservation of the resource. The State of Washington has neither argued nor demonstrated a conservation objective to justify the application of the reuse restriction to Indians fishing for commercial purposes in their treaty fisheries. CL # 23, 384 F.Supp. at 401-402.
78. The determination of preferences among treaty fishing purposes, i. e., subsistence, commercial or ceremonial is a matter concerning the internal and social relations of an Indian tribe and lies within the exclusive jurisdiction of tribal regulation. Settler v. Lameer, 507 F.2d 231, 237 (9th Cir. 1974); Settler v. Yakima Tribal Court, 419 F.2d 486 (9th Cir. 1969).
79. The use restriction of the Buy-Back statute, implementing regulations and the Vessel Sales Agreement unlawfully curtails the purpose for which the members of treaty Indian tribes may fish, are of broad applicability instead of specific as to time, place, species and gear, and are not the least restrictive regulations which can be imposed consistent with insuring the necessary escapement of fish for conservation purposes. CL # 35, 384 F.Supp. at 403.
80. The Vessel Sales Agreement is an extension of the Buy-Back legislation and is a means chosen by the state to implement the statutory prohibition against future treaty Indian use of vessels under tribal regulations. The provisions of the Vessel Sales Agreement restricting use of a vessel in the treaty Indian fishery is an unlawful restriction of the Indian treaty rights and is void and unenforceable against an individual who uses said vessel in the exercise of a treaty Indian fishing right. Such invalidity does not affect the validity of other provisions of the agreement or the buyer's right, title and interest under said sales agreement.
81. The State of Washington and the Department of Fisheries are without jurisdiction to arrest a treaty Indian or seize any property owned by or in permitted custody of a treaty Indian, regardless of its origin or prior ownership, because said Indian used a vessel or other property acquired under the Buy-Back Program in the Indian treaty fisheries contrary to the reuse restrictions referred to in Conclusion of Law No. 79 above.

*1093 Summary Judgment and Injunction

Upon the findings of fact and conclusions of law adopted by the court it is hereby:
ORDERED, ADJUDGED AND DECREED that the United States and the plaintiff tribes hereby have and recover summary judgment against the State of Washington and its officials administering the Buy-Back Program, including the State Departments of Fisheries and Game, as follows:
1. The provisions of RCW Ch. 75.28, WAC Ch. 220-95, and the predecessor emergency regulations of the Director of Fisheries promulgated as Order Number 76-10 and the Vessel Sales Agreement are an unlawful infringement on the exercise of the treaty fishing rights of the treaty Indian tribes and their members, insofar as those provisions prohibit, restrict, or impose penalties or forfeitures upon the use of any vessels or gear by treaty Indians in the lawful exercise of their treaty fishing rights as declared by the decisions and orders of this court.
2. The fishing rights secured to Indians by the treaties of the United States cited in Final Decision # I in this case (384 F.Supp. 312) are legally distinct from fishing rights or privileges of other citizens and nothing in this order shall render the use restrictions or other provisions of the statutes, regulations, or documents referred to in Paragraph # I above ineffective or invalid with respect to their application to use of any vessel or gear by any person for any purpose or in any fishery other than as specifically declared unlawful by this order.
3. Said defendants and all of their officers, employees, agents, and attorneys and those acting in concert therewith are hereby enjoined from:
(a) applying the provisions of RCW Ch. 75.28, WAC Ch. 220-95, Director of Fisheries Order Number 87-10, the Vessel Sales Agreement, or any other document used in connection with the Washington Fishing Gear Reduction (Buy-Back) Program, so as to prohibit, restrict, or impose penalties or forfeitures upon the use of any vessel or gear by an Indian tribe, a member thereof, or tribal enterprise in any fishery which is a lawful treaty fishery under the decisions and orders of this court;
(b) refusing to sell or deliver any vessel or gear under the Buy-Back Program to any Indian tribe, member thereof, or tribal enterprise because they retained treaty fishing rights and will not agree to refrain from using the vessel or gear in the exercise of such rights;
(c) requiring any treaty Indian tribe, member thereof, or tribal enterprise to execute any document or agreement by which they agree not to use any vessel or gear in any fishery which is a lawful treaty fishery under the decisions and orders of this court; and
(d) enforcing against any treaty Indian tribe, member thereof, or tribal enterprise, the provisions of any document or agreement by which they or any previous bidder or purchaser agreed not to use the vessel or gear in any fishery which is a lawful treaty fishery under the decisions and orders of this court, but this shall not affect the enforcement of any other provisions of any such document or agreement.

MEMORANDUM DECISION DENYING DISQUALIFICATION

(May 2, 1977)[30]
Comprehensive memoranda and numerous affidavits and exhibits have been filed either in support of or in opposition to the motion of the State of Washington for my disqualification from "further participation in this litigation."
All of the memoranda and supporting documents have been meticulously reviewed and fully considered and I am certain that all counsel are thoroughly cognizant of all of the arguments and contentions as well as the applicable case and statutory law. Accordingly, this decision will be brief.
*1094 Although the court does not rule on the long delay in the filing of the disqualification motion, it is a fact that all of the incidents on which the present motion is based occurred and were known to officials of the State of Washington not later than September 8, 1976. The state's informal request for my recusal was made September 29, 1976 and was denied by this court on November 12, 1976. Four months later, March 11, 1977, the state filed its disqualification motion. It may be significant that this delay is not adequately explained in the record.[31]
By way of background, it is important to note that Phase II of United States v. Washington is not a new case but involves numerous issues which were contained in intervenors' initial pleadings filed in 1971. The court segregated these issues for later hearing and thus "Phase II" evolved. However, extensive evidence presented in Phase I may be applied to Phase II.
The disqualification motion is based on 28 U.S.C. § 455(a) and § 455(b)(1) and is grounded on certain inspection trips which were conducted in anticipation of the trial of Phase II which, during the relevant time period, was scheduled to begin January 3, 1977.[32]
28 U.S.C. § 455(b)(1) provides that a judge shall disqualify himself where he has:
"(1) . . . personal knowledge of disputed evidentiary facts concerning the proceeding."
The State of Washington alleges in its disqualification motion that the court gained "personal knowledge of disputed evdentiary facts" during, and only during, the course of six so-called inspection trips to "facilities" and "locations" that may be involved in Phase II.
The propriety of a judge, either with or without a jury, making an on-site view of areas outside the courtroom is well established and, in fact, is recorded in English law as early as the thirteenth century.[33] For examples: see IV Wigmore on Evidence (1972), at 362 et seq.; cf. Snyder v. Massachusetts, 291 U.S. 97, 111, 54 S.Ct. 330, 78 L.Ed. 674 (1933). And, certainly, ordering such inspections in federal courts is within the sound discretion of the trial judge.[34]Snyder v. Massachusetts, supra, at *1095 111; Hodge v. United States, 75 U.S.App. D.C. 332, 126 F.2d 849 (1942); Schonfeld v. United States, 277 F. 934 (2d Cir. 1921); IV Wigmore on Evidence, supra, at 362-394; 2 Jones' Blackstone, 1957 (1916) citing Stat. 2 Ann.C. 16 (1705).
Several important facts are clear from the filed affidavits[35] and relevant portions of transcripts of record.[36] A representative of the State of Washington was given advance notice of every inspection trip, and a representative of the State of Washington participated in every inspection trip.[37]
It was certainly not intended by the amendment of 28 U.S.C. § 455 to impose a nonwaivable disqualification of a judge because of his exposure to evidence  even inadmissible evidence  in the course of his handling of the proceeding involved or of a prior related proceeding (such as an earlier trial of the same or a separate defendant, or of another case involving some of the same disputed facts).
It is part of a judge's judicial function, especially when he is the trier of fact, to consider and pass upon the admissibility of proffered evidence and to base his decisions only upon properly admitted relevant evidence. A few comments were made by tribal, state or federal representatives during these trips which related to the possible cause or effect of certain conditions. None of those comments has been treated by me as fact, nor has any weight been given to them as evidence to be considered by me in determining any disputed fact.
Prior to September 29, 1976, the date of Mr. Johnson's informal request for my recusal, and several weeks after the last inspection trip, no objections, criticism or negative comments were received either by me or my staff, including Dr. Richard R. Whitney, Fisheries Technical Adviser to the court, concerning: (1) any practice or procedure which was followed during the course of the inspection trips; (2) any areas inspected; or (3) any comments made by me during the entire course of the inspection trips. Indeed, each of the representatives of the Washington Departments of Fisheries and Game orally praised the inspection trips.[38] It is clear, without question, that the attorneys for the Washington Department of Fisheries and Game, of their own free will, chose not to participate in the inspection trips.
In sum, the inspection trips were conducted as a proper judicial function in the course of a massive and diverse litigation. All parties were fully invited to participate in each and every view and every nonparticipation therein was purely voluntary. The record will support no other reasonable conclusion.
The disqualification motion is also based on 28 U.S.C. § 455(a) as amended in 1974, which provides that:
"Any justice, judge, magistrate or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." (Emphasis added).
Any person thinking or acting reasonably must reach his or her opinions and conclusions *1096 upon established facts, as distinguished from conjecture, suspicion, rumor or inferences drawn from other than established facts.[39]
The affidavits clearly establish that, due to the very nature of this case, it was necessary to inspect more areas located on or near tribal reservations than sites and facilities on land owned by the State of Washington. Accordingly on certain inspection trips there were more representatives of the tribes present than representatives of the Washington Departments of Fisheries and Game. However, no representative was ever denied the opportunity to fully participate in any inspection trip.
Although in its opening brief the state questions the propriety thereof, no affiant asserts that I was influenced by any of the meals or token gifts of minimal monetary value which were given by the tribes or the state to inspection trip participants, including me, during the course of the inspections.[40] The fact is that all of the meals or "gifts" were offered as "ordinary social hospitality".[41] Also, no affiant suggests that during the course of the trips I was "partial" to one side or the other. In fact, the record discloses a deliberate and determined effort on my part to be a detached observer avoiding comments as fully as courtesy permitted in the circumstances.[42]
By distorting the true nature of the official site visitations and the events associated with them, the state can undoubtedly fan the emotions of those who have opposed my prior rulings in this case. But the test to be applied in determining whether a judge should remove himself or be removed from a case under 28 U.S.C. § 455(a) is whether his impartiality might reasonably be questioned. The law has had much experience with the application of the test of reasonableness. Even if one accepts as true all of the factual allegations recited in the state's affidavits  as distinguished from the highly opinionized characterization of those facts by counsel and some of the affiants  they fall far short of raising a reasonable question of impartiality.
A careful review of all of the allegations and facts contained in the various affidavits cannot support a finding that my "impartiality might reasonably be questioned." Such a finding is totally unreasonable, not supported by any established facts and inconsistent with my entire judicial career.[43]
*1097 In my fully considered judgment there is no basis, either in fact or law, for my disqualification in this litigation. This is an extensive and long-continuing litigation involving numerous problems and difficult decisions which may continue for an extended period into the future. It would be easy to escape those onerous duties by granting the motions for my disqualification. No matter how difficult or disagreeable, I have never in my entire judicial career, avoided or abandoned what I consider to be my judicial duty and I do not intend to do so now.
Defendants' Motion for Disqualification is denied.

MEMORANDUM ORDER AND PRELIMINARY INJUNCTION RE: INCLUSION OF GRAYS HARBOR IN THE CASE AREA

(August 31, 1977)[44]
The court's preliminary findings, made after a hearing, are summarized as follows:
The Quinault Indian Nation holds treaty fishing rights in Grays Harbor and its watershed which, although located outside the case area as defined in Final Decision # 1, were fully adjudicated in that decision.[45] At the time of that decision, the tribe had no salmon or steelhead harvesting capacity on Grays Harbor. Subsequently, however, it has, consistent with its obligations as a self-regulating tribe under Final Decision # 1, responsibly conducted salmon and steelhead harvesting, planting and research operations in Grays Harbor and its watershed and has built its harvesting capacity to the point where it now can take its treaty share of Grays Harbor-origin salmon and steelhead. Exclusion of these fisheries from the court's protection would threaten this tribe's efforts with severe set-back or extinction.
The state regulations for the 1977 Grays Harbor fall-salmon fishery will provide Quinault tribal harvests with little, if any, of their treaty share of such fish. A preliminary injunction is necessary to prevent irreparable injury to the tribe for which it has no adequate remedy at law and is further necessary in aid of this court's jurisdiction and to effectuate its judgments.
8. The Quinault Nation has no adequate remedy at law.
9. A preliminary injunction is necessary in aid of the court's jurisdiction and to effectuate its judgments.
The court therefore HOLDS AND ORDERS that:
1. The defendant State of Washington, its officers, agents, servants, employees, attorneys and all other persons in active concert or participation with them who have actual notice of this or subsequent orders are preliminarily enjoined and required to treat the usual and accustomed fishing places of the Quinault Indian Nation adjudicated in Final Decision # 1 (Finding of Fact # 121, 384 F.Supp. at 374) and all runs of salmon and steelhead bound for those usual and accustomed places, as being included within the boundaries of the case area until such time as further hearing and final determination can be had on this matter.
2. The Quinault Indian Nation and its adjudicated usual and accustomed fishing grounds and stations in Grays Harbor and its watershed shall be included and protected under the provisions of the allocation order and preliminary injunction of August 31, 1977, (below) and all permanent orders of the court made subsequent thereto.

MEMORANDUM ORDER AND PRELIMINARY INJUNCTION RE ALLOCATION OF 1977 SALMON RUNS AND OTHER MATTERS

(August 31, 1977, as Supplemented September 28, 1977)[46]
The court has fully reviewed and carefully considered the motions of plaintiff United *1098 States of America and the plaintiff intervenor tribes, the supporting and opposing memoranda, affidavits and attachments thereto, the documentary and testimonial evidence and oral argument offered in open court at hearings held August 8 and August 25, 1977, as well as evidence offered at a hearing held on July 21, 1977, on aspects relevant to the present motions. The memorandum order and preliminary injunction, entered by this court on August 10, 1977, and the clarifying minute order entered on August 12, 1977, are hereby vacated and superseded in their entirety by this memorandum order and preliminary injunction.
Based on all of the evidence, the prior holdings and decrees in this case, and certain decisions of the Supreme Court of the State of Washington, this court FINDS, HOLDS AND ORDERS, as follows:
1. The defendant, State of Washington and its courts, legislature and fisheries management and regulatory agencies and officers have failed and refused to manage and regulate the harvest of the fishery resources that are subject to the reserved treaty fishing rights of plaintiff tribes in a manner that will comport with the prior decrees of this court declaring and enforcing those reserved fishing rights which were secured to those tribes by treaties of the United States.
2. The defendant, State of Washington, through its attorneys herein, and the defendant Director of Fisheries, have stated that they are unwilling or unable to so manage and regulate such fishery resources and harvest and have stated that such inability is based, at least in part, on state law as recently pronounced by the Washington State Supreme Court and on the refusal of the state legislature to enact legislation authorizing the Department of Fisheries to regulate the harvest of the resource in conformity with the requirements of this court's prior decrees. (Tr. 8/8/77, pp. 139-140, 160-162).
3. The inability or unwillingness to so manage and regulate such fishery resources and harvest imminently threatens to deprive the plaintiff tribes of their treaty rights as previously decreed by this court unless this court provides for the allocation, under its direction and control, of the amount of fish from each run that must be reserved from state harvest control, and the amount that must be reserved for spawning escapement, in order to insure the plaintiff tribes their right to take fish, both now and in the future, to the extent provided by this court's decrees.
4. The Supreme Court of the State of Washington held in the case of Puget Sound Gillnetters Association v. Moos, 1977, (88 Wash.2d 677, 565 P.2d 1151), that the Department of Fisheries has a "statutory duty" under State law "to authorize the harvesting of salmon not required for . . . spawning" and that it "may restrict the harvesting of salmon by the commercial fishermen only to the extent that no surplus exists and that the restriction is necessary to prevent the impairment of the supply of salmon" and further that in carrying out this duty to authorize commercial harvest, the Director of Fisheries may not "allocate fish among competing claimants for purposes other than conservation," and specifically that he may not "allocate fish to treaty Indians or to non-Indians," and that "every fisherman in a class must be treated equally, and . . . given an equal opportunity to fish . . .." In this regard the Supreme Court of the State of Washington held that treaty Indians are not a separate class, but that each Indian is a citizen of the United States who may not be "granted special privileges and immunities. . . . Distinctions between fishermen based upon their race or ethnic background are not proper." It reaffirmed this holding on July 21, 1977, in Purse Seine Vessel Owners Association v. Moos, No. 43938, (88 Wash.2d 799, 567 P.2d 205).
5. The Director of the Department of Fisheries has stated publicly that as a state officer he feels bound to comply with the state supreme court holding in case No. 44401 even though the state court did not issue a writ of mandamus to order him to comply. (Tr. 8/8/77, pp. 137, 160-162). In *1099 declining to issue the writ the state court said, "We have full confidence that the director will abide by our decision." (565 P.2d at 1152).
6. The holdings of the Washington supreme court are contrary to the affirmed decision and decree of this court on the federal questions of the nature and scope of the treaty fishing rights of Indian tribes and the obligations of the state toward those rights, which decision and decree are binding upon the defendants in this case, including the State of Washington and its Director of Fisheries. Specifically, this court has decreed that the treaty tribes hold the reserved treaty right to harvest anadromous fish. This reserved right is distinct from rights or privileges of others, does not depend upon state law, and may not be qualified by any action of the state. This court has also decreed that the tribes reserved the right to share equally with the nontreaty citizens of the United States the opportunity to take fish at their usual and accustomed places and that the treaty fishermen as a group and nontreaty fishermen as a separate group are each to have the opportunity to take up to fifty percent (50%) of the harvestable number of fish that would reach such fishing places; that the Department of Fisheries' harvesting plan must provide for an opportunity for treaty Indians to take this share; and that state laws or regulations which affect the volume of anadromous fish available for harvest by a treaty tribe must be designed so as to carry out the purpose of the treaty provision. Neither the treaty Indians nor the nontreaty fishermen may fish in a manner so as to destroy the resource or to pre-empt it totally. This court has also decreed that the defendants must make "significant reductions in the non-Indian fishery, as are necessary to achieve the ultimate objective of the Court's decision . . .." (384 F.Supp. at 343, 345, 346, 401, 403, 406, 407, 408 and 420).
7. The defendant, Director of Fisheries and defendant Director of Game have each on occasion applied RCW 75.12.060 and RCW 77.16.060 to restrict the exercise of the fishing rights of certain plaintiff tribes contrary to the holding and decree of this court. (Ex. PL 109, PL 110, PL 111; Tr. 8/8/77, pp. 143-146).
8. On July 27, 1977, the Director of Fisheries, without prior notice to the plaintiffs or this court, adopted an emergency order closing certain areas, including State Salmon Management Area 6A, to all treaty Indian salmon fishing except when opened by regulations of the International Pacific Salmon Fisheries Commission. (Ex. PL 103). The United States had previously taken official action to reject IPSFC control over the treaty Indian sockeye and pink salmon fisheries and to regulate such fisheries in IPSFC waters by regulations of the Department of the Interior. (42 Fed.Reg. 31450-31453; Tr. 8/8/77, pp. 147-148).
9. On or about June 1, 1977, the Director of Fisheries adopted and filed with this court an emergency regulation closing Indian Treaty Puget Sound Salmon Management and Catch Reporting Areas 10B, 10C and 10D to commercial salmon fishing by treaty Indians for the reason that the existing forecast indicated that the 1977 Lake Washington sockeye run would be below spawning escapement needs and needed "complete protection." The Director advised the tribes and this court that if later data indicated a run in excess of escapement needs, the sport and net fishery could be authorized. (Exs. USA 141, USA 142).
10. On July 14, 1977, the Director of Fisheries adopted an emergency regulation opening said areas 10C and 10D (Lake Washington) to sport fishing for sockeye commencing July 16, 1977, giving as his reason that the run size was then forecast to be 44,000 fish more than were needed for escapement and that an emergency opening was necessary to harvest those excess fish. (Ex. USA 143). The Director refused tribal requests to rescind his conservation closure of the treaty Indian fishery on these same fish for the reason that RCW 75.12.010 prohibited a treaty net fishery in those areas. (Ex. USA 144; Tr. 8/8/77, p. 151).
11. Although no conservation justification for a prohibition of the treaty fishery *1100 in Lake Washington or in management area 10B existed subsequent to July 14, 1977, the Director did not rescind the closure of the treaty fishery until July 21, 1977, after the plaintiffs had obtained that date for hearing in this court on a motion for injunctive relief against the continuance of the closure. (Ex. F 111). By that time, the Department of Fisheries had established that the harvestable surplus in the run was 61,000. (Tr. 7/21/77, p. 151).
12. Under the protection of a temporary restraining order of this court, the Muckleshoot and Suquamish Tribes authorized tribal fisheries to take up to 30,500 fish. The state and the tribes monitored this fishery. This fishery was closed by the Muckleshoot and Suquamish Tribes after tribal members had taken their allotted number of fish.
13. On July 22, 1977, the Director of Fisheries adopted regulations for the 1977 commercial harvest of Puget Sound chinook, coho and chum salmon runs. (Ex. PL 102). Neither the regulations nor the accompanying statement of "1977 Regulatory Considerations" makes any reference to treaty rights of any Indians, nor do they contemplate compliance by the state, through its Department of Fisheries, with decrees and orders of this court in this case. The regulations are intended to apply to treaty Indians and nontreaty fishermen alike. (Ex. PL 121; Tr. 8/8/77, pp. 139, 171-172). The regulations fail to provide the plaintiff tribes with the opportunity to harvest their share of such salmon as decreed by this court and are in violation of the decrees and orders of this court.
14. RCW 75.12.010 is broader than necessary for the preservation of the fishery resource and does not meet the standards previously declared by this court for state measures which may lawfully be applied to restrict members of treaty tribes from exercising their tribe's treaty fishing rights or which may be applied to authorize nontreaty fishing within limitations prescribed by the decrees of this court.
15. The Fisheries Advisory Board appointed a technical committee of biologists representing treaty tribes and the Department of Fisheries to develop a joint report on the run sizes, escapement goals, harvestable numbers, troll and sport interception rates and ceremonial and subsistence numbers for 1977 runs of chum and coho salmon returning to the various Puget Sound salmon management areas and to Grays Harbor. The court finds that harvest allocations for such runs shall be based upon the data contained in that committee's unanimous report which was approved by the Fisheries Advisory Board, subject to in-season updates of pre-season estimates of run sizes and harvestable numbers to be determined as provided in this order and upon the plaintiff tribes' estimates of their anticipated subsistence and ceremonial and on-reservation catches as previously filed by them with this court. The subsistence and ceremonial estimates should be added to the run size and harvestable numbers contained in the technical committee's report.
16. The percentage allocations ordered herein for coho and chum salmon are solely limited to the 1977 salmon runs and are based on the facts, circumstances and equities peculiar to this year's runs. These allocations shall not be interpreted in any way as an express or implied modification by this court of Final Decision # 1.
17. For 1977 the allocations of Puget Sound and Grays Harbor area coho salmon to the treaty Indian fisheries, including fish taken for subsistence and ceremonial purposes and those taken on the reservations, shall be 45% of the total harvestable numbers determined as provided in paragraph 15 above and the allocations to the nontreaty fisheries shall be 55% of such harvestable numbers.
Because treaty tribes of Northern Puget Sound have benefitted from fishing on unusually abundant sockeye and pink salmon runs, while the tribes of Southern Puget Sound have not, the court orders, in the interest of equity, that with respect to Puget Sound stocks the 45% allocation to the treaty fishery be divided so that the share in the south Sound is closer to 50%, while that in the north Sound is somewhat further from 50% as shown below:

*1101
 Approximate Percentage of Total Harvestable
 Puget Sound Origin Coho 
 Nontreaty Treaty
 Area Fishermen Fishermen
Strait of Juan de Fuca 55 45
Bellingham Bay-Samish Bay
 (Nooksack-Samish Rivers) 60 40
Skagit River 63 37
Snohomish-Stillaguamish
 Rivers 58 42
South Sound 52 48
Hood Canal 55 45

Purposes of the above division of catch are to give a 55%-45% overall allocation, and to give a sharing formula of the salmon runs inside Puget Sound which will approximate 60% to the treaty fishery and 40% to the nontreaty fishery in all regions except Bellingham Bay, which is approximately 50% to the treaty fishery and 50% to the nontreaty fishery. The allocation percentages inside Puget Sound are intended to provide an allocation that can be attainable in practice without complex manipulations in management of the treaty and nontreaty fisheries.
These percentages shall continue to apply to any revision in harvestable numbers that may be found to be required because of revised estimates of run sizes.
Based upon the agreed total numbers of coho, the 1977 allocation ordered above can be achieved by an allocation of the following percentages of the allowable catch in Puget Sound or in Grays Harbor and tributaries, respectively, of the coho originating in the following terminal areas:

 % allocation
 to treaty % allocation
 Indian to nontreaty
 Terminal Area fishermen fishermen
Strait of Juan de Fuca
 tributaries 60 40
Bellingham Bay-Samish
 Bay (Nooksack-Samish
 Rivers) 50 50
Skagit River 60 40
Snohomish-Stillaguamish
 Rivers 60 40
South Sound 60 40
Hood Canal 60 40
Grays Harbor 81 19

18. For 1977 the allocations of Puget Sound and Grays Harbor area chum salmon to the treaty Indian fisheries, including fish taken for subsistence and ceremonial purposes and those taken on the reservations, shall be 50% of the harvestable numbers determined for the regions of origin by the Fisheries Advisory Board as specified in paragraph 15 above and the allocations to the nontreaty fisheries shall be 50% of such harvestable numbers. These percentages shall continue to apply to any revision in those harvestable numbers that may be found to be required because of revised estimates of run sizes. Because there are no significant prior interceptions of chum salmon, the allocation of chum salmon is a one-step process.
19. Chinook salmon are hereby allocated to treaty Indian and nontreaty fishermen on the basis of a percentage of the Washington Department of Fisheries' present run size predictions.
The court makes the following allocations with respect to the harvestable numbers of chinook salmon in Puget Sound or Grays Harbor and tributaries, respectively, which when taken in addition to prior offshore harvests will result in the nontreaty fishermen receiving approximately 50% of the total harvestable number of Puget Sound origin chinook, after deducting on-reservation, ceremonial and subsistence catches, and 55% of the Grays Harbor origin chinook:

 Treaty %
 including ceremonial,
 subsistance and
 Area on-reservation Nontreaty %
Bellingham Bay 60 40
Skagit Bay 70 30
Hood Canal 75 25
Grays Harbor 70 30

20. Issuance of a preliminary injunction is necessary to prevent irreparable injury to the plaintiff tribes and their members.
21. The United States and the plaintiff tribes have no adequate remedy at law.
22. Issuance of a preliminary injunction as hereinafter set out is necessary in aid of *1102 this court's jurisdiction and to protect and effectuate its judgments.
23. The Supreme Court of the United States has held that while the states have jurisdiction under their police power to regulate the off-reservation exercise of the treaty Indians' reserved fishing right to the extent necessary to preserve the resource, they do not have the authority to qualify that right, even though the Indians are now citizens of the United States. Puyallup Tribe v. Department of Game, 391 U.S. 392, 398, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968). That Court has not hesitated to prohibit the application to treaty Indians of state laws that went beyond this limited power of regulation. Antoine v. Washington, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); Washington Department of Game v. Puyallup Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973); Tulee v. Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942). The court of appeals for this circuit has done likewise. United States v. Washington, 520 F.2d 676 (1975) (this case); Holcomb v. Confederated Tribes, 382 F.2d 1013 (9 Cir. 1967); Maison v. Confederated Tribes, 314 F.2d 169 (9 Cir. 1963); Makah v. Schoettler, 192 F.2d 224 (9 Cir. 1951).
On the basis of the above findings of state refusal to manage the fishery resources that are subject to the reserved and federally-secured rights of the plaintiff tribes and to regulate the harvest thereof in a manner that conforms to this court's prior holdings and decrees that have now become final and binding as a result of completion of appellate review, this court reluctantly, but necessarily, finds that it is necessary for this court to make the allocations required to effectuate those decrees, including approval of allocations of fish necessary for propagation escapement to perpetuate the fish runs, and to enjoin the state from exercising any form of jurisdiction over the fish so allocated without obtaining the express approval of this court in a manner herein provided for.
24. It is further necessary that this court require the defendants to adopt and enforce appropriate regulations to prevent nontreaty fishermen from taking more than their allocated shares of the runs or from taking fish needed for propagation to perpetuate the runs.
Accordingly, it is HEREBY ORDERED that:
A. The 1977 allocations of Puget Sound and Grays Harbor salmon shall be those adopted in this memorandum order and preliminary injunction unless modified by this court.
B. The Washington Department of Fisheries shall be responsible for developing updated estimates of run sizes for coho and chinook salmon as each particular fishery develops and shall advise the court, the court's Fisheries Technical Advisor, and the Northwest Indian Fisheries Commission who shall in turn be responsible for notifying each affected treaty tribe thereof.
The court refers to the Fisheries Advisory Board the matter of the developing an appropriate method of updating in-season run-size estimates for chum salmon.
C. Any challenges of the Washington Department of Fisheries shall be presented to the Fisheries Advisory Board pursuant to the established procedures.
D. Jurisdiction and harvest control over all allocations for treaty fisheries is hereby vested in this court. The defendants, State of Washington, Director of Fisheries and State Game Commission and Director, and their officers, agents, servants, employees, attorneys and all other persons in active concert or participation with them who have actual notice of this or subsequent orders are hereby enjoined from exercising jurisdiction or any form of harvest management, authorization or control over, or in any manner regulating, restricting, prohibiting or interfering with the taking, fishing for, possessing or disposing of, the fish comprising that portion of any run allocated by this court to the treaty fisheries, except as specifically provided for in this or subsequent order of this court.
*1103 E. The defendants, State of Washington, Director of Fisheries, State Game Commission and Director, and their officers, agents, servants, employees, attorneys and all other persons in active concert or participation with them who have actual notice of this or subsequent orders are hereby further enjoined to manage and regulate the harvest of the portions of such runs not herein removed from the defendants' jurisdiction and control in such manner as will assure the escapement from nontreaty harvest of the numbers of fish allocated to propagation escapement and to the treaty fisheries pursuant to this order. Copies of all state regulations governing the nontreaty harvest in the case area shall be filed with the court's Fisheries Technical Advisor, each affected plaintiff tribe, the United States Fish and Wildlife Service, the Northwest Indian Fisheries Commission, and their respective counsel. The state shall carefully monitor any nontreaty fishery and immediately advise the court when any nontreaty catch meets the quota specified in this court's allocation and also advise this court of any encroachment on spawning escapement goals and of the extent and effectiveness of state efforts to prevent such encroachment.
F. Regulation and harvest control over the fish allocated to treaty fishermen pursuant to this order shall remain with the court. Tribal regulations governing such fishery shall be adopted and filed with the court in strict conformance with Final Decision # 1 and subsequent orders of this court.
G. Nothing in this order shall diminish the immunity from state regulation or affect the jurisdiction of self-regulatory tribes as prescribed by prior orders of this court, except that such tribes shall be bound by the allocations made effective pursuant to the provisions of this order.
H. The United States, through its appropriate agencies and officers, is hereby directed to monitor fishing activities in the waters of the case area and Grays Harbor area for and on behalf of the court and to report to the court on a daily basis, with copies to all affected parties, regarding the extent of compliance with state, tribal and court-determined regulations and to immediately report any substantial violations thereof to the court for further action as the court deems appropriate.
I. The defendants shall not apply or enforce RCW 75.12.010 or the regulations of the Director of Fisheries concerning certain Puget Sound salmon fisheries adopted July 22, 1977, to regulate, limit or restrict the exercise of the fishing rights of a treaty tribe or to authorize a nontreaty harvest in excess of the amounts allocated for that purpose pursuant to this order.
J. The defendants shall not adopt, apply or enforce any regulationsincluding Director of Fisheries Order No. 77-60to regulate, limit or restrict any fishing by members of a treaty tribe that is authorized by regulations of the United States or any of its agencies without first obtaining the prior express approval of this court.
K. The defendants shall not apply or enforce any emergency regulations adopted under the permission of paragraph 19 of this court's injunction of March 22, 1974 (384 F.Supp. at 417), as modified by the order of December 17, 1976, Order Re: Rules of Procedures for Fisheries Advisory Board (p. 1061 supra), to limit or restrict the exercise of the fishing rights of a treaty tribe beyond the period for which the facts and circumstances of the emergency recited in the statement filed with this court continue to exist, or beyond thirty days after the adoption of such emergency regulations, whichever is shorter, provided that for regulations heretofore adopted, said thirty-day period shall commence on the date of this order. The foregoing durational limitation on emergency orders shall not preclude the defendants from adopting, in accordance with the approved procedural and other provisions of this court's orders, continuing regulations or renewing emergency regulations to deal with conditions that extend beyond thirty days. The defendants shall not, without the prior approval of this court, adopt, apply or enforce any emergency closure or limitation of treaty fishing if *1104 the nontreaty fishermen have taken more than the number of fish allocated pursuant to this order for the nontreaty harvest from any run affected by such regulation.
L. The portions of this court's order of March 22, 1977, entitled "Interim Plan and Stay Order Pending Final Decision on Appeal" (384 F.Supp. at 420) which stay certain portions of Final Decision # 1, the decree of February 12, 1974, and of the injunction of March 22, 1974, are hereby terminated.

PRELIMINARY INJUNCTION STAYING STATE COURT INJUNCTION AND ORDER IMPLEMENTING PRELIMINARY INJUNCTION

(August 31, 1977)[47]
This matter having come on regularly before the court on plaintiffs' motion for a preliminary injunction staying state court injunction and for an order implementing the preliminary injunction, the court makes the following findings of fact and conclusions of law and on the basis thereof, issues the following orders:

Findings of Fact
1. In an effort to assure plaintiff tribes their federally guaranteed treaty fishing rights and at the same time avoid unnecessary conflict with the state judiciary, the United States, and the plaintiff tribes on July 28, 1977, asked this court to specifically determine and allocate a portion of the harvestable fish between treaty and nontreaty fishermen for the 1977-78 season.
2. This request was prompted by the Washington supreme court's determination that the state's Department of Fisheries had no authority to make such an allocation under state law and the decisions of that court that the Director of Fisheries must affirmatively authorize the harvest of all fish not needed for propagation escapement and must do so on a basis that does not recognize treaty fishermen as a separate class whose distinct federally secured rights are to be specifically protected. This court thereupon issued a preliminary order on August 10, 1977, by which it assumed the responsibility for allocating the salmon runs between treaty and nontreaty fishermen, enjoined the state from authorizing or permitting harvest of the treaty fishermen's share, and directed the state to manage the remaining portion in a manner that would meet conservation needs and permit harvest of the remainder by nontreaty fishermen under state law and control. This federal court-ordered allocation was necessary only because the state supreme court's interpretation of state law had prohibited state regulatory or management authorities from safeguarding or observing the treaty tribes' federal rights. Purse Seine Vessel Owners Association v. Moos, 88 Wash.2d 799, 567 P.2d 205 (1977); Puget Sound Gillnetters Association v. Moos, 88 Wash.2d 677, 565 P.2d 1151 (1977).
3. The August 10, 1977, order referred to above, allocated a specific number of Puget Sound chinook to treaty Indians for the 1977-78 season. This court removed from the State of Washington authority, control and jurisdiction over the treaty allocation. The state was enjoined from exercising any form of harvest management authorization over the fish so allocated. (That order has been superseded by the order Aug. 31, 1977, set forth at pp. 1097 1104 supra).
4. The defendant Director of Fisheries promulgated regulations consistent with this court's orders but was then enjoined by the Superior Court for Thurston County from enforcing his Emergency Orders 77-68, 77-70 and 77-73. Puget Sound Gillnetters Association v. Sandison, No. 58107. The Director had determined that his regulations were necessary to effectuate the management scheme ordered by this court. The state court also ordered the Director of Fisheries to adopt harvest regulations based upon the total predicted number of salmon in the Puget Sound area in such a manner as to eliminate the opportunity for treaty fishermen to harvest their treaty share and *1105 in total disregard of this court's prior orders including Final Decision # 1.
5. The very purpose of this court's allocation order was to provide the treaty Indian fishermen the fishing opportunity required under treaties with the plaintiff tribes as interpreted by prior decisions of this court.
6. The number of fish needed to insure proper spawning escapement remains within the jurisdiction of the State of Washington. Regulations adopted by the state (Director of Fisheries Orders 77-68, 77-70, 77-73) were necessary to insure that nontreaty fishing did not encroach upon fish needed to perpetuate the run.
7. The regulations enjoined by the state court were adopted by the Director of Fisheries to comply with this court's allocation order. The Thurston County Superior Court's injunction against enforcement of these regulations therefore brings that court into direct conflict with specific orders of this court. These include, in addition to the order of August 10, 1977, this court's decision and orders of February 12, 1974, and March 22, 1974, (384 F.Supp. 312) which have been affirmed by the United States Court of Appeals for the Ninth Circuit and are now final and binding (520 F.2d 676, 693, cert. denied 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97). The March 22, 1974, order requires, in part, that:
The defendants will make significant reductions in the non-Indian fishery, as are necessary to achieve the ultimate objectives of the Court's decision without requiring mathematical precision, but in making such reductions will do so consistent with the concept of permitting the full harvest of fish. 384 F.Supp. at 420.
8. If the state court's judgment is permitted to stand, the orders of this court will be rendered ineffective and plaintiff tribes will again be denied their federally determined rights. Therefore, it now appears that in order to protect and effectuate the prior orders of this court, and to preserve its jurisdiction over the subject matter, it is necessary that this court stay the state court's preliminary injunction and enjoin the state courts from proceeding further in contravention of this court's orders.
9. Substantial fish resources for this year will be lost to plaintiff tribes if not harvested during the current and upcoming seasons. Because of the immediate threat of substantial economic harm and serious hardship to many treaty right fishermen prompt action is required to protect federal treaty rights that this court has found are constitutionally guaranteed as the law of the land and to assure the viability of this court's orders.

Conclusions of Law
1. This court has jurisdiction to enjoin the state court proceeding referred to in Finding of Fact # 1 above, within the express exceptions to the anti-injunction statute, 28 U.S.C. § 2283, and under the authority of Leiter Minerals, Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957). The court has an urgent duty to take such action to the extent shown necessary in order to effectuate its judgment and protect the federal treaty rights as adjudicated in such judgment.
2. It is clear beyond reasonable question that the state court injunction referred to above, if allowed to remain in effect, would prevent defendants from complying with this court's order to manage the allocated nontreaty share in such manner as to protect fish needed for escapement and not interfere with the treaty fishermen's opportunity to catch their allocated share of the harvestable resource. Interference with the exercise of Indian treaty fishing rights indisputably is within the jurisdiction of this federal court, and state court proceedings instituted by nonparties to this lawsuit cannot be allowed to frustrate either the jurisdiction or the final determinations of this court.
3. Gross inequities between treaty and nontreaty harvest will occur if defendants are prevented from enforcing their aforementioned adopted regulations. Plaintiffs herein have overwhelmingly met their burden of proof to show that enforcement of *1106 the aforementioned Department of Fisheries regulations limiting the fishing time on the nontreaty allocation would achieve at least partial compliance with this court's directives to make additional fish available for harvest by treaty-right fishermen, and that prohibition by the state court of enforcement of those regulations presents an immediate threat of substantial economic harm and serious hardship to plaintiff tribes. Thus, while plaintiffs have demonstrated irreparable injury to the treaty fishermen if a preliminary injunction is not granted, defendants have not demonstrated a substantial injury which will result to either themselves or other interested persons as a result of issuance of the preliminary injunction.
4. The public interest will best be served here by permitting the United States Government to honor its treaty obligations to the Indians and by this court seeing that its valid, final judgments and orders are protected and effectuated.
5. For the reasons set forth above, the court finds and concludes that the plaintiffs have a strong likelihood of prevailing in this cause following a trial on the merits and thus the preliminary injunction staying the state court preliminary injunction should issue.
6. Alternatively, the court finds and concludes that not only have plaintiffs raised serious questions, but they have demonstrated that the balance of hardships tips sharply in their favor. See, William Inglis and Sons Baking Co. v. ITT Continental Baking Co., 526 F.2d 86 (9th Cir. 1975).
For the reasons hereinabove stated, unless and until this court orders otherwise, it is now hereby ORDERED as follows:

Preliminary Injunction
1. The Superior Court of the State of Washington, County of Thurston, is hereby enjoined and prohibited from in any manner or to any extent enforcing the temporary injunction issued by said court on August 24, 1977, in cause No. 58107, and from issuing any other order in said cause which in effect will prevent the Washington Department of Fisheries from fully complying with the orders of this court.
2. Defendants State of Washington, Director of Fisheries Gordon Sandison and the Departments of Fisheries and Game of the State of Washington, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, shall not obey, carry out, enforce or otherwise treat as having any lawful force or effect the order of the Thurston County Superior Court for the State of Washington referred to in paragraph 1 above until further order of this court.
3. The application for injunctive relief herein having been made by the United States, this court may not require security therefor from the United States, (Rule 65(c), F.R.Civ.P.), and does not require such security from any parties joining in or supporting said application.

Implementing Order
For reasons not clear to this court, the Department of Fisheries takes the anomalous position of opposing entry of the preliminary injunction issued above, while asserting the correctness and appropriateness of the regulations enjoined in the state court proceeding. This court's preliminary injunction confirms the propriety of the Department of Fisheries' regulations. Moreover, this court has not and will not direct, limit or in any manner whatever interfere with full exercise of the prerogatives, duties and discretion vested by state law in the Directors of the Departments of Fisheries and Game, except to the extent necessary to enforce the judgment and decrees entered pursuant to Final Decision # 1 and to restore or preserve the Indian treaty rights specified therein. Nothing in this decision or in the above injunction should be construed or applied to the contrary.
However, due to the circumstances previously recited, and to aid in achieving an equal opportunity to both treaty Indian and nontreaty fishermen to harvest fish in the *1107 case area, this court finds it necessary in aid of its jurisdiction and to protect and effectuate its judgment, to provide as follows:
IT IS HEREBY ORDERED THAT:
1. The defendants are required to enforce their regulations providing for management and control for purposes of conservation and over the allocated nontreaty share of fish so that the treaty allocation shall not be encroached upon.
2. Regulations governing the nontreaty allocation, once adopted by the defendants in accordance with this court's prior rulings and this order, shall not thereafter be relaxed or rescinded without prior notice to this court and to all parties to this action, unless consent of the affected plaintiff tribes has been obtained prior thereto.
3. To the extent reduction in the nontreaty fishery adopted in accordance with the court's prior rulings already has been relaxed or rescinded prior to the entry of this order by reason of the preliminary injunction of the Thurston County Superior Court in Puget Sound Gillnetters Association v. Sandison, No. 58107 issued August 24, 1977, defendants shall cease immediately from carrying out directives, orders or policies in accordance with said preliminary injunction and shall resume forthwith to implement the regulatory schemes and policies previously adopted to effect their management control over the allocated nontreaty share.
4. If, at any time subsequent to the entry of this order defendants are participants in legal proceedings which, in their judgment might possibly result in an order that could impair or otherwise affect adversely their ability to conform to the requirements of this court's allocation order, or other orders in this case, defendants shall immediately so inform this court and shall serve upon all parties to this action copies of all papers filed in such legal proceedings.
5. Defendants shall take such action as may be necessary to notify forthwith their officers, agents, employee and attorneys, and those persons in active concert or participation with them, of the contents of this order and the duties and obligations defined herein.

MEMORANDUM ADOPTING SALMON MANAGEMENT PLAN

(August 31, 1977[48] as amended October 11, 1978)
The court has carefully reviewed and fully considered the report of the court's Fisheries Advisory Board, dated July 14, 1977, concerning an agreed-upon salmon management plan for 1977, subsequent modifications thereto as proposed by the parties and the court's Fisheries Technical Advisor, Dr. Richard R. Whitney, the oral argument of counsel presented in open court at a hearing held August 30, 1977, and the oral recommendation of the Fisheries Technical Advisor.
Upon careful consideration and review it appears that the parties, with only a few exceptions, are in basic agreement. It is also clear that all parties, the Fisheries Technical Advisor, and the court agree that a salmon management plan for 1977, is essential. Moreover, in the opinion of the court it is imperative that a salmon management plan be adopted by this court forthwith.
Accordingly, the court adopts the following plan, effective immediately, which in the opinion of the court will best accommodate the interests of all parties. However, the court recognizes that this plan is not an end in and of itself. Therefore, the court instructs the parties to continue to work together with the Fisheries Technical Advisor, and through the Fisheries Advisory Board, to refine issues that may still require clarification, modification, or development, such as the three points raised by Dr. Whitney in his memorandum to the court dated August 30, 1977, and to present to the court for approval any proposed clarifications to which all parties agree.
*1108 The following plan shall continue in effect until May 30, 1982. However, on or before May 1 of each succeeding year, beginning with 1978, the parties are instructed to confer with each other and with the Fisheries Technical Advisor with respect to any recommended clarifications and/or modifications of any provisions contained in the salmon management plan then in effect. If no modifications are proposed to the court prior to May 15 of any year, the then existing salmon management plan will automatically continue in effect for another year.

Salmon Management Plan Puget Sound Area Salmon Runs

1. Preamble

1.1 The purpose of this plan is to establish guidelines for management of salmonid resources originating in or passing through Washington waters from the mouth of the Strait of Juan de Fuca eastward (Puget Sound). The parties, hereto, all Puget Sound treaty tribes, and the State of Washington, agree to a philosophy of cooperation in implementing management programs to maintain, perpetuate and enhance the salmonid resources.
1.2 This plan is intended to insure that treaty fishermen and nontreaty fishermen subject to their respective regulatory authorities shall be accorded the opportunity to harvest their shares as determined in United States v. Washington, 384 F.Supp. 312, aff'd 520 F.2d 676 (9 Cir. 1975) cert. denied 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).
1.3 The parties agree to enact and recommend for enactment by the Pacific Fishery Management Council, appropriate regulations for the ocean salmon fishery that will provide for adequate escapement of salmon into Puget Sound waters to achieve the goals and purposes of this plan.
1.4 The parties shall advocate and recommend to the appropriate governmental and regulatory entities, international agreements to reduce foreign interceptions, particularly Canadian, of salmonids originating from Puget Sound.
1.5 The duration of this plan shall be for five (5) years from the date of acceptance by the court, subject to annual review, renewal, and modification, except that the provision (Sec. 7.2) for the annual adjustment of shares shall be modified only upon terms that are equitable.
1.6 Where action of the parties is required in this plan, failure to act or to reach agreement shall be resolved as provided in section 11.
1.7 When adopted by the court this plan supplements and where inconsistent modifies the federal district court's order on Certain Questions re: Fisheries Management, dated April 13, 1976, United States v. Washington, supra [p. 1069, supra] which is hereby extended and shall remain in effect until further order of the court. This plan also supplements and where inconsistent modifies the Order for Program to Implement Interim Plan, dated October 8, 1974, as extended by the minute order dated April 5, 1976, [p. 1035 supra] and the Order Re: Rules of Procedure for Fisheries Advisory Board and Resolution of Disputes, dated December 17, 1976 [p. 1061, supra].
This plan, for example, removes from the court much of the burden of making equitable adjustments through an automatic adjustment mechanism (Section 7.2).
2. DefinitionsExcept where the context clearly requires otherwise, the following terms used in this plan have the following meanings:
2.1 "Prior net interceptions". Harvest by net fisheries of a run outside of its region of origin. Computed separately for treaty and nontreaty fishermen.
2.2 "Region of origin." A geographic area which can be used to separate runs of the same species. The following geographic areas are recognized regions of origin for Puget Sound: 1) Strait of Juan de Fuca (tributaries) 2) Bellingham Samish Bays-Nooksack-Samish Rivers 3) Skagit 4) Stillaguamish Snohomish 5) South Puget Sound, south of Snohomish System 6) Hood Canal 7) Canada.
*1109 2.3 "Run". A stock, or group of stocks identified for fishery management purposes which return to the same region of origin at similar times.
2.4 "Run management period." A time interval during which a specific run is a target of a fishery in a particular harvest management area.
2.5 "Run size." The total number of fish in a run.
2.6 "Salmonid." Refers only to the following species:
Chinook-Oncorhynchus tshawytscha (also called spring, king, tyee, or black-mouth)
Coho-Oncorhynchus kisutch (also called silver, silverside, or hooknose)
Pink-Oncorhynchus gorbuscha (also called humpback or humpy)
Chum-Oncorhynchus keta (also called dog or keta)
Sockeye-Oncorhynchus nerka (also called red or blueback)
Steelhead-Salmo gairdneri

2.7 "Stock." A population of one species migrating to a particular lake or stream (or portion thereof) within a region of origin, at a particular season.
2.8 "Twelve Questions." Order on Certain Questions re: Fisheries Management, dated April 13, 1976, United States v. Washington, supra [p. 1069, supra].
2.9 "Viable natural stock." A stock for which a spawning escapement goal is established with the intent that the fishery will be managed to meet this goal.
3. Management of steelhead stocks: The parties shall manage from the premise that steelhead and salmon fisheries are intimately related.
The parties have made substantial progress in developing cooperative plans for scientific management of steelhead in their respective river systems, and it is important that these efforts result in firm management agreements prior to the 1977-78 steelhead season.
Therefore, prior to October 1, 1977, the affected parties shall reach agreement regarding the management of steelhead fisheries system by system and stock by stock.[49]
4. Escapement. Meetings of technical representatives regarding escapement goals during development of joint management principles for 1977 have proven especially productive. Therefore, the concepts of the "Initial Understandings on Technical Issues", of April 12, 1977, are essentially incorporated herein. This section, also, addresses the special problems which have arisen in past seasons from unilateral changes in escapement goals for hatchery stock requirements. Sections 4.2.1.1 and 4.3.1 will resolve such questions prior to the season in the future. Basic premises used are that harvest and enhancement policies and programs must be tempered with the understanding that certain natural stocks of salmonids native to particular river systems should be preserved and protected sufficiently to insure their perpetual existence and production.
4.1 Escapement goals shall be developed separately for natural stocks and hatchery stock requirements.
4.2 Escapement goals for natural stock requirements apply to those stocks where egg deposition and fertilization occur naturally.
4.2.1 Escapement goals for natural stock requirements shall be established only for viable natural stocks.
4.2.1.1 The affected parties shall reach agreement as to which natural stocks shall be considered viable natural stocks.
The Washington Department of Fisheries has determined that the following natural runs are not viable for harvest management purposes and in terms of achieving full natural spawning escapement goals WDF has conducted artificial production programs accordingly:

*1110
Bellingham Bay 1977, 78, 79, 80 Chinook
 1977, 78 Coho
Skokomish River 1977, 78, 79, 80 Chinook
 1978 Coho
Carr Inlet 1977, 78 Coho
Puyallup River 1977, 78 Coho
Duwamish-Green Rivers 1977, 78 Coho
Dungeness River 1977, 78 Coho
Elwha River 1977, 78 Coho

From the date of the adoption of this plan, parties shall agree on the enhancement planning that determines which natural stocks are considered viable and, therefore, determines future harvest management policies. This must, however be in the manner and time frame described below:
a) for new facilities this shall first be considered during the site selection and facility planning stage,
b) for all facilities this shall be considered prior to annual hatchery programming, on or about August 1 of each year.
In reaching an agreement, the parties shall consider the following factors:
Impact upon existing hatchery stock harvest in the mixed-stock fishery and the terminal fishery due to harvest rates necessary to provide for the natural escapement goal.
Harvestable numbers presently produced by a natural stock, or which may be projected based upon potentially available spawning ground and/or rearing environment.
Unique characteristics of the natural stock with respect to behavior, physiology or morphology, which indicate value for future natural or hatchery stock development.
4.2.2 Except as otherwise agreed by all affected parties, a viable natural stock as determined pursuant to section 4.2.1.1 shall remain a viable natural stock from year to year.
4.2.3 Annually, prior to each fishing season, the affected parties shall reach agreement as to escapement goals for natural stocks, according to the following schedule:
fall chinook stocks-April 1
coho stocks-May 1
chum stocks-June 1
all other stocks-at least forty (40) days prior to the entry of the stock into Puget Sound.
4.2.4 Escapement goals for natural stocks shall be the number of spawners which would, in an average year, maximize the biomass of juvenile outmigrants subsequent to incubation and freshwater rearing, under average environmental condition. These goals shall be consistent with the population-limiting factors for each species, e. g., spawning area and/or rearing area. In cases where the total run size of a stock entering Puget Sound is less than the escapement goal, it is understood that the escapement goal will not be fully attainable.
4.2.5 Except as otherwise agreed by all affected parties, escapement goals under this section 4.2 shall not be changed during the fishing season.
4.3 Escapement goals for hatchery stock requirements apply to those stocks from which eggs are collected and fertilized artificially.
4.3.1 The escapement goal for hatchery requirements is that number of spawners needed from a stock to meet an artificial production plan that is agreed upon by all affected parties.
4.4 Prior to the fishing season the affected parties shall reach agreement as to the methods for estimating actual escapement to the spawning grounds according to the following schedule:
fall chinook stocks-April 1
coho stocks-May 1
chum stocks-June 1
All other stocks-at least forty (40) days prior to the entry of the stock into Puget Sound.
4.5 Annually, prior to the fishing season, the Washington Department of Fisheries shall provide to all parties proposed draft reports on the following schedule:
fall chinook stocks-March 1
coho stocks-April 1
chum stocks-May 1

*1111 all other stocks-at least seventy (70) days prior to the entry of the stock into Puget Sound.
These reports shall be prepared on a system-by-system, species-by-species basis and shall contain proposed escapement goals for natural stock and hatchery stock requirements, and proposed methods and data for estimating escapement. These reports shall serve as a basis for discussions and to promote mutual understanding between the parties in reaching agreements as to these matters.
5. Run Size Estimation. The "Initial Understandings on Technical Issues," of April 12, 1977, demonstrate the clear agreement of all parties that some pre-season forecasts are inadequate and that in-season run strength estimation, together with pre-season forecasts, must be utilized for harvest management, both for providing escapement and allocation of the harvest.
5.1 Qualitative and quantitative pre-season forecasts shall be distributed by the Washington Department of Fisheries to all parties for each salmon species and region of origin. These reports shall include detailed data on brood year spawning escapements and artificial production releases, and other data and methods used to derive the pre-season forecast
5.2 Prior to June 1, 1978, the affected parties shall reach agreement as to the methods and estimates to be used for pre-season and in-season run strength estimation in each region of origin.
6. Harvest Rates. The following rules shall govern harvest management in all salmon fisheries, except as otherwise agreed by all affected parties.
6.1 Harvests of salmon in mixed-stock areas shall insure that the weakest viable stock is protected.
6.2 The maximum harvest rate for a stock or set of stocks shall be defined as follows:
 S - E
 _____
 H = S
where,
H = the maximum harvest rate
S = the numerical abundance of a defined stock or set of stocks based on the best available estimate of run size (see section 5).
E = the sum of escapement goals applicable to the stock or set of stocks.
6.3 The maximum harvest rates in each fishing area shall be determined separately for hatchery and viable natural stocks. Of the harvest rates computed in each fishing area, the lowest rate shall prevail in the management of the area during the course of the run, provided, however, that all affected parties may agree to a lower harvest rate.
6.4 Harvest rates in each fishing area shall be agreed upon between the state and all affected tribes on the basis of escapement goals agreed upon by the parties.
7. Allocation of Harvest
7.1 Shares shall be computed separately for each species and region of origin, unless otherwise agreed by all affected parties.
7.2 Both the state and the tribes recognize that fisheries management is not sufficiently precise to provide a prescribed harvest allocation between treaty fishermen and nontreaty fishermen on every run each year. Therefore, if treaty or nontreaty fishermen are not provided the opportunity to harvest their share of any given run as provided by the orders of the federal court, deficiencies in numbers of fish shall be made up during the next succeeding run of the same species whenever practicable. If necessary, the deficiency for each given year shall be distributed and made up over a series of years, not exceeding five years. Annually, prior to June 1, the parties shall agree upon recommendations regarding implementation of this section. This does not apply to Fraser River sockeye and pink salmon.
7.3 Catches made in Puget Sound marine waters having a mixture of stocks from two or more of the regions of origin in Puget Sound will be apportioned on the basis of comparative run-size estimates for the stocks involved.
*1112 7.4 Prior catch projections by troll and sport fisheries shall be agreed upon annually by the parties according to the following schedule:
spring chinook stocks-March 1
summer-fall chinook stocks-June 16
coho stocks-June 16
8. Catch Recording System. Reliable "soft" and "hard" data systems are needed for in-season fisheries management needs and for the finalizing catch and effort statistics, respectively. The "soft" data system shall provide updated current catch and effort information as frequently as is necessary for in-season management purposes.
8.1 To the extent feasible, the "hard" data shall include catch of salmon and steelhead for ceremonial and subsistence use for all fisheries of the parties.
8.2 Processing of treaty Indian fish tickets, correction of errors in such tickets, and collection of such data shall be carried out under an agreed-upon joint catch monitoring system which recognizes the need and responsibility of each treaty tribe to correct its own fish ticket information. Primary emphasis will be on achieving completeness and accuracy in the initial preparation of the fish ticket.
8.3 Nonstate-licensed Indian fish buyers shall submit commercial catch reports to the appropriate state harvest management agency on a daily basis on forms (fish tickets) to be provided by the state agency. Except as may otherwise be agreed to by the appropriate state harvest management agency and the affected tribes, the state agency shall, within one day of receipt, submit two copies of every fish ticket recording any treaty Indian catch received from any buyer (including state-licensed buyers) to the tribe of which the fisherman is a member.
8.4 For each run of salmon the Washington Department of Fisheries shall make available to the United States Fish and Wildlife Service and to the tribes summaries of the non-Indian commercial catch no less than weekly and supports catch biweekly.
9. Timing and Contents of Tribal Regulations
9.1 The parties shall cooperate to develop a system for filing, compiling, transmitting, and cross-indexing both pre-season and in-season tribal and state regulations affecting Puget Sound harvests (e. g., common files with access by computer terminals). In cases of conflicts, the system must identify the applicable regulations.
9.2 At least twenty-one (21) days prior to a run management period, tribes shall file, either separately or in common with other affected tribes, written regulations specifying at least the areas to be managed, the beginning and duration of the run management period, any appropriate gear restriction and estimates of the amount of each gear type to be used under the regulation.
9.3 At least twenty-four (24) hours prior to effectiveness tribes may supplement the pre-season regulations by filing either separately or in common with other affected tribes, written regulation modifications reflecting updated estimates of run strength specifying at least the duration and location of fishing to be conducted by each commercial gear type. This provision shall not limit the ability of tribes to promulgate emergency regulations, in accordance with prior orders of the federal district court, for fisheries managed by the International Pacific Salmon Fisheries Commission.
Subject to the provisions of other applicable orders of the federal district court and upon approval of the plan by the district court, the Order Re: Rules of Procedure of Fisheries Advisory Board and Resolutions of Disputes, dated December 17, 1976 [p. 1061, supra] is modified to permit the State of Washington to enact emergency closures of treaty-right fishing for conservation purposes within twenty-four (24) hours in cases where the tribal parties have not provided the state at least sixty (60) hours notice of the tribal emergency opening authorized by this section.
10. Submission of Regional Management PlansPrior to June 1, 1978, all treaty tribes shall, separately or in common with *1113 other affected tribes, submit comprehensive management plans for the portions of Puget Sound waters in which their tribal fisheries are conducted. The goal of these plans shall be to achieve coordination between all affected tribes and to eliminate potential conflicts in management strategy. These regional plans of the tribes shall specifically address the provisions of this plan as to viable stocks, escapement goals for both natural and hatchery production, methods of in-season run size estimation, harvest rates and inter-tribal sharing, and other matters as required by this plan.
11. Resolution of Disputes
11.1 Disputes regarding failure to reach agreements, or to take, or to refrain from taking, any action required under this agreement shall be resolved as provided in the Order Re: Rules of Procedure for Fisheries Advisory Board and Resolution of Disputes, dated December 17, 1976, United States v. Washington, supra, [p. 1061 supra] except that no party may object to the jurisdiction of the Board as to matters addressed by this plan. In addition, the parties shall choose a technical advisory committee or committees, which shall develop and analyze data pertinent to this agreement, including but not limited to the following: calculated run size for all species of fish, ocean catches, escapement goals, catches and adjustments, habitat restoration and hatchery rearing programs. Such a committee shall make recommendations to the fishery management entities to assure that the commitments in this agreement are realized. Members shall be qualified fishery scientists familiar with technical management problems in Puget Sound. The committee shall be comprised of an equal number of representatives named by the State of Washington and the Indian tribes, respectively.
11.2 This plan shall in no way affect or be considered by any person, party or court to affect the continuing jurisdiction of the United States District Court for the Western District of Washington over all issues and matters within the jurisdiction of that court pursuant to the rulings in United States v. Washington, supra.
11.2.1 This plan shall in no way be considered to change Final Decision # 1 of the United States District Court for the Western District of Washington, said case with regard to sharing principles, usual and accustomed fishing places, treaty rights, the self-regulating status of Indian tribes, the off-reservation jurisdiction of Indian tribal governments, the obligations of the State of Washington, the special status of on-reservation fisheries or any other matter.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND PRELIMINARY INJUNCTION RE: ENFORCEMENT OF 1977 FISHERIES ORDERS

(September 27, 1977)[50]
Upon motion of the United States and after hearings held on September 22, 1977, before the Magistrate, and on September 27, 1977, before the court, the court entered the following findings of fact and conclusions of law in support of a preliminary injunction regarding enforcement of its orders concerning allocation of the 1977 salmon fishing opportunity.

Findings of Fact
1. In Final Decision # 1 herein, this court recognized and affirmed the responsibility of all citizens to see that the terms of the treaties involved in this litigation are carried out. (384 F.Supp. at 406).
2. In Final Decision # 1, this court ordered the defendants to make significant reductions in the non-Indian fishery in order to assure that the treaty fishermen will have their rightful opportunity to harvest fish. (384 F.Supp. at 420 (Interim Plan and Stay Order, ¶ 5).)
3. On August 31, 1977, this court removed from the State of Washington all authority over the treaty harvest opportunity (except such authority as is needed to insure conservation), and further made an *1114 allocation of the 1977-78 salmon runs in Puget Sound between the treaty and nontreaty harvest opportunities. (Memorandum Order and Preliminary Injunction, August 31, 1977; p. 1097 supra).
4. Since Final Decision # 1, certain nontreaty fishermen have engaged in a substantial number of violations of those state fishing regulations which were issued to comply with allocation orders of this court and protect treaty fishing rights. (Exs. PL 130-PL 134; Tr. 9/22/77 pp. 47-48, 58).
5. A substantial number of the violations referred to Finding # 4 above, did not result in criminal citations from the State of Washington or any other sanction. (Ex. PL 130; Tr. 9/22/77 pp. 52, 61).
6. A substantial number of the citations which were issued in response to the violations described in Finding # 4 above did not result in criminal prosecution by the State of Washington or any other type of enforcement action. (Ex. PL 130; Tr. 9/22/77 pp. 52-55).
7. A substantial number of the state court criminal prosecutions which did take place as a result of violations referred to in Finding # 4 above resulted in dismissals on the ground that the Department of Fisheries has no authority to issue regulations designed to comply with orders of this court and to protect treaty fishing rights. (Exs. PL 130, PL 144).
8. Decisions by the Washington Supreme Court in Puget Sound Gillnetters Association v. Moos, 88 Wash.2d 677, 565 P.2d 1151 (1977), and Purse Seine Vessel Owners Association v. Moos, 88 Wash.2d 799, 567 P.2d 205 (1977), have apparently given approval to the lower state court practice of dismissing prosecutions against nontreaty fishermen. In Puget Sound Gillnetters Association v. Moos, supra the Washington Supreme Court said that the Director of Fisheries may not "allocate fish among competing claimants for purposes other than conservation," and that he may not "allocate fish to treaty Indians or to non-Indian." Those rulings prevent defendants from complying with earlier decrees of this court in the particulars specified in Finding of Fact # 6 in this court's memorandum order and Preliminary Injunction of August 31, 1977, (p. 1099 supra) which finding is adopted herein by reference. They also prevent defendants from complying with the law as set forth in repeated holdings of the United States Supreme Court on which this court's decision is based.
9. As a result of the decisions of the Washington Supreme Court referred to in Finding # 8 above, there have been widespread, open and intentional violations of this court's orders (and of state regulations enacted to comply with those orders) by certain nontreaty fishermen during the current fishing season. (Exs. PL 140, PL 144, PL 146-PL 152; Tr. 9/22/77 pp. 15-20; Tr. 9/22/77 pp. 58-61)
10. Although the Washington Department of Fisheries has indicated that it intends to enact regulations which comply with this court's allocation orders, it feels that such regulations will be ineffectual because of the refusal of certain county prosecutors to prosecute citations issued for violation of those regulations and the refusal of certain state courts to convict individuals who commit those violations. (Exs. PL 138, PL 139, PL 144; Tr. 9/22/77 pp. 52, 62)
11. Despite the violations referred to in Finding # 9 above, the Department of Fisheries has not issued a single citation for violation of those state regulations. (Tr. 9/22/77 pp. 61, 66, 69)
12. The State of Washington and its Department of Fisheries is, and will be, unable to enforce regulations it adopts to comply with orders of this court. (Exs. PL 138, PL 144; Tr. 9/22/77 pp. 61-63 Tr. 9/22/77 pp. 22-23)
13. This litigation has adjudicated the right of the State of Washington to authorize the harvest of anadromous fish and the rights of all its citizens to harvest those fish.
14. Because of the public nature of this litigation, implementation of the judgment depends in part on cooperation by the State of Washington and its citizens, and is vulnerable *1115 to disruption by any of a large number of individuals, whose identities cannot practicably be specified in advance.
15. During 1975, 1976 and 1977, certain nontreaty fishermen have engaged in regular, intentional, admitted violations of this court's orders. They have caused widespread disregard of the orderly process of law and adjudication of rights. They have frustrated the exercise of plaintiffs' federally protected treaty rights and implementation of this court's orders designed to protect those rights, and have interfered with defendants' ability to comply with those orders.
16. Those circumstances interfere with this court's jurisdiction over the property involved in this litigation, and specifically with its jurisdiction over the harvest opportunity reserved to the tribes by the treaties, and further interfere with this court's ability to protect and effectuate its prior decrees.
17. The conditions described in Findings # 15 and # 16 above have continued and become much more severe during the current coho salmon fishing season. (Exs. PL 140, PL 146-PL 152; Tr. 9/22/77 pp. 16-20; Tr. 9/22/77 p. 58)
18. Other methods used by this court to seek compliance with its orders in this case in previous years (e. g., Preliminary Injunction, 1975 Chum Fishing, October 27, 1975; Order Re 1976 Coho Fishery, September 6, 1976,) have not succeeded in deterring violations of those orders.
19. The only reasonable method available to achieve compliance with this court's orders and protection of plaintiffs' treaty rights is enforcement of those orders by this court, by means of an injunction directed toward violators of those orders enforced by federal law enforcement officers.
20. This court has always given, and continues to give, all individuals and groups who desire to be heard in this case an opportunity to present their positions and arguments. Attorneys for the groups which represent nontreaty fishermen were served with the pleadings and with notice of the hearings which culminated in entry of these findings, conclusions and orders.
21. The interests of nontreaty fishermen continue to be adequately, ably and vigorously advocated by the State of Washington, its Department of Fisheries and its attorneys.
22. Injunctive relief is necessary to prevent irreparable injury to the plaintiff tribes and their members and to the salmon resource.
23. Injunctive relief is necessary in aid of this court's jurisdiction and to protect and effectuate this court's prior judgments.
24. Plaintiffs have no adequate remedy at law.

Conclusions of Law
1. An allocation of the fishing opportunity between treaty and nontreaty fishermen, and enforcement of that allocation, is an appropriate exercise of this court's discretion. Department of Game v. Puyallup Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973); Puyallup Indian Tribe v. Department of Game, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977); United States v. Washington, 520 F.2d 676 (9th Cir., 1975).
2. This court has the authority and the duty to protect and effectuate its prior judgments. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Bullock v. United States, 265 F.2d 683 (6th Cir.), cert. den., 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959).
3. This court has broad discretion to fashion remedies which will protect and effectuate its earlier rulings, the more so when the public interest and the rights of a large group of people are involved. Golden State Bottling Co. v. N.L.R.B., 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); Virginia Railway Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); Bullock v. United States, supra.
*1116 4. This court is empowered to issue all writs necessary or appropriate in aid of its jurisdiction which are agreeable to the usages and principles of law. 28 U.S.C. § 1651.
5. This court is empowered to punish disobedience or resistance of its lawful orders and decrees. 18 U.S.C. § 401.
6. In limited and extraordinary circumstances, this court may enjoin individuals who are not parties to this action where they have notice of this court's orders, they intentionally violate those orders, they are members of a class who cannot realistically be specified in advance of such violations, and their actions violate the rights of a large class of plaintiffs, interfere with the obligations and ability of defendants to comply with this court's orders, create conditions of lawlessness and chaos in the community and interfere with this court's ability to adjudicate the rights and responsibilities of the parties before it. United States v. Hall, 472 F.2d 261 (5th Cir. 1972); Bullock v. United States, supra; Kasper v. Brittain, 245 F.2d 92 (6th Cir.) cert. den. 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957).
7. This court may enjoin individuals who are not parties to the lawsuit when they are in privity with one of the parties; that is, when the party is representing the interests and advocating the position of the nonparty. City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 340-341, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958); New Jersey v. New York, 345 U.S. 369, 73 S.Ct. 689, 97 L.Ed. 1081 (1953).
8. The orders of this court directed toward the State of Washington are binding on its citizens. City of Tacoma v. Taxpayers of Tacoma, supra 357 U.S. at 321, 78 S.Ct. 1209; New Jersey v. New York, supra; Wyoming v. Colorado, 286 U.S. 494, 52 S.Ct. 621, 76 L.Ed. 1245 (1932); Kentucky v. Indiana, 281 U.S. 163, 50 S.Ct. 275, 74 L.Ed. 784 (1930).
9. This court may enjoin interference with property which is under the control of this court, and punish violations of such injunctions. In re Lustron Corp., 184 F.2d 789 (7th Cir. 1950), cert. den., 340 U.S. 946, 71 S.Ct. 531, 95 L.Ed. 682 (1951); United States v. Dean Rubber Manufacturing Co., 71 F.Supp. 96 (W.D.Mo.1946); 7 Moore's Federal Practice ¶ 65.13, n. 1 (1976).

Preliminary Injunction
The court finds that the State of Washington remains unwilling or unable to control the nontreaty fishermen so as to be in compliance with the orders of this court by providing treaty Indians with the opportunity to catch their share of the returning salmon.
The court further finds that this situation, if permitted to continue, will lead to a breakdown of law and order in the case area, the substantial denial of federally guaranteed treaty fishing rights and will endanger the preservation of the fishery resource.
Therefore, IT IS ORDERED that:
1. All Puget Sound and other marine waters easterly of the Bonilla Point-Tatoosh line and their watersheds, all Olympic Peninsula watersheds and all Grays Harbor and its watersheds are hereby closed to all net salmon fishing except during such times and such specific waters as are opened by state or tribal regulations or regulations of the United States conforming to the orders of this court in this case.
2. All reef net, gill net and purse seine fishermen licensed by the State of Washington, all other persons who attempt to net or assist in netting salmon in the waters described in paragraph 1, the Puget Sound Gillnetters Association, the Purse Seine Vessel Owners Association, the Grays Harbor Gillnetters Association and all persons in active concert or participation with them are hereby enjoined and prohibited from engaging in taking, possessing, or selling salmon of any species taken from such waters, unless such person has first ascertained from the Washington Department of Fisheries telephone "hot-line," 1-800-562-5672 or 1-800-562-5673, that the area to be fished is open for fishing by nontreaty *1117 fishermen at the time the individual intends to fish, provided, that this provision shall not apply to persons exercising treaty fishing rights in accordance with the orders of this court.
3. The defendant State of Washington is directed to maintain a continuous telephone hot-line service free of charge to any caller from within the State of Washington to provide information on areas within the waters described in paragraph 1 of this order that are open to net salmon fishing by nontreaty fishermen in conformity with the orders of this court. The defendant shall furnish to this court and to the United States Attorney a transcript of the daily hot-line messages.
4. The defendant State of Washington is ordered and enjoined to commence immediately to serve by certified mail return receipt requested or otherwise copies of this preliminary injunction on all state-licensed commercial salmon net fishermen, and any other person found to be engaged in net fishing for salmon or assisting in such fishing and to furnish the court with proof of service or written statement of the reason for the inability to serve any particular licensee. The United States, through the Coast Guard, the National Marine Fisheries Service, the United States Marshal's Service, and such other agencies as may be appropriate, may serve copies of the preliminary injunction on all such persons.
5. Defendant State of Washington is ordered and the United States is directed to cite any fisherman who, having received notice of this order, thereafter engages in fishing or assisting with fishing in violation of the provisions of this order to appear before the United States States District Court to be ordered to show cause why he should not be held in contempt.

PRELIMINARY INJUNCTION STAYING THURSTON COUNTY SUPERIOR COURT PROCEEDINGS

(October 17, 1977)[51]
Upon the application of the United States and the Quinault Indian Nation, notice having been given to the State of Washington, the Honorable Frank Baker, Judge of the Superior Court, Thurston County, and the Thurston County Prosecuting Attorney, and the court having carefully considered the records and files of this case, together with the arguments of counsel, finds that:
1. On September 28, 1977, this court ordered the defendants State of Washington and Gordon Sandison, Director of the Department of Fisheries, to regulate the salmon harvest in Grays Harbor so as to not interfere with the opportunity of the treaty Indians to catch 45% of the chinook and coho and 50% of the chum which will return during 1977. That order was issued after the court considered testimony presented before United States Magistrate John L. Weinberg on September 16, 1977, and before this court on September 28, 1977, together with arguments of counsel. The court found, and continues to find, that irreparable harm would be suffered by the plaintiff treaty Indians if the allocation which has been ordered is not implemented. In that event, the plaintiff treaty Indians would be unable to catch their treaty entitlement of fish in 1977.
2. On October 4, 1977, the Superior Court for Thurston County, in Grays Harbor Gillnetters Association v. Sandison, Cause No. 58462, ordered the defendants to promulgate emergency regulations which would not restrict commercial salmon fishing in Grays Harbor except for conservation and to disseminate those regulations over the Washington State Department of Fisheries "hot line." Such action by the state would have been directly contrary to this court's orders to the defendants of August 31, 1977, (Preliminary Injunction Staying State Court Injunction and Order Implementing Preliminary Injunction) [p. 1104, supra], September 28, 1977, (Order Allocating Salmon Catch in Grays Harbor) [p. 1097, supra], and Temporary Restraining Order of October 8, 1977.
3. The State of Washington has previously promulgated regulations which are *1118 consistent with this court's orders allocating the salmon catch in Grays Harbor. If the State enacts and publicizes new regulations which do not allow treaty Indians to catch their full share of salmon, the plaintiff treaty Indians will suffer irreparable harm and nontreaty fishermen who are now prohibited by orders of this court from fishing contrary to state allocation regulations which permit treaty Indians to harvest their full share of the salmon could be allowed to resume fishing contrary to that allocation. Thus enforcement of the court's preliminary injunction of September 27, 1977, which is directed at the nontreaty fishermen might be frustrated. Additionally, the state has been enjoined from adopting any salmon fishing regulations, other than closures for conservation, by this court's temporary restraining order of October 8, 1977.
THEREFORE, IT IS HEREBY ORDERED that the Superior Court of the State of Washington, County of Thurston, is hereby enjoined and prohibited from in any manner or to any extent enforcing the temporary injunction issued by said court (per the Honorable Frank Baker) on October 4, 1977, in Cause No. 58462, and from issuing any other order in said cause, or in any other cause, which will have the effect of preventing the State of Washington, the Washington State Department of Fisheries, or their officers and agents, from fully complying with the orders of this court.
The defendants State of Washington, Gordon Sandison, the Departments of Fisheries and Game of the State of Washington, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, are hereby relieved from any obligation to comply with the orders of the Thurston County Superior Court for the State of Washington in Cause No. 58462 and are ordered not to obey, carry out, enforce or otherwise treat as having any lawful effect any of the orders of that court which are contrary to the orders of this court.
This order shall remain in effect until a trial shall be held on the merits or until further order of this court.

ORDER ADOPTING STEELHEAD MANAGEMENT PLAN

(January 31, 1978, as modified April 21, 1978, and October 11, 1978)
The court having considered the report of the Fisheries Advisory Board, the submissions of the parties and the argument of counsel in this matter, hereby approves the "Joint Steelhead Harvest Management Plan for Washington Department of Game and Treaty Tribes" as approved by the Fisheries Advisory Board and attached hereto, and hereby adopts said plan as the order of this court; PROVIDED, that any party may within fifteen days after the entry of this order notify the court that the plan, as attached hereto, does not reflect the prior agreement of the parties. In such event the court shall, with or without a hearing as appropriate, make such modifications as are necessary or appropriate to conform to the parties' agreement.[52]

Joint Steelhead Harvest Management Plan For Washington Department of Game and Treaty Tribes

I. Introduction

The purpose of this plan is to establish guidelines for the harvest of steelhead (Salmo gairdneri) originating in the river systems, as required by the order of August 31, 1977, title "Salmon Management Plan" in this case [p. 1107, supra]. The steelhead management plan shall be in effect until otherwise modified or ordered by the court.

II. Responsibilities of the Washington State Department of Game

The state will abide by timetables established in "Order for Program to Implement the Interim Plan" [p. 1035, supra] in developing criteria for harvest of the resource. The "Order for Program to Implement *1119 Interim Plan" states the chronology of regulatory events which for winter steelhead are as follows:
(1) On or before September 1, numbers of harvestable fish, and information concerning timing and condition requested by the tribes, shall be furnished by the Washington Department of Game.
(2) On or before September 20, the state agencies and tribes shall exchange proposed off-reservation fishing regulations affecting the particular fishery.
The Department of Game will provide, after obtaining input from affected groups, estimates of the numbers of steelhead which can safely be harvested from each river within the case area. Such estimates for the 1977-78 winter run have been provided.
The Department of Game will establish area and time periods for the sport fishery, outlining when the sport harvest of steelhead may occur.
The Department of Game will establish regulations for the all-citizen hook and line fishery which will protect wild stocks of steelhead to as great an extent as possible while maximizing harvest of hatchery stocks of steelhead.
The Department of Game will close any steelhead fishery for conservation, after consultation with affected groups, and as outlined in procedures of the court, when necessary steelhead are needed for escapement to maintain the resource.
The harvest will be monitored as in past years, by documenting tribal and sport harvest. Where data are not readily available, projections will be made from historical data of all groups.
In-season adjustments of harvestable numbers will be made where necessary, on the basis of cooperation of tribal and department biologists exchanging current biological information.

III. Responsibilities of the Treaty Tribes

The treaty tribes will provide the state with information on their fisheries capable of taking winter steelhead as provided for in the "Order for Program to Implement the Interim Plan," as follows:
1. On or before September 10, the tribes shall furnish information concerning their anticipated fishing activity as requested by the state.
2. On or before September 20, the state agencies and tribes shall exchange proposed off-reservation fishing regulations affecting the particular fishery.
3. On or before October 11, tribal regulations shall be adopted and filed pursuant to Paragraph 1 of the Interim Plan and Stay Order, (384 F.Supp. at 420) provided that emergency regulations are enforceable upon filing them with the court and service upon the other parties affected, along with a statement of the facts and circumstances of the emergency on which the regulation is based.
Tribes will regulate their fisheries to protect wild stocks of steelhead to as great an extent as possible while maximizing harvest of hatchery stocks of steelhead.

IV. Data Collection

The state will provide treaty tribes with data on catch and biological information as it becomes available.
The treaty tribes will provide the state with data on catch and biological information on the steelhead fisheries as it becomes available. Individual River System Plans may specify the time periods for catch reporting.
The Washington Department of Game shall, at a minimum, maintain in-season creel census efforts on those river systems which were so surveyed in 1977-78 or are proposed to be surveyed in the upcoming season(s). Summaries of the data from such effort shall be made available to the United States Fish and Wildlife Service and to the tribes no less than biweekly.

V. Catch Sharing Formulas

In the event that catch sharing formulas set forth in existing orders of the court are *1120 subsequently modified by an appeal or by the court, the provisions of this plan shall be modified accordingly.

VI. Resolution of Disputes

Disputes regarding failure to reach agreements, or to take or refrain from taking, any action requested under this agreement shall be resolved as provided in the order re: Rules of Procedure for Fisheries Advisory Board and Resolutions of Disputes, dated December 17, 1976, [p. 1061 supra] The Fisheries Advisory Board shall meet on or before August 1, 1978,[53] to begin development of agreements between the parties where there are conflicts between salmon and steelhead management.
VII. This plan shall in no way affect the continuing jurisdiction of the United States District Court for the Western District of Washington over all issues and matters within the jurisdiction of that court pursuant to the ruling in United States v. Washington, No. 9213.
VIII. This plan shall in no way be considered to change Final Decision # 1 of the United States District Court for the Western District of Washington in United States v. Washington, No. 9213, with regard to sharing principles, usual and accustomed fishing places, treaty rights, the self-regulating status of Indian tribes, the off-reservation jurisdiction of Indian tribal governments, the obligations of the State of Washington, the special status of on-reservation fisheries, or any other matter.

IX. River Systems

Due to the magnitude and complexities involved in the individual river systems, management plans are provided on a river system by river system basis, which deal with agreements between Game Department and individually affected tribes on those river systems. Where inconsistent, the general provisions of this plan are superseded by the provisions of the agreed-upon river system plans. Such river system plans are annexed hereto and incorporated as part of this plan. Upon agreement of the affected parties and approval of the Fisheries Advisory Board, such river-system plans may be modified or additional plans added. Such modified or added plans shall thereupon be added to this plan and shall be subject to the court's order approving this plan.
(River System Plans for the 1977-78 season for the following river systems or tribal fisheries were appended to this order:
Steelhead Management Plan for the Hoh River System;
Lummi Tribe Steelhead Harvest Management Plan;
Agreement Between the Nooksack Tribe and the Washington Department of Game Concerning Steelhead Management;
Steelhead Harvest Management Plan for the Makah Treaty Area;
Steelhead Management Plan for the Muckleshoot Tribal Fisheries Green-Duwamish Rivers and the Lake Washington Watershed;
Nisqually River Steelhead Harvest Management Plan;
Plan for Point No Point Treaty Area Steelhead Harvest Management;
Steelhead Harvest Management Plan for the Quillayute River;
Steelhead Harvest Management Plan for the Skagit River System;
Steelhead Fisheries  Squaxin Island, Suquamish and Yakima Tribes;
Steelhead Harvest Management Plan for the Stillaguamish Tribal Fisheries;
Harvest Management Plan for the Harvest of Winter Steelhead Stocks Destined for Stillaguamish and Snohomish Rivers;
The 1977-78 Steelhead Management Program for the Quinault Indian Nation.)

ORDER RE: 1978 SAC ROE HERRING FISHERY

(April 14, 1978 as supplemented May 2, 1978)
The Magistrate's Report of April 7, 1978, is approved and adopted by the court. *1121 The 20% "on-reservation" share of the sac roe herring allocated to the Lummi Indian Tribe must be harvested on the Lummi Indian Reservation.

Summary of Magistrate's Report
On February 23, 1978, the Washington State Department of Fisheries (Fisheries) filed a request for determination pursuant to Paragraph 25 of the Injunction of March 22, 1974, (384 F.Supp. at 419) on three issues concerning the 1978 sac roe herring fishery. The issues are:
"(1) Whether there should be a Lummi Tribe on-reservation catch counted as separate and additional to any off-reservation Lummi catch. If so, then it must be additionally determined what would be proper on-reservation gear for the harvest of roe herring."
"(2) The proper method for regulating the sac roe fishery. It appears alternatives include a continued management of this fishery to achieve a percentage share for discrete user groups (allocation) or to simply set a harvestable quota for the entire fishery and manage to achieve this quota without special concern with the exact amount of harvest by any particular user group."
"(3) Whether emergency conservation regulations for management of this fishery should be effective and enforceable upon filing with the court. If this court decides this fishery should be continued to be managed on an allocation basis, the immediate effectiveness of allocation closures must also be answered."

Summary of the Hearing
The court's Fisheries Technical Advisor and Chairman of the Fisheries Advisory Board, Dr. Richard R. Whitney, reported on the efforts of the Fisheries Advisory Board to reach agreement on a management plan for the 1978 sac roe herring fishery. Although agreement was reached on many points, the board was unable to reach complete agreement. Dr. Whitney gave his recommendations as follows: If the court rules that there should be an on-reservation allocation, there should be no on-reservation fishery until 7,500 tons biomass is determined; the on-reservation catch should be limited to 250 tons until such time as 9,000 tons of biomass is determined; there should then be a ceiling to the total on-reservation catch based on a percentage of the total harvestable, to be provided by the court; the technical team's points and recommendations should be binding and incorporated into a memorandum order of the court; and the proposed procedures for emergency closures should be reworded to cover all eventualities, including both on-and off-reservation fisheries, so that the court would not have to convene in order to accomplish a closure of one party or the other.
Mr. Robert Trumble, Washington Department of Fisheries Herring Fisheries Manager, testified concerning the nature of the herring resource, the characteristics and capabilities of the fishery, and of the treaty and nontreaty fishing fleets, the discussions between his department and the tribes concerning joint or compatible management, the views and attitudes of treaty and nontreaty fishermen, the areas of agreement between state and tribal representatives concerning management requirements and guidelines, and the problems requiring prompt resolution. Over Lummi tribal objections as to its relevancy and accuracy, he testified as to the nature of the ground profile of the area shoreward from the line of lower low tide on the Gulf of Georgia and Hale Passage portion of the Lummi Indian Reservation, the general tidal characteristics during the planned fishing hours of the anticipated period within which the 1978 sac roe herring fishery will be scheduled  April 9 to May 20  and the type or size of fishing gear that physically can be used effectively in that area during those times.
Sergeant Lyle L. Nelson, the Washington Department of Fisheries patrol officer for the northeastern Puget Sound area within which the sac roe herring fishery occurs, testified as to enforcement problems connected with such fishery. His principal concerns are: (1) determining on the scene the *1122 location of the westerly shoreline boundary of the Lummi Indian Reservation; and (2) the position taken by the Whatcom County judges and prosecuting attorney with respect to citations for violation of fishing regulations. He testified that they would not permit or undertake prosecution of nontreaty fishermen for violating time or area closures based upon allocation of the harvestable fish among different user categories.

Findings of Fact
(1) Sac roe herring are expected to start arriving at the northeastern Puget Sound waters in early April.
(2) Present information indicates that the herring that are the target of the Gulf of Georgia sac roe herring fishery constitute a single stock of fish which spawn in different marine areas depending upon variable natural conditions.
(3) The resource is highly vulnerable to, and the existing fishing gear is capable of, rapid harvest of the total harvestable amount in a very short period of time. Therefore, it is necessary for the perpetuation of this resource in harvestable quantities that harvest not be permitted until the presence of a minimum biomass is determined and that such harvest be closely controlled on a daily, and sometimes even hourly, basis.
(4) The treaty and nontreaty fishing fleets and gear, respectively, each presently have an equal capability to harvest the resource when operating at the same times and under the same regulatory terms and conditions. Therefore, special off-reservation times or conditions for the treaty Indian fishery are not now necessary to provide the tribes an equal off-reservation harvest opportunity.
(5) The parties agree that a minimum biomass of 9,000 tons should be determined before any off-reservation harvest of sac roe herring should be allowed. In addition, I find that once a 7,500 ton biomass is determined, a maximum 250 ton harvest may be permitted by the Lummi Tribe on its reservation prior to the determination of a 9,000 ton total stock biomass without endangering total stock perpetuation.
(6) With respect to the 1978 season, a uniform basic open period of 6 a.m. to 4 p.m., Mondays, Wednesdays and Thursdays, applicable to both the treaty and nontreaty fisheries alike, when coupled with the procedure adopted by this court for implementation of regulatory changes, is consistent with conservation while permitting full harvest of the harvestable portion of the resource shared between treaty and nontreaty fishermen as required by this court's decree.
(7) At present, regulations adopted by the Washington Director of Fisheries (WAC 220-49-02000A adopted by Director's Order No. 78-12, dated March 27, 1978) close until further notice the treaty and nontreaty herring fishery in Marine Fish and Shellfish Management and Catch Reporting Areas 20A, 20B, 21A and 21B.
(8) At present, regulations of the Lummi Tribe filed with this court on or about March 2, 1978 (Lummi Tribal Fishing Regulation No. 8) open the tribal herring fishery in Areas 20A, 20B, 21A, 21B, 24A, 24B, 26A, and 26B unless specifically regulated by tribal regulation.
(9) This court's order of February 13, 1976 [p. 1063 supra], placed into effect an Interim Plan for Management of Herring Fisheries as agreed to by the parties submitting it. Provisions for modifying the plan are set forth therein.
(10) On the basis of past findings of the court, including particularly paragraph 11 of this court's order of April 18, 1975 [p. 1048 supra], I find that the total harvestable amount of sac roe herring for the on-reservation fishery shall be deemed to be not more than 20% of the total harvestable amount of the sac roe herring.

Conclusions and Recommendations

(1) Separate and additional on-reservation catch for Lummi Tribe.

This court has previously held that on-reservation fishing by treaty Indians is not subject to state regulation and that fish *1123 caught by a tribe on its reservation are not included in any allocation of fish between treaty and non-treaty fishermen. (384 F.Supp. at 343). The defendant has pending before this court a motion to modify this aspect of the court's holding but that motion has not been acted upon, nor is it before the Magistrate on this referral order. Therefore, without constituting any decision on the previously submitted motion, I hold that the question is governed by the above-stated prior holding of the court. It should be pointed out, however, that the exclusion applies only to fish taken on the reservation unless there is a stipulation or determination that a specified amount of fish (expressed either in numbered or percentage quantity) is to be treated as the on-reservation catch. There are also practical problems associated with a water boundary that may require the parties or the court to develop other criteria for determining what catches are to be deemed to be on-reservation catches. The type and size of the vessel or gear, the time and place of its use, and the extent to which catches from different locations are intermingled on the same vessel will obviously be factors in determining the extent to which the fish caught with it were actually taken on the reservation. However, in the absence of a greater showing of adverse conservation effect from the use of any particular type of gear, it is not appropriate for the court to determine at this time what type, size or quantity of gear may be used for harvest of sac roe herring on the reservation. Further provisions with respect to the on-reservation fishery are set forth in the management plan recommended below.

(2) Proper method for regulating the 1978 sac roe herring fishery.

Because I have found that the treaty and nontreaty sac roe herring fleets have equal harvest capability when fishing under identical regulations as to time and place of fishing, I conclude that the proper method for regulating the 1978 sac roe fishery is to set a harvestable quota for the entire fishery and to manage the on- and off-reservation fisheries, respectively, so as to achieve and keep the total on- and off-reservation harvest within this quota without special concern with the exact amount of harvest actually made by the treaty and nontreaty fishermen, respectively, but subject to the provisions specified herein with respect to allowing for an on-reservation harvest. This is in conformity with this court's prior holding that both the treaty tribes on the one hand, and the nontreaty fishermen on the other, are to have the opportunity to take up to one-half of the harvestable amount of fish that may be taken at the treaty-affected off-reservation areas without requiring precise mathematical equality. (384 F.Supp. at 343).

(3) Procedure for emergency regulations.

The third issue stated in the request for determination is dealt with in the management plan recommended below.

Recommended 1978 Sac Roe Herring Management Plan
All fishing for 1978 sac roe herring shall proceed under the provisions of this management plan as follows:
(1)(a) No on-reservation fishing shall occur until the presence of a minimum of 7,500 ton total biomass has been determined from the acoustic and spawning surveys and any prior incidental catch. The Lummi Tribe may open an on-reservation fishery after the above event, but the on-reservation catch shall be limited to 250 tons until such time as a 9,000 ton total biomass has been determined from the acoustic and spawning surveys and prior catch.
(b) Twenty percent of the total catch shall be deemed to be the on-reservation share and such share shall not exceed this limit.
(c) The 250 tons referred to in subparagraph (1)(a) above constitute about 10% of the presently anticipated total harvestable amount for the combined sac roe herring fishery. The parties should submit proposals to the Fisheries Advisory Board for how the Lummi Tribe should be permitted to take the remainder of the on-reservation *1124 share referred to in subparagraph (1)(b) above and the Magistrate should retain jurisdiction to review such proposals and make findings and recommendations to the court if the parties are unable to agree thereon.
(2) No off-reservation fishing shall occur until the presence of a minimum of 9,000 tons total biomass has been determined from the acoustic and spawning surveys and any prior incidental catch.
(3) The targeted combined on- and off-reservation harvest shall be 20% of the sac roe herring biomass.
(4) No on- or off-reservation fishing shall occur except during such times as are specifically opened by regulations adopted in accordance with the criteria and procedures specified in this plan. When so opened all such fishing shall be limited to the hours of 6 a.m. to 4 p.m., Mondays, Wednesdays, and Thursdays, except as may be determined otherwise in the interest of conservation in accordance with paragraph 6 below or as necessary to achieve the on-reservation allocation specified in subparagraph (1)(c) above.
(5) Procedures for implementing regulations.
a. These procedures shall apply to all regulations of the Washington Department of Fisheries and the treaty Indian tribes or treaty area councils for all off-reservation openings or closures of the 1978 sac roe herring fishery; provided, however, that the Lummi Tribe shall also close the reservation for conservation whenever the fishery is so closed for all fishermen off-reservation by the Fisheries Advisory Board or its chairman. All such openings and closures shall be discussed by the Fisheries Advisory Board, either by telephone conference call or in person.
b. Any party seeking an opening or closure shall, through its designated representative, immediately telephone the designated representative of the other party and Dr. Whitney or his designated alternate. When all three of the Board are on the telephone line (or physically present) the moving party shall discuss in detail the data regarding the need for an opening or closure. After discussion of all of the available data, the members of the board shall decide whether to approve, disapprove, or modify the proposed opening or closure. In the event of disagreement between the representatives of the tribes and the state, or in the event the board is unable to convene at least five hours before the next then-authorized fishing period, Dr. Whitney (or the designated alternate chairman) shall render a decision which shall be binding upon all parties unless and until modified by the United States district court.
c. Openings and closures, as determined above, shall be communicated by the Department of Fisheries to all affected persons, in the department's usual manner. Openings and closures shall, in addition, be communicated to treaty-right fishermen by the designated tribal representative, his alternate or the chairman as follows:
i. Immediately following the meeting of the Fisheries Advisory Board, notice of the opening or closure shall be radioed to all tribal fishermen;
ii. The Lummi Tribal Fisheries Patrol shall immediately begin personal notification of fishermen on the water;
iii. Written notice of the opening or closure shall be posted in conspicuous places at docks commonly used by Indian fishermen; and
iv. Notice shall be telephoned to the offices of the Point Elliott Treaty Council, Lummi Indian Tribe, Nooksack Indian Tribe, Suquamish Indian Tribe, and Swinomish Indian Tribe.
d. Except in extraordinary circumstances which hamper notification of fishermen and which are brought up during the Fisheries Advisory Board meeting regarding the proposed closure, emergency closures adopted in accordance with the above procedure may be enforced by the Department of Fisheries and treaty Indian tribes four hours after the decision of the Fisheries Advisory Board or its chairman, as above provided.
*1125 (6) Agreed on-reservation herring fishery principles.
The parties agree that the following principles shall govern the Lummi Indian on-reservation sac roe herring fishery for 1978:
a. The Lummi Tribe agrees to accept as the marine boundary for the on-reservation fishing area the line which is represented on the attached nautical chart with the further understanding that the parties will jointly place buoys which are necessary to depict and enforce the agreed boundary line;
b. Only gillnets are appropriate on-reservation gear and must be fished totally inside the agreed boundary line;
c. The Lummi on-reservation fishery may occur during times already scheduled for fishing and also during Sunday and Tuesday from 6 a.m. to 4 p.m.;
d. All areas of the Lummi Reservation, including marine boundaries which are not covered by the agreed-on reservation fishing area boundary lines, shall be considered off-reservation areas for the sac roe herring fishery.
e. Any fishing outside of the terms of this agreement is not protected by treaty.
f. This agreement shall be effective when accepted by the United States district court. This agreement shall not affect any of the rights of the parties in any subsequent determination of the Lummi Reservation boundaries.

ORDER, FINDINGS OF FACT, CONCLUSIONS OF LAW AND PRELIMINARY INJUNCTION RE: ENFORCEMENT OF LIMITATIONS ON NONTREATY SALMON FISHERIES FOR 1978 AND SUBSEQUENT SEASONS

(June 6, 1978, as amended June 15, 1978)

Order
The court has fully reviewed and carefully considered the Report of United States Magistrate Re: Preliminary Injunction Involving Enforcement of Limitations on Non-Indian Treaty Salmon Fisheries for 1978, the findings of fact, recommended conclusions of law and proposed preliminary injunction attached thereto; the transcripts of the hearings of April 5, 6 and 24, 1978; the objections filed to the Magistrate's proposed findings, conclusions and injunction and the "Final Draft" of the proposed injunction served and filed by the United States.
Upon this review and consideration, the court hereby denies the requests of counsel for certain plaintiff tribes and also counsel for the Washington Reefnetters Association for an additional hearing on the matter of the issuance of a preliminary injunction. Moreover, the court has fully considered and hereby rejects the request of the State of Washington received this date for an additional hearing. The court is satisfied that an additional hearing would serve no useful purpose.
The court hereby adopts the findings of fact and proposed conclusions of law lodged by United States Magistrate Robert E. Cooper May 5, 1978, as modified by this court. To the extent that a finding of fact may be in whole or in part a conclusion of law, or vice versa, it shall be considered to be either one, or the other, or in both categories.
The court also has signed this date a separate document entitled Preliminary Injunction Re: Enforcement of Limitations on Nontreaty Salmon Fisheries for 1978 and Subsequent Seasons.

Findings of Fact
1. The treaty fishing rights of the plaintiff tribes have been previously determined by this court.
2. Since 1974 there has been increasing difficulty in enforcing treaty fishing rights. Denial of treaty fishing opportunity will result in injury to economic, cultural and governmental interests of the plaintiff tribes.
3. If the lack of enforcement of treaty Indian fishing rights by the State of Washington continues, there will be irreparable harm to the plaintiff's rights assured them under the decision of this court.
*1126 4. The evidence has established that there have been numerous instances of violations of state regulations designed to allocate additional fish to treaty Indians, but there has been a lack of enforcement against these violators, due to either state court decisions or the enforcement policies set by the Washington State Department of Fisheries.
5. The State of Washington has indicated through its court decisions, and through its executive policy, that the Director of the Department of Fisheries is not empowered to promulgate regulations allocating additional fishing opportunity to treaty Indians as required by the decision of this court.
6. The Washington Department of Fisheries did not assist in issuing citations or serving the enforcement injunction during 1977.
7. An emergency exists because of the State of Washington's continuing inability and unwillingness to assume its regulatory and enforcement responsibilities under Final Decision # 1. This mandates the creation of a federally led enforcement group, which needs time to develop a comprehensive enforcement plan for the upcoming season.
8. Alternatives to direct injunction of nontreaty fishermen which have been used by this court in previous years to obtain compliance with its orders have not sufficiently deterred violations of those orders, nor provided adequate additional fishing opportunities to treaty tribes.
9. Although the court may speculate that if no injunction were issued there might be less havoc in the fishery, that is not the test. The test is whether or not treaty fishing rights can be effectuated without the entry of the injunction. No alternative plan which contemplates enforcement of treaty fishing rights has been presented.
10. The court has the authority to enjoin the fishermen who are nonparties in this case. Puget Sound Gillnetters Association v. United States District Court for the Western District of Washington, 573 F.2d 1123 (9th Cir. 1978). Rule 65(d) of F.R. Civ.P. does not enumerate the only nonparties who may be enjoined.
11. Notice of this hearing has been given to approximately 2,455 of the 2,700 commercial net fishermen directly affected by the proposed injunction. Additionally, the Puget Sound Gillnetters Association, the Purse Seine Vessel Owners Association and the Grays Harbor Gillnetters Association have been given notice. Several of these nonparties have appeared and have been given the opportunity to address the court and to present evidence. The fact that they are not parties to this lawsuit has placed restrictions on the scope of their participation.
12. None of the nonparty associations or persons asked for intervention in connection with this proceeding. Under the reference to the Magistrate, there was no power for him to grant the status of "party" to a nonparty.
13. Although both the United States and the plaintiff tribes offered to make witnesses available to the nonparty participants, none took advantage of this offer.
14. Although the implementation of the treaty rights as determined in Final Decision # 1 necessarily diminishes the opportunity of the nontreaty fishermen to harvest fish, that fact is not controlling.
15. Until a better solution arrives through agreement by the parties, congressional action or the willingness of the State of Washington and its courts to assume the state's management and enforcement responsibilities as directed by Final Decision # 1, this court, in its continuing jurisdiction over the resource, must provide for protection of treaty fishing rights.
16. [Withdrawn by order entered 6/15/78].
17. The nature of the fishery is such that an effective management and enforcement system must provide the ability to open and close the fishery on short notice.
18. The enforcement injunction presented by the government provides a reasonable *1127 means by which to notify the fishermen of lawful openings and closings.
19. A toll-free telephone "hotline" has been used to announce fishing regulations in the State of Washington for several years.
20. Statements of several of the fishermen who appeared before this court indicate that widespread resistance to recognizing treaty fishing rights still exists.
21. Voluntary reductions in non Indian fishing are unlikely. An individual fisherman wishing to make a good faith effort to comply with Final Decision # 1 cannot do so unless some government tells him when he may fish without infringing on treaty rights. The State of Washington will not do this.
22. Because the nontreaty marine fishing fleet is much larger and more efficient than the treaty fleet, and because much Indian fishing occurs in the terminal areas, substantial curtailment of the marine fishing opportunity for nontreaty fishermen is necessary in order to permit treaty fishermen the opportunity to catch the share of the runs to which they are entitled.
23. During the 1976 and 1977 fishing seasons the Washington State Department of Fisheries developed a policy of not issuing citations to violators of allocation closures.
24. The Washington State Department of Fisheries has the power to regulate the fishermen it controls in such a way as to shift the burden of providing treaty Indian fishing rights away from the net fishermen and spreading it to the hook-and-line fishermen by controlling their seasons, bag limits, gear type and otherwise restricting hook-and-line fishing.
25. During the 1977 fishing season, there was a substantial amount of fishing during conservation closures. While most of this fishing was done by nontreaty fishermen, the State of Washington cited over 100 treaty Indians for fishing in violation of conservation closures as defined by the Washington Department of Fisheries.
26. During 1976, over 135,000 fish were taken in violation of state regulations, and during 1977, over 183,000 were taken by fishermen licensed by the State of Washington.

Conclusions of Law
1. In order to provide treaty Indians with the opportunity to catch 50% of the salmon returning to their usual and accustomed grounds, it is necessary to provide them with substantial exclusive fishing time.
2. Because of state court interpretation of its regulatory authority, the Washington State Department of Fisheries will not promulgate regulations giving treaty Indians exclusive fishing time.
3. The failure to provide treaty Indians with substantial exclusive fishing time will cause them irreparable harm to their right to the opportunity to catch 50% of the salmon returning to their usual and accustomed grounds.
4. The rights of the treaty and nontreaty fishermen have already been adjudicated, therefore economic disruption associated with implementing the 1974 decree is not legally cognizable. Weighing the relative legally cognizable hardships, the court finds that the plaintiffs would be more damaged if this injunction were not entered than the defendants and nonparty fishermen will be by its entry.
5. It is probable that the plaintiffs would succeed in a trial on the merits.
6. The public interest will be served by entry of this injunction in that United States' treaty obligations will be upheld, United States district court orders will be enforced and a breakdown of law and order will be prevented.
7. Fixed pre-season regulations are impossible due to the nature of the fishery.
8. In order to insure that exclusive treaty Indian fishing time can be provided, there must be a means by which this court can order nontreaty commercial fishermen not to fish during times when treaty Indians are fishing.
*1128 9. A mechanism for authoritatively informing the fishermen of lawful fishing times must be established before the fishing season.
10. The mechanism provided for in the government's proposed order is reasonable.
11. An allocation of the fishing opportunity between treaty and nontreaty fishermen, and enforcement of that allocation is an appropriate exercise of this court's discretion. Puyallup Indian Tribe v. Department of Game, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977); United States v. Washington, 520 F.2d 676 (9th Cir. 1975); Department of Game v. Puyallup Indian Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973).
12. This court has the authority and the duty to protect and effectuate its prior judgments. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Doe v. Ceci, 517 F.2d 1203 (9th Cir. 1975); United States v. Texas, 356 F.Supp. 469 (E.D.Texas 1972); aff'd, 495 F.2d 1250 (5th Cir. 1974); Bullock v. United States, 265 F.2d 683 (6th Cir.), cert. denied, 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959).
13. This court has broad discretion to fashion remedies which will protect and effectuate its earlier rulings, the more so when public interest and the rights of a large group of people are involved. Golden State Bottling Co. v. N. L. R. B., 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); Virginian Railroad Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937).
14. This court is empowered to issue all writs necessary or appropriate in aid of its jurisdiction which are agreeable to the usages and principles of law. 28 U.S.C. § 1651.
15. This court is empowered to punish disobedience or resistance of its lawful orders and decrees. 18 U.S.C. § 401.
16. In limited and extraordinary circumstances, this court may enjoin individuals who are not formal parties to this action where they have notice of this court's orders, they intentionally violate those orders, they are members of a class who cannot realistically be specified in advance of such violations, and their actions violate the rights of a large class of plaintiffs, interfere with the obligations and ability of defendants to comply with this court's orders, create conditions of lawlessness and chaos in the community and interfere with this court's ability to adjudicate the rights and responsibilities of the parties before it. United States v. Hall, 472 F.2d 261 (5th Cir. 1972); Bullock v. United States, supra; Kasper v. Brittain, 245 F.2d 92 (6th Cir.), cert. denied, 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); N. L. R. B. v. Sunshine Mining Co., 125 F.2d 757 (9th Cir. 1942).
17. This court may enjoin individuals who are not parties to the lawsuit when they are in privity with one of the parties; that is, when the party is representing the interests and advocating the position of the nonparty. City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 340-1, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1957); New Jersey v. New York, 345 U.S. 369, 73 S.Ct. 689, 97 L.Ed. 1081 (1953); Puget Sound Gillnetters Association v. United States District Court, 573 F.2d 1123 (9th Cir. 1978).
18. The orders of this court directed toward the State of Washington are binding on its citizens. Such action is appropriate in this case because the litigation has adjudicated the right of the State of Washington to authorize the harvest of anadromous fish and the rights of all its citizens to harvest those fish. Arizona v. California, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); City of Tacoma v. Taxpayers of Tacoma, supra; New Jersey v. New York, supra; Wyoming v. Colorado, 286 U.S. 494, 52 S.Ct. 621, 76 L.Ed. 1245 (1932); Kentucky v. Indiana, 281 U.S. 163, 50 S.Ct. 275, 74 L.Ed. 784 (1930).
19. The fact that the fishermen were not participants in the litigation leading up to Final Decision # 1 does not prevent them from being bound by it. The State of Washington represented, and continues to represent, all of the nontreaty fishermen in *1129 this litigation. Puget Sound Gillnetters Association v. United States District Court, supra.
20. This court may enjoin interference with property which is under the control of this court and punish violations of such injunctions. Board of Governors v. Trans-america Corp., 184 F.2d 311 (9th Cir. 1950); In re Lustron Corp., 7 Cir., 184 F.2d 789; In re Lustron Corp., 184 F.2d 798 (7th Cir. 1950), cert. denied, 340 U.S. 946, 71 S.Ct. 531, 95 L.Ed. 682 (1951); 7 J. Moore Federal Practice ¶ 65.12, n. 1 (1976); State v. Terry, 99 Wash. 1, 168 P. 513 (1917).
Therefore, it is ORDERED that the injunction shall issue.

Preliminary Injunction
Upon the motion of the United States, together with the exhibits, the testimony of witnesses and the records and files of this case, the court finds that the State of Washington and its officers and agencies remain unwilling or unable to carry out the existing orders of this court and to prevent certain nontreaty fishermen from taking, under color of state law and in some cases in defiance thereof, salmon which under the orders of this court are to be left available for harvest by the plaintiff tribes and their members under reserved rights expressly secured by federal law.
The court further finds that this situation, if permitted to continue, will frustrate the decrees of this court, irreparably harm the plaintiff tribes and their members by substantially depriving them of their rights to harvest such salmon, imperil the perpetuation of the salmon resource and lead to a breakdown of law and order, and that to prevent such continuance, only direct action of this court, including the issuance of and enforcement of an injunction against certain nonparties, is required in the form and manner hereinafter set forth.
The court also finds that adequate public and/or personal notice of the hearing on the government's motion for an injunction on this matter and an opportunity to be heard prior to the entry of any injunction was given to affected nonparties. The court finds that service of the notice and invitation to be heard was made by the United States Marshal's Service on some 2,445 persons who were state-licensed commercial net salmon fishermen for 1977, out of a total of 2,700. The court has considered all relevant points and authorities presented by such nonparties.
Therefore, it is hereby ORDERED that:
1. Fishing in the waters of Puget Sound and other marine waters easterly of the Bonilla Point-Tatoosh Line (located at the western end of the Strait of Juan de Fuca) and their watersheds, all Olympic Peninsula watersheds, and all Grays Harbor and its watersheds is subject to the provisions of this order.
2. All gillnet, purse seine and reefnet fishermen licensed by the State of Washington, all other persons who attempt to net or assist in netting salmon in any portion of the waters described in paragraph 1, the Puget Sound Gillnetters Association, the Purse Seine Vessel Owners Association, Grays Harbor Gillnetters Association and all persons in active concert or participation with them, are hereby enjoined and prohibited from taking, attempting to take or offering for sale, salmon of any species taken from such waters, or assisting in any of the foregoing, unless such person has, within the previous twenty-four hours, ascertained from the National Marine Fisheries Service telephone "hot-line" (toll free number: 1-800-562-5672) that such fishing in the area in which the individual intends to fish is not prohibited by this court at the time of such fishing, provided that this paragraph shall not apply to treaty Indians fishing pursuant to tribal regulations promulgated in accordance with the orders of this court. The National Marine Fisheries Service shall announce all lawful openings of nontreaty fishing and all lawful conservation closures on its "hot-line" and shall maintain a written copy of all such announcements for a period of at least 60 days beyond the end of the calendar year in which the announcement was made.
*1130 3. All fishermen described in paragraph 2 are hereby prohibited from possessing salmon of a particular species in any area in which at that time fishing for that species by such person is prohibited by paragraph 2 of this order; provided that this paragraph shall not prohibit fishermen from transporting salmon caught in an open area through a closed area for the purpose of selling the catch.
4. Personnel of the National Marine Fisheries Service, the Coast Guard, the United States Marshal's Service and the Washington Department of Fisheries and persons lawfully deputized by any such agency may board fishing vessels for the purpose of investigating suspected violations of this injunction.
5. At the direction of any enforcement agent described in paragraph 4, all persons described in paragraph 2 are hereby ordered to stop their vessels, permit boarding by enforcement agents, permit themselves and their vessels to be photographed, permit their catch to be examined, identify themselves and their vessels to the satisfaction of the boarding enforcement agents, and produce either a valid Washington Department of Fisheries net salmon fishing license or a valid treaty Indian identification card for the then-current fishing season which, by this order, all fishermen are required to carry when engaged in any salmon fishing activity described in paragraph 2. Any fisherman failing to identify himself as provided herein may be placed under arrest and shall be taken before a United States Magistrate for proceedings pursuant to Rule 5 of the Federal Rules of Criminal Procedure.
6. The United States, through the Coast Guard, the National Marine Fisheries Service, the United States Marshal's Service, and such other agencies as may be appropriate, may serve copies of this injunction and other relevant orders or process on fishermen described in paragraph 2. All officers and Petty Officers of the United States Coast Guard and the National Marine Fisheries Service assigned by their respective superiors to carry out the provisions of this order are hereby appointed as process servers and agents of the court within the meaning of Title 18, United States Code, Sections 1501 and 1509. The orders, citations and papers required to be served by enforcement agents under this order are found to be judicial writs and process of this court within the meaning of Title 18, United States Code, Sections 1501 and 1509.
7. The State of Washington and the United States are ordered to maintain reasonable surveillance of the fishing areas affected by this order and to cite any fishermen who, having had notice of this injunction, thereafter continues or engages in any act prohibited by paragraphs 2 or 3 of this injunction or fails to do any act required by paragraph 5, to appear before the United States District Court to be ordered to show cause why he should not be held in contempt.
8. Nothing in this order shall relieve the defendant State of Washington or its agencies, officers and employees of any obligation under prior orders of this court including, but not limited to, the obligation under paragraph 8 of the injunction of March 22, 1974 (384 F.Supp. at 415-16), to diligently and vigorously enforce, as far as circumstances permit, their applicable statutes and regulations in order to safeguard the fish resources from depletion or destruction due to unlawful fishing by persons subject to the state's jurisdiction.
9. The issuance of this injunction is necessary to prevent irreparable injury to the plaintiff tribes and their members and to the salmon resource for which there is no adequate remedy at law.
10. The issuance of this injunction is necessary in aid of this court's jurisdiction and to protect or effectuate this court's judgments.
This injunction shall remain in effect until further order of this court.
NOTES
[1] The court would like to express its sincere appreciation to Andrew D. Gill, Esq., law clerk to the court, for his outstanding effort over an extended period of time, in assisting the court in summarizing, editing and assembling these orders.
[2] Dr. Richard R. Whitney is a professor in the College of Fisheries, University of Washington, where he has been leader of the Washington Cooperative Fishery Research Unit since 1967. At the time of his appointment by the court, Professor Whitney was supervising research projects in the unit which were affected by the State of Washington Department of Game and Department of Fisheries, the Quinault Tribe and the United States Fish and Wildlife Service, demonstrating an ability thereby to work with the parties in the case.

Professor Whitney has had a wide range of experience in fisheries throughout the United States having commenced his education in Utah (B.S. 1949, M.S. 1951, University of Utah) and completed it in Iowa (PhD 1955, Iowa State University). After receiving his doctorate, Dr. Whitney engaged in fisheries research projects at various locations across the United States, prior to accepting a position at the University of Washington.
[3] Exhibit A was a portion of Plaintiffs' brief and is summarized as follows:

The regulations and actions at issue here represent attempts by the state to conform to Paragraph 5 of the Interim Plan and Stay Order obligating them to make "significant reductions" in the non-Indian fishery in order to achieve Indian opportunities. By restraining such obligated reductions, the state court preliminary injunctions directly conflict with this court's earlier rulings. The questions now before this court are whether this court is empowered to protect its earlier rulings from such past and future incursions and, if so, by what means.
The power of the court to defend its judgments, even to the extent of restraining inconsistent state directives, is not seriously in doubt. This court has retained continuing jurisdiction to assure compliance with its judgment and decree. Conclusion of Law # 48 (384 F.Supp. at 405). That jurisdiction extends if necessary to staying state court judges.
The apparent clashes between state and federal courts presented here have been an inescapable ingredient of a dual court system since the early days of the Republic. See C. Wright, Law of Federal Courts, § 47 (2d Ed. 1970). Federal courts are reluctant to interfere with state court adjudications, a policy familiar and persuasive to this court. But the policy is one of restraint, not abdication. It is expressed today in the "anti-injunction statute," 28 U.S.C. § 2283:
"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."
Section 2283 is not a jurisdictional statute as such, but rather is an embodiment of long-established principles of comity. E. g., Hale v. Bimco Trading Co., 306 U.S. 375, 59 S.Ct. 526, 83 L.Ed. 771 (1939); Smith v. Apple, 264 U.S. 274, 44 S.Ct. 311, 68 L.Ed. 678 (1925); Wells Fargo and Company v. Taylor, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205 (1920). Thus, the statute, its exceptions, and case law interpreting it are useful vehicles for discussing the court's powers in this case.
A. A Federal Court May Act where Necessary in Aid of its Jurisdiction or to Protect or Effectuate Its Judgments
More than four years ago this court assumed jurisdiction over the question of what obligations the State of Washington owed to Indian tribes under the fishing rights provisions in the federal treaties. Final Decision # I made clear the obligation of the state to take action to assure treaty Indians an opportunity to harvest a greater number of fish in order to effect an equal sharing consistent with the language and intent of the treaties. This court specifically ordered the defendants to make reductions in non-Indian fishing. Thus, this court has assumed jurisdiction over the subject matter which nonparties have attempted to bring before the state courts. And it has rendered decisions and orders which would be effectively frustrated by the state courts' inconsistent injunctive orders. This presents a clear case of violation of comity principles where a federal court can and must act to preserve its jurisdiction and to assure that its rulings will have meaning and will be heeded. The exceptions to the comity doctrine and to section 2283 "imply that some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970).
Cases are legion which affirm the exercise of a federal court's power to prevent state court action from interfering with federal jurisdiction and from undermining federal court judgments. Many of these cases arose in situations such as the present where a federal court had forged remedies to protect the rights under federal law of a disadvantaged minority, only to be called upon immediately to defend its judgment from hostile flanking movements in the state courts. An example is Thomason v. Cooper, 254 F.2d 808 (8th Cir. 1958) where the federal court enjoined use of a state court injunction that had been obtained to prevent a school board from enrolling white children in an integrated school to carry out earlier federal court integration order. Accord, Grenchik v. Mandel, 373 F.Supp. 1298 (D.Md.1973); United States v. Texas, 356 F.Supp. 469 (E.D.Tex.1972).
In Montgomery County Board of Education v. Shelton, 327 F.Supp. 811 (N.D.Miss.1971) a federal court, having limited protest activities during school hours, later enjoined a more restrictive ex parte state court decree secured by nonparties to the federal action. The federal court said that "the effect of the state injunction will be to undermine and interfere with the prior orders of this court and to limit our flexibility in dealing with the multiple and complex problems which almost inevitably arise in the wake of school desegregation." 327 F.Supp. at 815. See also, Coffey v. Braddy, 372 F.Supp. 116 (M.D.Fla.1971) (federal court order regarding hiring practices in local fire department; attorney enjoined from pursuing sanctions for failure to comply with subsequently entered state court injunction); Concerned Consumers League v. O'Neill, 371 F.Supp. 644 (E.D.Wis. 1974) (federal injunction in consumer picketing controversy issued directly against state court judge although state court action was first in time).
Labor disputes also have occasioned conflicts between federal and state adjudications. In National Labor Relations Board v. Nash-Finch Co., 404 U.S. 138, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971), the Supreme Court upheld a federal injunction sought by the National Labor Relations Board to restrain enforcement of a state court antipicketing order secured by the company before the federal agency acted on the union's unfair labor practice charges. Accord, National Labor Relations Board v. Sunshine Mining Co., 125 F.2d 757 (9th Cir. 1942) (granting injunction sought by NLRB restraining persons from further prosecuting state court actions laying claim to funds payable to employees as back pay under federal court order).
Federal court injunctions also have been issued to effectuate judgments in cases outside of the sphere of major social conflicts. Donelon v. New Orleans Terminal Co., 474 F.2d 1108 (5th Cir. 1973), upheld an injunction to prevent relitigation of issues pertaining to track maintenance under the Federal Railroad Safety Act. The court explained: "While § 2283 was designed to ensure the state courts' adjudicative potency, its exceptions assure that the federal courts and their judgments will not be eunochized and that their muscularity will not be atrophied." 474 F.2d at 1114. See also Teas v. Twentieth Century-Fox Film Corp., 413 F.2d 1263 (5th Cir. 1969) (party enjoined from proceeding with state court suit in order to protect federal judgment awarding one-half of the royalties under an oil and gas lease); Miller v. Climax Molybdenum Co., 96 F.2d 254 (10th Cir. 1938) prosecution of state court suits affecting railroad properties in a way likely to threaten an ICC order enjoined); Fresno v. Edmonston, 131 F.Supp. 421 (S.D.Cal.1955) (state water rights proceedings enjoined on the theory, among others, that the "res" of the dispute was before the federal court).
We have here no unseemly race to the court-house such as often characterizes efforts to enjoin pending or threatened state prosecutions. Compare Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (granting injunction), with Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (denying injunction). This is a case where "the enjoining court, having previously adjudicated the case on the merits, would seem * * * in a better position to determine the extent and nature of duplication." Comment, 32 U.Chi.L. Rev., 471, 474 n. 17 (1965).
That which was so carefully decided by this court is hastily being undone by a series of proceedings hardly resembling contested cases. Each injunction issued has been without security and thus in clear violation of state law. See Irwin v. Estes, 77 Wash.2d 285, 461 P.2d 875 (1969); Evar, Inc. v. Kurbitz, 77 Wash.2d 948, 468 P.2d 677 (1970); RCW 7.40.080. In each case the state has virtually conceded the irreparable injury necessary for a preliminary injunction. Given the summary decision-making and leisurely pace towards any trial on the merits, these state injunctions effectively will determine whether there will be any significant restrictions on the non-Indian fishery in the coming year as decreed by this court. For all practical purposes the federal decision is facing suspension for another year without so much as a single witness being subjected to cross-examination in the state courts.
B. Federal Statutes Furnish a Basis for the Court's Action
There are at least two statutory authorizations for the type of order sought by plaintiffs. First, the All Writs Act, 28 U.S.C. § 1651, authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions." This authorization extends to granting injunctions against state adjudicative proceedings. Public Utilities Commission v. United Fuel Gas Co., 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1943); Fresno v. Edmonston, supra.
A second statutory basis for an injunction is found in the civil rights acts. The court, in part, is exercising its jurisdiction under 28 U.S.C. § 1343(3) and (4) to redress the deprivation, under color of state law, of rights secured by the Constitution, laws and treaties of the United States. Under 42 U.S.C. § 1983 the remedy available for such deprivations includes equitable relief. The Supreme Court has held that 42 U.S.C. § 1983 is within the "expressly authorized" exception to 28 U.S.C. § 2283. Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).
C. The United States and Indian Tribes Assert Superior Federal Interests Which Override the Comity Principle
The United States, together with the plaintiff tribes, has initiated this request to protect the court's rulings from the interference of inconsistent state court directives. The Supreme Court has held that where an injunction is sought by the federal government, the inhibitions of § 2283 vanish. The purpose according to the Court, is "not to hamstring the Federal Government and its agencies in the use of federal courts to protect federal rights." National Labor Relations Board v. Nash-Finch Co., supra. The origins of this federal government exception to § 2283 are traceable to Leiter Minerals, Inc. v. United States, 352 U.S. 220, 225-226, 77 S.Ct. 287, 290, 1 L.Ed.2d 267 (1957), where Mr. Justice Frankfurter said:
"The statute [§ 2283] is designed to prevent conflict between federal and state courts. This policy is much more compelling when it is the litigation of private parties which threatens to draw the two judicial systems into conflict than when it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest. The frustration of superior federal interests that would ensue from precluding the Federal Government from obtaining a stay of state court proceedings except under the severe restrictions of 28 U.S.C. § 2283 would be so great that we cannot reasonably impute such a purpose to Congress from the general language of § 2283 alone."
As stated in United States v. Wood, 295 F.2d 772, 783 (5th Cir. 1961), cert. denied 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9 (1962):
"Where the United States has instituted the suit we must assume that the considered judgment of the Attorney General has concluded that a violation of the national interest has taken place.
Here the United States, which stands in a guardian-ward relationship to Indians, has acted in pursuit of its special duties to protect their treaty fishing rights. Enforcement of such rights is a national goal of the highest order and clearly is a "superior federal interest." See President's Message to Congress, July 18, 1970.
In Alonzo v. United States, 249 F.2d 189 (10th Cir. 1957), cert. denied 355 U.S. 940, 78 S.Ct. 429, 2 L.Ed.2d 421 (1958), a federal district court enjoined prior state court proceedings against an Indian tribe and its officers involving rights to lands held by the tribe in restricted fee. The court of appeals upheld the federal court injunction under the superior federal interest doctrine of Leiter, finding that "since the United States is suing as a guardian of a dependent nation in discharge of a fiduciary duty, its right and duty to protect the interests of its wards may be even greater than it would be if it were suing in its own behalf with respect to its own lands." 249 F.2d at 197.
Superior federal interests have justified injunctions in many other contexts. E. g., United States v. Barrett, 442 F.2d 642, 646 (4th Cir. 1971) (Federal Housing Act); Brown v. Wright, 137 F.2d 484 (4th Cir. 1943) (rent control); United States v. Wood, supra, (voter registration).
The same reasoning that exempts federal plaintiffs from application of normal comity rules applies to Indian tribes. These tribes are not merely private parties in the sense that other civil litigants are. They appear here under 28 U.S.C. § 1362 as parties to treaties made with the United States. They are "distinct political communities," Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483 (1832), and stand in relation to the United States as "domestic dependent nations." Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1837). As a consequence, they have many attributes of sovereignty. For instance, they possess immunity from suits to which they do not consent in federal and state courts. See United States v. U. S. F. & G. Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); Thebo v. Choctaw Nation, 66 F. 372, 375 (8th Cir. 1895).
The legislative history of 28 U.S.C. § 1362 shows that it was intended to permit Indian tribes to litigate issues in federal court on the same basis as if the government had instituted the action. See H.R.Rep.No. 2040, 89th Cong., 2d Sess. (1966) quoted in part in Moses v. Kinnear, 490 F.2d 21, 25 n. 9 (9th Cir. 1973).
Recognizing this status of Indian tribes, the courts have applied the so-called "co-plaintiff" rule to allow the tribes to stand in the shoes of the government for various purposes if they properly might have been co-plaintiffs with the United States. The Ninth Circuit Court of Appeals has applied this rule to allow suits by Indian tribes to enjoin assessment of state taxes which are prohibited from being brought by private parties under 28 U.S.C. § 1341, on the same basis that such suits are permitted when the United States is plaintiff. Moses v. Kinnear, supra; Agua Caliente Band of Mission Indians v. County of Riverside, 442 F.2d 1184, 1186 (9th Cir. 1971), cert. denied 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972). See also, Walker River Paiute Tribe v. Sheehan, 370 F.Supp. 816, 821 (D.Nev.1973). Cf. United States v. Ahtanum Irrig. Dist., 236 F.2d 321 (9th Cir. 1956), cert. denied, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367, 330 F.2d 897 (9th Cir. 1964), 338 F.2d 307 (9th Cir. 1964), cert. denied, 381 U.S. 924, 85 S.Ct. 1558, 14 L.Ed.2d 683, in which the court found that Indian property rights could not be lost through laches or estoppel.
Because Indian tribes possess the essential aspects of sovereignty, normal consideration of comity applicable to private litigants do not apply to such tribes. As such, the co-plaintiff rule should apply and the federal anti-injunction statute, 28 U.S.C. § 2283, should be no bar to the requested injunctive relief. See National Labor Relations Board v. Nash-Finch Co., supra; Leiter Minerals v. United States, supra, 352 U.S. at 220-225, 77 S.Ct. 287.
The matter of this court's power to act under the circumstances as well as the need for such action are beyond question. The only issue is how best to exercise the court's authority to protect the federal judgment with a minimum of friction.
[4] Superseded as of October 11, 1978, by ¶ 8.3 and ¶ 8.4 of the Salmon Management Plan, p. 1112 infra and § IV of Steelhead Management Plan, p. 1119 infra.
[5] See p. 1097 infra for subsequent decision and order re Grays Harbor.
[6] The findings of fact and conclusions of law are numbered sequentially with those of the original decision of February 12, 1974, 384 F.Supp. at 348-405.
[7] The only such request was by the Makah Tribe with respect to the usual and accustomed fishing places of the Lower Elwha Tribe, paragraph # 3, supra. See court's order of March 10, 1976, p. 1066 infra.
[8] There are no Third Supplemental Findings or Conclusions and no Findings of Fact Nos. 268, 269 or 270.
[9] Appeal dismissed. 573 F.2d 1118 (9th Cir. 1978).
[10] There are no Conclusions of Law Nos. 53 or 54.
[11] Appeal dismissed as moot. 573 F.2d 1118 (9th Cir. 1978).
[12] The court initially stayed the injunction pending conclusion of scheduled discussions between the United States and Canadian government representatives. Following those discussions the original injunction was modified and the stay vacated on July 30, 1975.
[13] Appeal dismissed as moot. 573 F.2d 1118 (9th Cir. 1978).
[14] Appeal dismissed 573 F.2d 1118, 1121 (9th Cir. 1978).
[15] Appeals dismissed 573 F.2d 1117 (9th Cir. 1978).
[16] See pp. 1108, 1112-1113 infra for modification of this section.
[17] See also p. 1120 infra.
[18] No party has contested the assertion of the Lower Elwha Band that the herring usual and accustomed fishing places specified in the court's order are the same for the taking of anadromous fish.
[19] Specifically, "* * * the waters of Northern Puget Sound around the San Juan Islands, Whidbey Island and other places in Haro and Rosario Straits * * *" (Lower Elwha Memo p. 15).
[20] Counsel asserts that the Makah were warlike and aggressive in nature, "that Makah Elders have strong memories of fishing on rivers east of the Hoko," that the Makah have continuously and vigorously defended their fishing rights in court actions and that the Makah were "commercial middlemen in coastwise and Straits trade at Treaty times." (Makah memo p. 3)
[21] The Makah Tribe subsequently moved, pursuant to Rule 60(b)(2) Fed.R.Civ.P., for a rehearing to consider newly discovered evidence. The motion was granted September 10, 1976. The evidence pertained to new archeological diggings along the Hoko River and whether the artifacts uncovered there indicated prehistoric occupation and control of that river by the Makah or Clallam Tribe or both and whether that would affect the prior findings concerning control at the time of the 1855 treaties. Following the rehearing the court stated orally that the March 10, 1976, Order was still applicable unless and until modified. On November 28, 1978, the court denied the motion for relief from the prior judgment and affirmed the March 10, 1976, order.
[22] No salmon management plan was completed for 1976. A five-year plan was approved on August 31, 1977, and this order was continued in effect as therein modified. See p. 1107 infra.
[23] See pp. 1085 and 1118 infra for subsequent orders re steelhead management principles.
[24] Appeal dismissed April 5, 1977, rehearing denied May 4, 1977 (No. 76-3757 9th Cir. Unpublished).
[25] See 384 F.Supp. at 328.
[26] Puyallup I, II and III, as referred to in this order, are defined in Finding of Fact # 19, p. 1076 infra.
[27] Where a tribe is so incorporated this court's prior findings of fact have so stated. See, e. g., FF # s 60 and 133, 384 F.Supp. at 363 and 376.
[28] By an order of January 10, 1978, after further review and consideration of the advice of the Fisheries Technical Advisor, the provisions of this order were reinstated and extended to remain in effect until further order of the court.
[29] Appeal pending. (No. 77-1397 9th Cir.)
[30] Appeal dismissed 573 F.2d 1121 (9th Cir., 1978).
[31] The delay in the filing of the disqualification motion is explained by Mr. Johnson, Assistant Attorney General, as follows:

"There was some delay in the formal filing of the motion for disqualification. This is explained by the fact that the motion was filed with great reluctance only after full inquiry into the facts and review of the matters disclosed therein." (Defendants' Reply to United States Memorandum re Disqualification, p. 6, ls. 23-27).
[32] Mr. Johnson, in the state's reply memorandum and his affidavit, states that the 6/29/76 memo from me to "all counsel" titled "Phase 2  Proposed Visits by Court to Locations and Facilities Involved" (United States' Memorandum in Opposition to Motion to Disqualify Judge, Exhibit M) was not received by either him, the Washington Attorney General or their offices.

Throughout the history of this case, over the past several years, a memo addressed to "all counsel" has always been sent to all counsel of record in the case. In addition, Mr. Johnson, Assistant Attorney General and Mr. Gorton, Attorney General of the State of Washington each, under separate cover, receive a copy of anything sent from me "to all counsel." It is therefore highly unlikely that both Mr. Johnson and Mr. Gorton would not have received the 6/29/76 memo. However, even if the memo was not received, it contained no information which was not stated by me in open court on June 28, 1976, while Mr. Johnson was present. (See n. 36 infra). Moreover, following my remarks about the proposed inspections, I stated that a confirming memo would be sent out either later that day (6/28/76) or the next day (6/29/76). Surely, failure to receive an announced memorandum within a reasonable time should have then raised a question as to why it was not received and a copy requested.
[33] Henrici De Bracton, De Legibus Et Consuetudinibus Anglie Libra Quinque, Edited by Sir Traves Twiss, Q.C., D.P.C.L., Book 4 at 594-601. Also found in, IV Wigmore on Evidence (1972) at 362.
[34] In discussing the scope of judicial discretion, the Ninth Circuit has stated:

"A trial judge is more than a moderator or umpire." His responsibility is to preside in the manner and with the demeanor to provide a fair trial to all parties and his discretion in the performance of his duty and management is wide. (citations omitted)." United States v. Larson, 507 F.2d 385 (9th Cir. 1974).
[35] The affidavit of Dr. Whitney is the most detailed and thorough of any of those filed. None of the facts contained therein is contradicted by any of the other affidavits. (United States' Memorandum in Opposition to Motion to Disqualify Judge, Exhibit N).

In his affidavit on page 20 at lines 13 and 14, Dr. Whitney records the following incident which occurred during the third day of Inspection trip Number 5:
"Roger Wolcott (of the U.S. Fish and Wildlife Service) offered the judge a written report on the river and its fish runs. The judge handed it to Andy Gill who was standing beside me."
Neither Mr. Gill (my law clerk) nor I read the report, and neither of us will read it unless and until it is offered and admitted into evidence in Phase II.
[36] Transcript of June 28, 1976, pp. 51-53 (United States' Memorandum in Opposition to Motion to Disqualify Judge, pp. 7-8); Transcript of July 19, 1976, p. 78.
[37] See affidavit of Dr. Whitney. (United States' Memorandum in Opposition to Motion to Disqualify Judge, Exhibit N).
[38] Also see, Frank Haw letter to the Tacoma News Tribune, published July 11, 1976. (United States' Memorandum in Opposition to Motion to Disqualify Judge, Exhibit S).
[39] See, Hearings on S. 1064 Before the Sub-Comm. on Courts, Civil Liberties and Administration of Justice on the House Comm. on the Judiciary 93rd Cong. 2d Sess. Ser. 39 at 14-15 (1974).
[40] Affidavit of Dr. Whitney, p. 7, ls. 23-25; p. 27, ls. 2-1 (United States' Memorandum in Opposition to Motion to Disqualify Judge, Exhibit N).
[41] The state asserts that Canons 2 and 5(c)(4) of the Federal Code of Judicial Conduct establish my impartiality. However, the Reporter's Notes to the Code of Judicial Conduct, explaining the cited Canons, states:

"The Committee opted for a standard of `ordinary social hospitality.' The judge should not be excluded from all social relationships with lawyers or persons who are likely to be litigants in his court. The scope of permissible hospitality will vary somewhat from place to place, depending on local customs and practices. The Committee felt that there are common sense limits and that the standard is understandable . . ." Thode, Reporter's Notes to the Code of Judicial Conduct, 84 (1973) (Emphasis added).
[42] Affidavit of Dr. Whitney, p. 4, ls. 35-36; p. 5, ls. 1-1 p. 5, ls. 27-33; p. 23, ls. 30-35. (United States' Memorandum in Opposition to Motion to Disqualify Judge, Exhibit N).
[43] The words of the Senate Judiciary Committee when it submitted the 1974 provision to the Senate for enactment are pertinent:

"(I)n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are, in fact, seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a reasonable basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a `reasonable fear' that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice." S.Rep.No.93-419, 93rd Cong., 1st Sess. 1973, at 5 (emphasis in original).
[44] Affirmed 573 F.2d 1123, 1130-1132 (9th Cir. 1978).
[45] See also decision of November 22, 1974, p. 1038 supra.
[46] Affirmed 573 F.2d 1123 (9th Cir. 1978).
[47] Affirmed 573 F.2d 1123 (9th Cir. 1978).
[48] Affirmed 573 F.2d 1123 (9th Cir. 1978).
[49] See, p. 1117 infra.
[50] Affirmed 573 F.2d 1123 (9th Cir. 1978).
[51] Affirmed 573 F.2d 1123 (9th Cir. 1978).
[52] Several revisions were submitted within the specified period and were approved by the Fisheries Advisory Board and added to the plan by the court's order of April 21, 1978.
[53] Date as revised by Fisheries Advisory Board, May 30, 1978.